No. 25-60496

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAMES THOMAS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; DAWN ZIMMERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; L. E. JIBOL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821; MADISYN DONLEY, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ALEXIS COBBS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; KAREN ADERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, AND ENVIRONMENTS; WOMEN IN SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; GREG POWELL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAKOB CLARK, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ASHLEY ROGERS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Appellees*,

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; GEE OGLETREE, IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; STEVEN CUNNINGHAM, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; DONALD CLARK, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; ET AL.,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Mississippi
No. 3:25-cv-00417-HTW-LGI

## DEFENDANTS-APPELLANTS' OPENING BRIEF

LYNN FITCH
 *Attorney General*
SCOTT G. STEWART
 *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
 *Deputy Solicitors General*
DANIEL KIM
 *Assistant Solicitor General*
MISSISSIPPI ATTORNEY
 GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: justin.matheny@ago.ms.gov
*Counsel for Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

s/ *Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendants-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

The district court issued a preliminary injunction blocking an important state law that ensures that Mississippi public schools treat students and employees based on individual merit and performance, and without consideration of race, sex, color, national origin, or opposition to "diversity, equity, and inclusion." Oral argument would aid the Court in resolving the issues presented in this appeal.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS ..........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION .........................................................6

STATEMENT OF THE ISSUES...............................................................6

STATEMENT OF THE CASE ................................................................7

SUMMARY OF ARGUMENT ...............................................................21

STANDARD OF REVIEW.....................................................................21

ARGUMENT ..........................................................................................22

I.    This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional.........................................22

    A.    The District Court Failed To Perform The Demanding Facial Analysis That Applies To Plaintiffs' Claims.........................23

    B.    The District Court Erred In Ruling That The Challenged Provisions Likely Facially Violate The First Amendment...28

    C.    The District Court Erred In Ruling That The Challenged Provisions Are Likely Facially Void For Vagueness ............44

II.   Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction .......................51

CONCLUSION .......................................................................................57

iii

CERTIFICATE OF SERVICE.................................................................58

CERTIFICATE OF COMPLIANCE.......................................................58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AARP v. Trump,*
  145 S. Ct. 1364 (2025)........................................................................56

*Abbott v. Perez,*
  585 U.S. 579 (2018)............................................................................52

*Boring v. Buncombe County Board of Education,*
  136 F.3d 364 (4th Cir. 1998) (en banc) .............................................42

*Buchanan v. Alexander,*
  919 F.3d 847 (5th Cir. 2019).............................................................38

*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005).......................................... 33, 37, 40, 42

*City of Dallas v. Delta Air Lines, Inc.,*
  847 F.3d 279 (5th Cir. 2017).............................................................22

*Doe I v. Landry,*
  909 F.3d 99 (5th Cir. 2018)...............................................................44

*Evans-Marshall v. Board of Education of Tipp City,*
  624 F.3d 332 (6th Cir. 2010).......................................................37, 38

*Ex parte Young,*
  209 U.S. 123 (1908)............................................................................16

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006).......................................................................35, 36

*Hazelwood School District v. Kuhlmeier,*
  484 U.S. 260 (1988)..............................................................42, 43-44

*Kennedy v. Bremerton School District,*
   597 U.S. 507 (2022) ............................................................ 34, 35, 36

*Kleindienst v. Mandel,*
   408 U.S. 753 (1972) ........................................................................ 39

*Little v. Llano County,*
   138 F.4th 834 (5th Cir. 2025) (en banc) ................................ 22, 40, 50

*Martin v. City of Struthers,*
   319 U.S. 141 (1943) ........................................................................ 39

*McClelland v. Katy Independent School District,*
   63 F.4th 996 (5th Cir. 2023) ................................................. 24, 44, 46

*McConnell v. FEC,*
   540 U.S. 93 (2003) .......................................................................... 45

*Miller v. Johnson,*
   515 U.S. 900 (1995) ........................................................................ 42

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024) ................................... 3, 4, 20, 23-28, 31, 43, 46, 53

*NetChoice, LLC v. Fitch,*
   134 F.4th 799 (5th Cir. 2025) ............................................. 23, 24, 25, 27

*NetChoice, LLC v. Moody,*
   546 F. Supp. 3d 1082 (N.D. Fla. 2021) ............................................. 28

*NetChoice, LLC v. Paxton,*
   121 F.4th 494 (5th Cir. 2024) ......................................................... 27

*NetChoice, LLC v. Paxton,*
   573 F. Supp. 3d 1092 (W.D. Tex. 2021) ............................................. 28

*PETA, Inc. v. Gittens,*
   414 F.3d 23 (D.C. Cir. 2005) ........................................................... 33

vi

*Pickering v. Board of Education of Township High School District 205*,
391 U.S. 563 (1968) ........................................................................ 37

*Planned Parenthood of Greater Texas v. Kauffman*,
981 F.3d 347 (5th Cir. 2020) (en banc) ................................ 21-22, 27

*Pleasant Grove City v. Summum*,
555 U.S. 460 (2009) ................................................................ 32, 33

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
515 U.S. 819 (1995) ........................................ 33, 35, 41, 43

*Seyfried v. Walton*,
668 F.2d 214 (3d Cir. 1981) ................................................. 40

*Shurtleff v. City of Boston*,
596 U.S. 243 (2022) ................................................................ 32, 33

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
600 U.S. 181 (2023) ........................................... 42, 45, 46

*Tinker v. Des Moines Independent Community School District*,
393 U.S. 503 (1969) ............................................................. 41, 42

*Trump v. CASA, Inc.*,
145 S. Ct. 2540 (2025) .......................................... 54, 55, 56

*United States v. Conlan*,
786 F.3d 380 (5th Cir. 2015) ............................................. 45

*United States v. Williams*,
553 U.S. 285 (2008) .................................... 44, 45, 49, 51

*Virginia v. American Booksellers Ass'n*,
484 U.S. 383 (1988) .............................................................. 50

*Walls v. Sanders*,
144 F.4th 995 (8th Cir. 2025) ............................................ 40, 41

*Washington State Grange v. Washington State Republican Party*,
  552 U.S. 442 (2008) .............................................................. 51

*West Virginia State Board of Education v. Barnette*,
  319 U.S. 624 (1943) ............................................................. 41

*Willey v. Harris County District Attorney*,
  27 F.4th 1125 (5th Cir. 2022) ........................................... 22

*Wood v. Florida Department of Education*,
  142 F.4th 1286 (11th Cir. 2025) ....................................... 35

## Constitutional Provisions

U.S. Const. amend. I .... 2, 3, 4, 6, 12, 14, 15, 16, 19, 21-24, 26, 28, 31, 32,
                                    33, 35, 36, 39, 40, 43, 50

U.S. Const. amend. XIV ............................................. 15, 24, 50

## Statutes

28 U.S.C. § 1292 ......................................................................6

28 U.S.C. § 1331 ......................................................................6

2025 H.B. 1193 ................................. 1-6, 9-16, 19, 20, 21, 24-35, 37-55

## Rules

Fed. R. Civ. P. 23 ..................................................................56

Fed. R. Civ. P. 60 ..................................................................17

## Other Authorities

Ending Illegal Discrimination and Restoring Merit-Based Opportunity,
  Exec. Order No. 14173, 90 Fed. Reg. 8633 (2025).......................... 7, 31

Ending Radical Indoctrination in K-12 Schooling,
    Exec. Order No. 14190, 90 Fed. Reg. 8853 (2025)............... 7, 8, 32, 52

Letter from Hon. Henry T. Wingate (Oct. 21, 2025) .............................18

Letter from Sen. Charles E. Grassley (Oct. 6, 2025).......................17, 18

Office of the Attorney General,
    Guidance for Recipients of Federal Funding Regarding Unlawful
    Discrimination (July 29, 2025)................................................... 8, 9, 46

## INTRODUCTION

This Court should reject the district court's preliminary injunction blocking enforcement of Mississippi House Bill 1193, the State's recent effort to ensure that public schools treat students and employees based on individual merit and performance, and without consideration of race, sex, color, national origin, or opposition to "diversity, equity, and inclusion." The injunction rests on serious errors of law.

In recent years, schools around the country have embraced "diversity, equity, and inclusion" efforts in admissions, programming, hiring, staff training, and other aspects of academic life. Like a growing number of States, Mississippi has now chosen a different course. The State Legislature has determined that DEI efforts encourage treating individuals based on race, sex, or other characteristics unrelated to merit or intrinsic worth, and thus risk stigmatizing individuals based on crude stereotypes or denying individuals the opportunity to participate on an equal playing field. The Legislature has therefore decided that DEI efforts do not have a place in public schools. In April 2025, the Legislature adopted HB 1193 to prohibit public K-12 schools, colleges, and universities in the State from engaging in certain DEI-related activities. The Act bars public schools and their employees from, for example, giving preference in admissions or employment based on race, sex, color, or national origin; mandating that students or employees undergo "diversity training"; or endorsing specifically defined "divisive concepts,"

such as the odious view that certain persons are inherently racist or sexist. Schools that violate the Act can lose state funding.

Plaintiffs—two unions, two student groups, and a handful of public-school educators, students, and parents—brought a facial challenge against several of the Act's provisions. Plaintiffs purport to sue on behalf of themselves and their children and as class representatives of all educators, students, and parents of minor students at public K-12 schools, colleges, and universities in Mississippi. They claim that some of the Act's prohibitions violate the First Amendment and are unconstitutionally vague.

The district court granted a preliminary injunction. On the First Amendment claims, the court ruled that the challenged provisions disfavor certain DEI-related speech and viewpoints and chill academic freedom. The court recognized that the Act on its face regulates public institutions and employees, and not private, individual speech. But the court believed that the Act would infringe educators' and students' individual free-speech rights. On the vagueness claim, the court ruled that the Act lacks clear definitions and might encompass any historical works, course materials, and fields of study that touch on race, sex, or gender. The court recognized that the Act defines key terms and includes exceptions for (among other things) scholarly research and creative works by students and faculty. But the court deemed the definitions and exceptions inadequate to prevent the Act from affecting in-school speech

and association. On the equities, the court relied on its merits rulings and credited plaintiffs' claims of harm from chilled speech. The court refused to limit relief to the named plaintiffs, and although plaintiffs never moved for class certification, the court granted universal injunctive relief on the challenged provisions on a "statewide" and "class-wide" basis.

This Court should reject the preliminary injunction.

*First*, the district court erred when it ruled that plaintiffs will likely win on their facial First Amendment and facial vagueness claims.

To start, the district court failed to apply the standards that govern facial claims. When ruling on a facial challenge, a court must conduct a rigorous two-step "inquiry" to assess whether the plaintiff has "carr[ied]" the demanding "burden" that makes such a challenge so "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718, 723, 744 (2024). The court must first "assess" the relevant law's "scope" by "determin[ing]" each challenged provision's "full set of applications." *Id.* at 718, 724. The court must then "decide which of the law['s] applications violate" the Constitution and "compare" the law's valid and invalid applications to decide whether "the constitutionally impermissible" applications are pervasive enough for success on a facial challenge. *Id.* at 725-26. The district court here did nothing like this. Rather than conduct step 1, it simply block-quoted (some of) the Act's challenged provisions and repeated plaintiffs' atextual view that those provisions bar countless "books, historical concepts, subjects, student organizations, and even

fields of study" simply for "touch[ing] on issues of race, sex, etc."
ROA.978, 979-980. The court never assessed "how" the challenged
provisions actually "work[ ] in all of [their] applications." 603 U.S. at 744.
At what should have been step 2, the court never acknowledged the Act's
many permissible applications or "compare[d]" those applications to any
properly found impermissible ones. *Id.* at 726. The court simply accepted
plaintiffs' self-serving (and facially absurd) assertion that they "could
think of no constitutional applications of the challenged provisions."
ROA.980. And the court faulted defendants for not offering "evidence" of
the Act's constitutional applications, even though plaintiffs bear the
burden of showing an entitlement to facial relief. ROA.980. Vacatur is
required on this basis alone: this facial injunction plainly cannot stand.

Next, plaintiffs' facial First Amendment claims fail. Plaintiffs claim
that the challenged provisions flunk viewpoint neutrality and infringe on
educators' and students' free-speech rights. In fact, the Act regulates the
conduct and messaging of public schools and officials solely in their
capacities as government employees. States can regulate public
employees in the course of their duties without raising First Amendment
concerns. And the Act's prohibitions do not apply to individual students:
the Act regulates public schools and officials. Moreover, even if the Act
affected students' in-school experience, students do not have a right to
dictate a State's curriculum: rather, the State is entitled to regulate to
pursue legitimate pedagogical concerns. Principles of academic freedom

do not change this analysis. The Act includes specific protections for academic freedom: it expressly carves out scholarly research, creative works, and compliance with academic-accreditation standards. And its prohibitions target DEI-related conduct and messaging that States may lawfully exclude from public schools.

Last, plaintiffs' facial vagueness claim fails. The Act uses plain language and includes comprehensive definitions for key terms. The Act clearly defines each of the "divisive concepts" it bars public schools from perpetrating on students. At the least, the Act's clear language and defined terms show that the Act has a plainly legitimate sweep and is not vague in all or most applications. That dooms plaintiffs' facial claim.

*Third*, equitable factors also require reversal. In ruling that the equities favored plaintiffs, the district court relied on its flawed merits rulings and on a misreading of the Act. The injunction is profoundly damaging: it blocks a law that helps to ensure that public-school students and employees remain free from DEI-related discrimination. The Act also helps to ensure that Mississippi schools remain eligible for essential funding that the federal government has pledged to deny to schools that undertake certain DEI-related activities. On top of this, the injunction exceeds the district court's equitable authority. The Supreme Court recently affirmed that federal courts cannot issue "universal" injunctions that bind non-parties. Yet that is the relief the district court ordered here. It should not stand.

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. On August 18, 2025, the district court issued an order preliminarily enjoining enforcement of the Act's challenged provisions. ROA.960-981. On September 16, 2025, the Attorney General filed a timely notice of appeal. ROA.1078-1080. This Court has jurisdiction under 28 U.S.C. § 1292.

## STATEMENT OF THE ISSUES

I. Should this Court reject the preliminary-injunction order because: (A) the district court failed to perform the required facial analysis that applies to plaintiffs' claims; (B) the Act does not facially violate the First Amendment because it lawfully regulates the conduct and messaging of government institutions and employees; and (C) the Act is not facially vague because it uses plain terms and has clear definitions such that a reasonable person can tell what it requires?

II. Should this Court reject the preliminary-injunction order because: (A) the equities weigh against blocking the Act, which ensures that public-school students and employees are treated based on individual merit and performance and not demographics; and (B) the universal relief it grants exceeds the district court's equitable authority?

6

## STATEMENT OF THE CASE

### A.    Factual Background

1. On January 21, 2025, President Trump issued an executive order titled Ending Illegal Discrimination and Restoring Merit-Based Opportunity. Exec. Order No. 14173, 90 Fed. Reg. 8633 (2025). That order explains that "race- and sex-based preferences" adopted "under the guise of so-called 'diversity, equity, and inclusion'" can "undermine the traditional American values of hard work, excellence, and individual achievement." *Id.* at 8633. And in some cases, the order explains, DEI-related policies and initiatives may "violate" "longstanding Federal civil-rights laws" by denying "opportunities" to individuals based on "race," "sex," or other protected characteristics. *Ibid.* Soon after, the President issued an executive order called Ending Radical Indoctrination in K-12 Schooling. Exec. Order No. 14190, 90 Fed. Reg. 8853 (2025). That order observes that "[d]iscriminatory equity ideolog[ies]" can be used to "indoctrinate" students on race, sex, national origin, and similar topics. *Id.* at 8853. And such indoctrination, the order says, can "violate[ ] longstanding anti-discrimination" "law[s]" if (for example) it "promotes racial discrimination" or undermines "sex-based equality and opportunity." *Ibid.* The order defines "[d]iscriminatory equity ideology" as any ideology that "treats individuals as members of preferred or disfavored groups, rather than as individuals"; "minimizes agency, merit, and capability in favor of immoral generalizations" on "race, color, sex, or

national origin"; or teaches that "[v]irtues such as merit, excellence, hard work, fairness, neutrality, objectivity, and racial colorblindness are racist or sexist." *Id.* at 8853-54. The order directs the federal government to "eliminat[e] [f]ederal funding" for schools that practice "illegal and discriminatory treatment and indoctrination" through "discriminatory equity ideology." *Id.* at 8854.

In February 2025, the U.S. Department of Education issued a "Dear Colleague" letter stating that "colleges, universities, and K-12 schools" that receive federal funds may "violate[ ] the law" if they use "race" and other protected characteristics to make "decisions pertaining to admissions," "hiring," and "other aspects of student, academic, and campus life." ROA.565-566. "DEI programs," the letter explains, may be unlawful if they "preference certain racial groups," "stigmatize students ... based on crude racial stereotypes," or "deny students the ability to participate fully in the life of a school." ROA.567. The letter stresses that "[i]nstitutions that fail to comply with federal civil rights law[s] ... face potential loss of federal funding." ROA.568.

The U.S. Attorney General later issued guidance to recipients of federal education funding, stating that—"except in rare cases"—"[u]sing race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities" "is unlawful." Office of the Attorney General, Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination at 2 (July 29, 2025)

(AG Guidance), bit.ly/47DQyKI. The guidance details how DEI-related discrimination may jeopardize federal-funding eligibility and risk other legal, financial, and reputational harms. *Id.* at 4-9.

2. Against this backdrop, the State of Mississippi in April 2025 enacted House Bill No. 1193. The Act's stated purpose is to "prohibit public schools and public postsecondary educational institutions from ... engaging in discriminatory practices." § 1. Consistent with the orders and guidance described above, the Act "seeks to ensure that employment, academic opportunities and student engagement are based solely on individual merit, qualifications and academic performance, without consideration of an individual's race, sex, color, national origin, or expressed opposition to, or refusal to affirm or participate in, [DEI]." *Ibid.*

Section 2 of the Act defines terms. Section 2(a) defines "[d]iversity, equity and inclusion" to include "[a]ny effort": to "select or influence the composition of [a] faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin"; to "promote differential treatment of or provide special benefits to individuals in employment or admissions based on race, sex, color or national origin"; to "promote or promulgate policies and procedures designed or implemented to favor individuals based on race, color or national origin"; or to "require trainings, programming, or activities designed and/or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual

orientation." § 2(a)(i)-(iv). Section 2(d) defines "[d]iversity training" to mean "any formal or informal education, seminars, workshops or institutional program[s] that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." § 2(d). And Section 2(e) lists a series of "[d]ivisive concepts," which include: (i) that one "race, sex, color, or national origin is inherently superior to another"; (ii) that an individual "is inherently racist, sexist, or oppressive" "by virtue of his or her race, sex, color, national origin"; (iii) that individuals "should be discriminated against or treated adversely solely because of their race, sex, color, or national origin"; (iv) that individuals "cannot and should not attempt to treat others without respect to" "race," "sex," "color," "national origin," "gender identity," or "sexual orientation"; (v) that an individual's "moral character is necessarily determined by his or her race, color, sex, or national origin"; (vi) that an individual "bears responsibility for actions committed in the past by other members of" his or her "race, color, sex or national origin"; (vii) that an individual "should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race, color, sex, or national origin"; and (viii) that "[m]eritocracy or traits such as hard work ethic are racist or sexist, or were created by a particular class to oppress another class." § 2(e)(i)-(viii).

Section 3 sets out the Act's prohibitions. It requires that listed state agencies "ensure" that educational "institution[s]," "college[s]," and

"public school[s]" (referred to collectively here as "schools") "shall not" engage in certain DEI-related practices. For example, section 3 bars schools from "[r]equir[ing]" "diversity statements" as part of any "hiring," "contract[-]renewal," "evaluation," or "promotion process" (§ 3(d)) and from "[g]iv[ing] preference based on race, sex, color or national origin" in "employment" or "contract[ing]" (§ 3(e)). Most relevant here:

- Section 3(b) bars schools from "[e]ngag[ing] in divisive concepts as defined in" section 2(e);

- Section 3(f) bars schools from "[m]aintain[ing] any programs, including academic programs or courses, or offices that promote [DEI], [or] endorse divisive concepts or concepts promoting transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts";

- Section 3(g) bars schools from "[r]equir[ing]" "any person to participate in [DEI] training" "as a condition of enrolling," "accepting employment," or "being awarded a contract"; and

- Section 3(i) bars schools from "[r]equir[ing] any 'diversity training' ... or any other policies or procedures that result in any formal or informal education, seminars, workshops or institutional program[s] that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

Section 3 states that the prohibitions apply to "institution[s]"—public elementary and secondary schools, public charter schools, and public colleges and universities. *See also* § 2(f), (g) (defining "[p]ublic school[s]" and "[p]ublic postsecondary education institutions").

Section 5 sets out exceptions from the Act's application. Most relevant here:

- Section 5(b) excepts "[s]cholarly research" and "creative work[s] by students, faculty, employee[s] or staff," and "the dissemination of [such] work[s]";

- Section 5(c) excepts any "activity of a registered student organization, guest speaker or performer at" a school "as long as state funds are not used";

- Section 5(d) excepts any "policy to limit or restrict freedom of speech pursuant to the First Amendment ... or Section 13 of the Mississippi Constitution or academic course instruction that undermines the duty of a public school" "to protect academic course instruction, intellectual diversity and true expression provided that none of these protected tenets conflict with the [A]ct";

- Section 5(h) excepts "requiring or taking action against a student, employee, faculty [member], staff [member] or contractor for failing to comply with federal or state law";

- Section 5(i) excepts "[d]iscussing pathological approaches or experience with students with ... disabilities"; and

- Section 5(j) excepts "complying with" "academic accreditation standards or requirements."

Section 7 requires state agencies to adopt a "complaint process" and "procedures" for "investigating" alleged "violations" of the Act. § 7(1)-(2). It authorizes public-school employees, faculty members, students, and parents to "assert a violation" of the Act by "fil[ing] a formal complaint" with the relevant agency. § 7(3); *see* § 7(4)-(5). And it requires agencies to "investigate" "reported" or "potential violation[s]" and to issue "formal" "finding[s]." § 7(6)(a). If an agency "finds a violation," the offending

"public school" has 25 days to "cure all actions relating to the violation." § 7(6)(b). If the violation "remain[s] uncured" beyond that 25-day period, an "aggrieved party" may seek "injunctive relief." *Ibid.*

Section 8 provides that if a "public school" "is determined, through final adjudication," "to be in violation of" the Act, and that violation is "not cured" within 30 days of a "formal" "finding" that the school has committed a "subsequent violation[ ]," then the State "shall withhold" certain state funds from the school. § 8(1). Funding may resume when the "violating entity demonstrates full compliance" with the Act. § 8(2).

Section 9 provides that a person "aggrieved by the action" of an agency that receives a complaint of a violation may "notify the Attorney General." § 9(1)(a). If the relevant school "has failed to cure" the violation within 30 days, the Attorney General may seek a "writ of mandamus" to compel "compl[iance] with [the Act]." § 9(1)(b). A court "may award relief in the form of an injunction and/or actual damages." § 9(2).

The Act took effect on April 17, 2025. *See* § 11.

## B.    Procedural History

1. On June 9, 2025, plaintiffs filed this lawsuit challenging parts of the Act. ROA.35-69. Plaintiffs filed two amended complaints. ROA.303-341, 982-1027. The operative second amended complaint was the first to include class-action claims. Complaint (ROA.982-1027).

Plaintiffs include a public-school-teachers union and a college-faculty and graduate-student union; two student groups; a handful of

individual professors, teachers, graduate students, and parents of K-12 students; and a school librarian. Complaint ¶¶ 12-32 (ROA.987-994). Plaintiffs purport to bring this lawsuit on behalf of themselves and their minor children, and as a class action. *Id.* ¶¶ 113-25 (ROA.1019-1022). They seek to represent two classes: (1) "[a]ll educators at postsecondary public educational institutions and K-12 public schools in Mississippi," and (2) "[a]ll students and parents or guardians of minor students at postsecondary public educational institutions and K-12 public schools in Mississippi." *Id.* ¶¶ 115-16 (ROA.1020). Plaintiffs sued the Attorney General and members of several state agencies involved in implementing the Act. *Id.* ¶¶ 33-37 (ROA.994-995).

Plaintiffs bring four sets of claims and seek declaratory and injunctive relief. Complaint ¶¶ 126-41 & pp. 44-45 (ROA.1022-1026).

First, plaintiffs allege that certain prohibitions in section 3 of the Act impose content- and viewpoint-based restrictions that violate educators' and students' First Amendment free-speech rights. Complaint ¶¶ 126-38 (ROA.1022-1024). Plaintiffs challenge four prohibitions: section 3(b) ("[e]ngage[ment] in divisive concepts"); section 3(f) ("programs" and "offices" that "promote [DEI]" or "endorse divisive concepts"); section 3(g) ("[r]equire[ments]" to "participate in [DEI] training"); and section 3(i) ("diversity[-]training" "[r]equire[ments]," "policies," and "procedures"). They claim that those provisions "prohibit[ ]" "educators" and "students" "from speaking about disfavored

topics," "den[y] student[s]" the right "to receive information" and "to learn from [certain] viewpoints and content," and jeopardize "student group funding." *Ibid.* (ROA.1022-1024).

Second, plaintiffs allege that certain provisions are unconstitutionally vague under the First and Fourteenth Amendments. Complaint ¶ 139 (ROA.1024-1025). They claim that the Act's prohibitions in sections 3(b), 3(f), 3(g), and 3(i), the exceptions from the Act's application in sections 5(b), 5(c), 5(d), 5(h), 5(i) and 5(j), and the consequences for violating the Act in sections 7, 8, and 9 "are vague, confusing, and overbroad," "do not allow people of ordinary intelligence to distinguish prohibited speech from permissible speech," and "allow for arbitrary and capricious enforcement." *Ibid.* (ROA.1024-1025).

Third, plaintiffs claim that section 3(b) violates the Fourteenth Amendment's Equal Protection Clause. Complaint ¶ 140 (ROA.1025). They claim that section 3(b) ("[e]ngage[ment] in divisive concepts") unlawfully "singl[es] out and prohibit[s] engagement with 'issues related to race, sex, color, gender identity, sexual orientation or national origin.'" *Ibid.* (quoting § 3(b)) (ROA.1025).

Last, plaintiffs allege that section 8 violates the Fourteenth Amendment's Due Process Clause. Complaint ¶ 141 (ROA. 1025). They claim that by "withdraw[ing]" "state funding" from schools with "two uncured violations" of the Act, section 8 will "deprive[ ]" "[s]tudents ... of their education" and educators "of their jobs." *Ibid.* (ROA. 1025).

Plaintiffs challenge each listed provision on a facial, rather than an as-applied, basis. Complaint ¶¶ 126-41 & pp. 44-45 (ROA.1022-1026); *see* ROA.1106 ("[t]his is a facial challenge"); ROA.1108-1109; ROA.636-637.

2. On July 20, the district court granted a TRO blocking enforcement of the challenged provisions. ROA.696-710. The court first ruled that plaintiffs "alleged sufficient imminent harm" to show standing "[a]t th[at] preliminary stage" and that "at least some" of plaintiffs' claims "f[e]ll within the exception to [sovereign] immunity recognized in *Ex parte Young*, 209 U.S. 123 (1908)." ROA.700-701. On the merits, the court ruled that plaintiffs were likely to succeed on their claims that the Act's "restrictions" unlawfully "target specific viewpoints" and that the Act's "terms" (like "'divisive concepts,'" "'gender identity,'" and "'promotion'") are unconstitutionally vague. ROA.702-703. The court also ruled that strict scrutiny likely applies and that the Act likely fails that standard. ROA.703-705. Finally, the court ruled that plaintiffs showed a likelihood of irreparable harm from a "[d]eprivation of First Amendment rights" (ROA.705) and that the "balance of equities" and the "public interest" weighed in plaintiffs' favor (ROA.706-708, 708-709).

On July 22, defendants moved to clarify the TRO. ROA.716-722. Defendants noted that the order contained significant errors—including references to parties, allegations, evidence, and statutory language that did not exist—and asked the court to "clarify or correct" those "indisputable factual inaccuracies." ROA.716-720; *see* ROA.743-761

16

(original TRO). That day, the court (without explanation) removed the original TRO from the docket and swapped in a "corrected" order, which the court backdated to July 20. *See* D. Ct. Dkt. 51; ROA.28, 696-710.

On July 28, defendants filed a second motion to clarify. ROA.734-812. Defendants maintained that the parties (and the Fifth Circuit) are entitled to a complete and accurate record. ROA.737-739. Defendants therefore requested that the court restore the original TRO order to the docket and provide an explanation for the errors in that order, especially given the public scrutiny the errors had received. ROA.737-740.

On August 1, the district court denied defendants' motion. ROA.884-885. The court said that its "original" TRO order "contained clerical errors referencing improper parties and factual allegations," that the court "promptly corrected those errors" by "issu[ing]" a corrected order, and that Fed. R. Civ. P. 60(a) and the court's "inherent authority" "permit[ted] correction of clerical mistakes and errors arising from oversight or omission." ROA.884. The court said that it was "not obligated to preserve superseded orders containing clerical errors" and that "[n]o further explanation" was "warranted." ROA.885.

After that, U.S. Senator Charles E. Grassley sent a letter to the district court, expressing concern that the court had used artificial intelligence to prepare the TRO. Letter from Sen. Charles E. Grassley (Oct. 6, 2025), bit.ly/42tKEKg. The letter said that the order's "substantive errors"—and the lack of any explanation by the court—

17

"undermine[d] confidence in the [c]ourt's deliberative process." *Id.* at 2. And the letter said that it was "particularly concerning" that the court "characterize[d]" the errors as "'clerical,'" which "raise[d] serious doubts" about whether the court was "affording" this case due "care and accuracy." *Ibid.*

In response to Senator Grassley's letter, the district court explained that a law clerk had indeed used AI as a "drafting assistant" for an "early" version of the TRO, which was "mistake[nly]" "docketed" without undergoing "review." Letter from Hon. Henry T. Wingate at 1 (Oct. 21, 2025), bit.ly/430akP3. The court said that it "removed the inaccurate [o]rder from public view" to avoid "confus[ion]" in "future cases." *Id.* at 2. And the court said that it had described its errors as "'clerical'" "to signify that the mistakes were due to a failure to confirm the accuracy of certain information rather than errors in core legal reasoning or the ultimate judgment on the merits." *Ibid.*

3. After the preliminary-injunction motion was briefed, the court held an evidentiary hearing on August 5 and 6. *See* ROA.31. Plaintiffs called three witnesses: a plaintiff sociology professor with children in Mississippi public schools, a Ph.D. student who is the treasurer of a plaintiff student group, and a law-school professor. ROA.962-963.

On August 18, the district court granted a preliminary injunction. ROA.960-981. The court first reiterated its prior rulings from the TRO that plaintiffs had standing at the "pre-discovery stage[ ]" and that

18

plaintiffs' claims were not barred by sovereign immunity. ROA.964-966. The court then "incorporate[d]" its prior merits rulings and said that the Act "fails to treat speech in a viewpoint-neutral manner," "risks ... the chilling of expression and academic freedom," and "is unconstitutionally vague." ROA.976-981. (The court did not address the equal-protection or due-process claims, which plaintiffs did not raise in their motion.)

On free speech: The court rejected defendants' view that the Act "regulate[s]" the conduct and messaging of government "institutions" and "employees." ROA.977. The court recognized that the Act "purport[s] [to] regulat[e]" government "institutions," but such regulation, the court said, "may cast a broad malaise of self-censorship that would necessarily trickle down to classroom instruction, teacher-student engagement with curriculum, and the ability of students to associate." ROA.977. Though the order is unclear on this point, the court seems to have ruled that these effects violate the First Amendment. ROA.976-978; *see* ROA.702-709.

On vagueness: The court credited plaintiffs' view that the Act may bar many "books, historical concepts, subjects, student organizations, and even fields of study." ROA.979-980; *see* ROA.977-980 (suggesting that the Act may "forbid discussion" of "Dr. Martin Luther King, Jr.," "*Of Mice and Men*," and "Greek mythology"). The court said that the vagueness concerns were magnified because the Act "has a mouthful of sharp teeth which could inflict deep bites" through potential loss of funding. ROA.980. And the court said that the Act's "exceptions" in

section 5 "raise more questions than they answer" and "provide little comfort to the educators and students." ROA.979.

On facial relief: The court said that plaintiffs made the showing "supposedly necessary" for facial relief "under *Moody v. NetChoice*," in part because plaintiffs "affirmatively stated that they could think of no constitutional applications of the challenged provisions." ROA.979-980. Although the court recognized that defendants "carry no burden" at the preliminary-injunction stage, the court faulted defendants for "not offer[ing] competent evidence and argument as to constitutional applications adequately to rebut [p]laintiffs' showing." ROA.980.

On the scope of relief: The court declined to limit relief to the named plaintiffs. ROA.975-976. The court said that "injunctions ... should be all-or-nothing renditions" and that it "disfavor[ed] an injunction of limited geographical and personal capacity." ROA.975. It added that "[s]omething less than a statewide preliminary injunction would be insufficient to afford complete relief to the[ ] putative plaintiffs." ROA.976. Even though plaintiffs did not move for class certification, the court purported to grant relief both "statewide" and "class-wide." ROA.960-961, 975-976. The court enjoined defendants from enforcing sections 3(b), 3(f), 3(g), and 3(i) and from taking any action in furtherance of those sections under sections 7, 8, and 9. ROA.981.

Defendants timely appealed. ROA.1078-1080.

## SUMMARY OF ARGUMENT

I. This Court should reject the preliminary-injunction order on the merits. The district court failed to perform the facial analysis that applies to plaintiffs' claims, which alone requires vacatur. And plaintiffs failed to show that the Act facially violates the First Amendment: the Act lawfully regulates the conduct and messaging of public institutions and employees and does not violate educators' or students' free-speech rights. Plaintiffs also failed to show that the Act is facially void for vagueness: the Act relies on plain language that reasonable people can understand, defines key terms, and (at the least) has a plainly legitimate sweep.

II. The preliminary-injunction order also cannot stand because it rests on an erroneous assessment of the equities and grants relief that exceeds the district court's equitable authority. Enjoining the Act harms the State and its citizens. The Act serves the State's compelling interest in ensuring that public-school students and employees are treated based on individual merit and performance, and not demographics. Even if some injunctive relief were warranted, the relief the district court ordered exceeds its authority. Article III and equitable principles dictate that injunctive relief cannot extend to nonparties, and so the universal relief the district court ordered cannot stand.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy." *Planned Parenthood of Greater Texas v. Kauffman*, 981 F.3d 347, 353 (5th Cir.

2020) (en banc) (cleaned up). A movant must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Willey v. Harris County District Attorney*, 27 F.4th 1125, 1129 (5th Cir. 2022). This Court "review[s] the district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion," but it reviews "a decision grounded in erroneous legal principles de novo." *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017) (cleaned up). "By definition, a district court abuses its discretion by granting a preliminary injunction based on incorrect legal principles." *Little v. Llano County*, 138 F.4th 834, 842 n.7 (5th Cir. 2025) (en banc).

## ARGUMENT

This Court should reject the preliminary-injunction order.

## I.    This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional.

The district court ruled that plaintiffs will likely win on their facial First Amendment claims (ROA.976-978; ROA.971-972, 974) and facial vagueness claim (ROA.976-981; ROA.971-972, 974). The court erred.

**A.    The District Court Failed To Perform The Demanding Facial Analysis That Applies To Plaintiffs' Claims.**

The district court failed to "perform[ ] the facial analysis" that applies to plaintiffs' claims. *Moody v. NetChoice, LLC*, 603 U.S. 707, 726 (2024). Vacatur is warranted on this basis alone.

Plaintiffs "chose to litigate th[is] case[ ] as [a] facial challenge[ ], and that decision comes at a cost." *Moody*, 603 U.S. at 723; *see* Complaint ¶¶ 126-41 & pp. 44-45 (ROA.1022-1026); ROA.1106; ROA.1108-1109; ROA.636-637. "[F]acial challenges" are "hard to win," and courts must undertake a rigorous "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs such challenges. *Moody*, 603 U.S. at 718, 723, 744. First, a court must "assess" the challenged law's "scope" by "determin[ing]" its "full set of applications." *Id.* at 724, 718. As part of that assessment, a "court must determine what activities and what actors are regulated, and whether the law regulates or prohibits those actors from conducting those activities." *NetChoice, LLC v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025). Second, the court must "decide which of the law['s] applications" (if any) violate the Constitution, and then "compare" the law's "constitutionally impermissible and permissible" applications. *Moody*, 603 U.S. at 725, 726. A facial First Amendment claim can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. And a facial vagueness challenge can succeed "only" if the law "is

impermissibly vague in all of its applications." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023). A court must assess whether the plaintiff has made the required showing for each challenged provision. *See Moody*, 603 U.S. at 724-26, 727 n.3 (using provision-by-provision analysis). The burden on a plaintiff is thus considerable. But that is the "price" of challenging a law on its face rather than as applied. *Id.* at 744. And a court must hold a plaintiff to its burden rather than "disregard the requisite inquiry." *Ibid.*

The district court here conducted nothing like the "requisite inquiry." The court never even mentioned *Moody* in addressing plaintiffs' facial First Amendment claims. ROA.974, 979-980; *see* ROA.702. And on the facial vagueness claim, the court said that *Moody* "supposedly require[s]" the analysis set out above—but the court refused to perform that analysis. ROA.974; *see* ROA.979 (*Moody* analysis "supposedly necessary"). *Moody* does not "supposedly require" that analysis: It "mandate[s]" that courts perform a "detailed factual analysis" to assess whether a plaintiff "carried its burden of showing that it is substantially likely to succeed in its contention that [a law] is unconstitutional under a First Amendment facial challenge and a Fourteenth Amendment vagueness challenge." *Fitch*, 134 F.4th at 803, 808 (applying *Moody*).

The district court defied *Moody* across the board. At step 1, the court did not assess "how" the Act's challenged provisions actually "work[ ] in all of [their] applications." 603 U.S. at 744. The court did not,

24

for example, "determine what activities" the challenged prohibitions in section 3 actually "regulate[ ]" (*Fitch*, 134 F.4th at 807)—admissions, hiring, staff trainings, faculty evaluations, in-class instruction, etc. Instead, the court block-quoted (some of) the challenged prohibitions (ROA.967-969) and then noted (without analysis) that plaintiffs "identified" "books, historical concepts, subjects, student organizations, and ... fields of study" that are "arguably" covered by the Act's "restrictions" (ROA.979-980). The court also did not consider how the Act's exceptions in section 5—including for "[s]cholarly research," "creative work[s]," "student[-]organization" "activit[ies]," and "compl[iance] with" "academic accreditation standards," § 5(b), (c), (j)—cabin the challenged prohibitions' application. The court simply declared (again, without analysis) that the exceptions "raise more questions than they answer." ROA.979. Nor did the court determine what actors the Act's prohibitions govern—teachers, administrators, support staff, etc.—or consider whether they apply to public-school officials solely in their professional capacities. Instead, the court speculated that the Act's "regulations"—which (the court acknowledged) "aim[ ]" at government "institutions" and not "individual speech"—"almost assuredly would spill over to the public." ROA.977. The court's "terse" analysis shows that it "did not address the full range of activities the [Act] cover[s], as required by *Moody*." *Fitch*, 134 F.4th at 808 (cleaned up).

25

The district court's missteps at step 1 guaranteed that it would fail to "perform[ ]" the rest of the "facial analysis." *Moody*, 603 U.S. at 726. And indeed, at what should have been step 2, the district court failed to account for the Act's many permissible applications and never "compare[d]" those applications to any properly found impermissible ones. *Ibid.* Instead, the court sidestepped the Act's permissible applications by accepting plaintiffs' self-serving claim that they "do not seek to challenge [the Act's] prohibitions on unlawful discrimination." ROA.968. In fact, the provisions that plaintiffs challenge themselves target "unlawful discrimination" and have clearly permissible applications. For example, section 3(f) (along with defined terms in section 2(e)) bars public schools from "endors[ing]" (§ 3(f)) the views that one "race" "is inherently superior to another" (§ 2(e)(i)) or that individuals "should be" "treated adversely solely because of their race" (§ 2(e)(iii)). And section 3(g) (and related definitions) bars schools from requiring prospective students or employees to participate in "training" that seeks to "compel" them "to change their beliefs" on "race" (§ 2(a)(iv)) "as a condition of enrolling" or "accepting employment" (§ 3(g)). Surely the district court would not contend that the First Amendment requires allowing public schools to endorse or indoctrinate students or employees on such noxious ideology. The gaps in the court's analysis make clear that the court did not conduct the rigorous analysis that *Moody* demands.

Instead, the district court parroted plaintiffs' (self-evidently absurd) claim that "they could think of *no* constitutional applications of the challenged provisions," and faulted *defendants*—at the preliminary-injunction stage—for "not offer[ing] competent evidence and argument as to constitutional applications adequately to rebut [p]laintiffs' showing." ROA.979-980 (emphases added). But *plaintiffs* have the burden of exhaustively cataloguing *all* of the challenged law's applications. *Compare NetChoice, LLC v. Paxton*, 121 F.4th 494, 498 (5th Cir. 2024) (plaintiffs must show "every hypothetical application of the challenged law" and cannot rely on alleged "heartland applications"), *with* ROA.635 (plaintiffs' claim that the Act's "impermissible applications" "outweigh" "[w]hatever the universe of constitutionally permissible applications" might be). And *plaintiffs* have the burden of showing that they are entitled to the "extraordinary remedy" of a preliminary injunction. *Planned Parenthood of Greater Texas v. Kauffman*, 981 F.3d 347, 353 (5th Cir. 2020) (en banc). If a plaintiff fails to make those required showings, the defendant does not have to do anything: the court must deny relief.

The district court's manifest failure to perform the required facial analysis alone requires vacatur. *See Fitch*, 134 F.4th at 802-03, 807-09 (vacating preliminary-injunction order for failing to apply *Moody* to facial free-speech and vagueness claims).

One brief note. Plaintiffs suggested below that *Moody* "does not apply" to laws alleged to be "content-[ ] and viewpoint-based." ROA.928.

27

That is wrong. The *Moody* analysis applies to all "facial challenges"—including those "based on the First Amendment." 603 U.S. at 723. *Moody* itself involved claims that state laws were content- and viewpoint-based. *See NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1114 (W.D. Tex. 2021) ("content-based, viewpoint-based, and speaker-based restrictions"); *NetChoice, LLC v. Moody*, 546 F. Supp. 3d 1082, 1094 (N.D. Fla. 2021) ("viewpoint-based motivation"). In any event, the Act here regulates government speech, which is not subject to the typical restrictions on content and viewpoint discrimination. *Infra* Part I.B.

## B. The District Court Erred In Ruling That The Challenged Provisions Likely Facially Violate The First Amendment.

In granting a preliminary injunction, the district court appears to have ruled that the Act's challenged provisions likely facially violate the First Amendment because they "fail[ ] to treat speech in a viewpoint-neutral manner" and "risk[ ] ... the chilling of expression and academic freedom." ROA.976-978; *see* ROA.971-972, 974; ROA.702-705. The court erred. The analysis that the court should have performed under *Moody* shows that the challenged provisions pass First Amendment scrutiny.

1. Start with the Act's "scope": "What activities, by what actors," does the Act "prohibit or otherwise regulate?" *Moody*, 603 U.S. at 724.

On "actors": The Act—including the challenged provisions relevant here—regulates "public schools and public postsecondary educational

institutions." § 1; *see* § 2(f), (g). It regulates teachers and other educators only in their capacities as employees of public educational institutions. And it does not regulate individual students. *See ibid.*

Section 3—which includes the Act's central prohibitions—confirms that the Act targets public institutions and not private, individual speech. It charges listed state bodies with ensuring that "institution[s]" ("college[s]" and "public school[s]") "shall not" engage in prohibited discrimination. § 3. Section 5—which lists the Act's exceptions—also makes clear that the Act does not target individual students or private speech and does not undermine academic freedom. It excepts, for example, "[s]cholarly research," "creative work[s]" and their "dissemination," and the non-state-funded "activit[ies]" of "registered student organization[s]" from the Act's coverage. § 5(b), (c). And Section 8—which addresses remedies for violations of the Act—again reaffirms that "educational institution[s]" are the regulated parties. § 8(1); *see* § 8(2) (discussing "violating entit[ies]"). In fact, the district court itself noted that the Act's "wording" "aims to regulate" the "actions and messaging" of "public institutions," and "does not, on its face, regulate or prohibit individual speech." ROA.977; *see* ROA.699 (TRO statement that the Act's "restrictions" apply to "public institutions of education").

On "activities": The Act regulates the DEI-related activities of public schools "to ensure that employment, academic opportunities and student engagement" remain free of "discriminatory practices." § 1. Most

29

relevant here, section 3 prohibits public "school[s]" from "[e]ngag[ing] in" listed "divisive concepts" (§ 3(b)); from "promot[ing] diversity, equity and inclusion" (§ 3(f)), which is defined in section 2(a) as including "effort[s]" to "favor[ ] applicants" or "promote differential treatment" in "employment or admissions" "based on race, sex, color or national origin" or to "compel" individuals "to change their beliefs" on "race, color, national origin, gender identity or sexual orientation"; from "[r]equir[ing]" "[DEI] training" "as a condition of enrolling," "employment," or "contract[ing]" (§ 3(g)); and from "[r]equir[ing]" students or employees to undergo "'diversity training'" or other "program[s]" that "focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin" (§ 3(i)). "Divisive concepts" include, for example, that one "race" "is inherently superior to another" (§ 2(e)(i)), that individuals "should be" "treated adversely solely because of their race" (§ 2(e)(iii)), or that individuals "should feel discomfort, guilt, anguish[, or] psychological distress on account of [their] race" (§ 2(e)(vii)). Together, the Act's prohibitions ensure that public schools treat students and employees based on "individual merit, qualifications and academic performance"— not demographics. § 1.

The exceptions in section 5 also ensure that the Act's sights are trained on preventing discriminatory practices. Again, the Act does "not ... apply" to "[s]cholarly research" or "creative work[s] by students,

faculty, employee[s,] or staff," or to "the dissemination of [such] work[s]." § 5(b). And the Act does "not ... apply" to or "prohibit" the "activit[ies]" of "registered student organization[s]," "guest speaker[s]," or "performer[s]" (when "state funds are not used") (§ 5(c)) or to efforts to "comply[ ] with" "academic accreditation standards or requirements" (§ 5(j)).

2. "The next order of business is to decide which of" the challenged "provisions[']" "applications violate the First Amendment." *Moody*, 603 U.S. at 725. The answer is that none—or very few—of the Act's applications abridge the "freedom of speech." U.S. Const. amend. I. And any potentially unlawful applications are greatly outweighed by valid applications that infringe no protected speech.

As explained, the Act's prohibitions in section 3 apply to government actors—public schools and their employees—and target discriminatory practices related to DEI. The prohibitions seek to prevent discriminatory conduct by school officials—like treating students and employees differently based on protected characteristics or forcing them to undergo "training" to make them change their personal beliefs. And they otherwise bar officials from promoting or endorsing such discrimination in their capacities as educators and administrators. The Act thus helps to ensure that schools refrain from adopting unlawful "race- [or] sex-based preferences under the guise of [DEI]," Exec. Order No. 14173, 90 Fed. Reg. 8633, 8633 (2025), and from "indoctrinat[ing]" students with "[d]iscriminatory equity ideolog[ies]," in ways that

"violate[ ]" "civil rights law[s]," Exec. Order No. 14190, 90 Fed. Reg. 8853, 8853 (2025).

Despite the Act's focus on preventing discrimination, the district court credited plaintiffs' view that the challenged provisions likely will "regulate or prohibit individual speech" in violation of the First Amendment. ROA.977. The various rationales offered by the district court and by plaintiffs for that view do not withstand scrutiny.

*First*, the district court suggested that the challenged provisions violate the First Amendment because they "fail[ ] to treat [DEI-related] speech in a viewpoint-neutral manner." ROA.976; *see* ROA.702 (TRO statement that the Act "target[s] specific viewpoints" "disfavored by the State" "while permitting opposing viewpoints"). In reaching that conclusion, the district court ignored that the challenged provisions—at least in part—target DEI-related *conduct*, which (again) shows that the court's facial analysis is woefully incomplete. But the court's viewpoint-neutrality theory fails for a more fundamental reason: the First Amendment's viewpoint-neutrality requirement does not apply in this context. The First Amendment's Free Speech Clause generally prohibits restricting speech "based on viewpoint." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009). But that Clause applies to "government regulation of *private* speech; it does not regulate *government* speech." *Id.* at 467 (emphases added). "When the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff v.*

*City of Boston*, 596 U.S. 243, 247-48 (2022); *see id.* at 252 (the Constitution relies "on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks"). The Act here regulates the activities and messaging of public educational institutions and officials. This Court has made clear that in "establishing and implementing" the way public schools will "function[ ]"—such as by "devis[ing] the state curriculum" and "select[ing]" the material that "teachers will teach to the students"—"it is the [S]tate [that is] speaking." *Chiras v. Miller*, 432 F.3d 606, 613, 614-15 (5th Cir. 2005). And when a State speaks, it "has the discretion to promote policies and values of its own choosing free from" the First Amendment's "viewpoint-neutrality requirement." *Id.* at 613; *see Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 833 (1995) (States "may make content-based choices" when "determin[ing] the content of the education [they] provide[ ]" through public schools). So when "run[ning]" public "primary and secondary schools" and "universities," States can "engage[ ] in the type of viewpoint discrimination that would be unconstitutional if [they] were acting as" "regulator[s] of private speech." *PETA, Inc. v. Gittens*, 414 F.3d 23, 29 (D.C. Cir. 2005); *see Summum*, 555 U.S. at 468 ("It is the very business of government to favor and disfavor points of view.").

The district court bypassed the Act's manifest regulation of government speech by assuming that the Act's "regulations" will "spill over to the public"—which presumably means individual students and

educators in their personal capacities—and impinge on "individual speech." ROA.977. The court said that defendants "implicitly admit[ted] as much." ROA.977. Defendants admitted no such thing. In the statement the district court cited, defendants stressed that "the Act *does not*, on its face, regulate or prohibit individual speech," and observed only that "to the extent" that plaintiffs "*may ultimately* have a viable claim related to the Act" it "would theoretically arise from the actions of [non-party] *public schools regulated by the Act*." ROA.939-940 (emphases added). That in no way "admit[s]" that the Act "regulate[s] or prohibit[s] individual speech"—it says the opposite. And speculation that the Act's implementation may, in some future case, impact individual speech does not overcome the Act's clear regulation of public "institution[s]" (§ 3) and its evident purpose to bar certain DEI-related activities by "public schools" (§ 1). It certainly does not justify the pre-enforcement facial relief that plaintiffs are seeking here.

*Second*, the district court suggested that the challenged provisions impermissibly "chill[ ]" educators' and students' rights of "expression" and undermine "academic freedom." ROA.976; *see* ROA.976-978. The court said that "'teachers and students'" do not "'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" ROA.978 (quoting *Kennedy v. Bremerton School District*, 597 U.S. 507, 527 (2022)). Granted. But the Act does not violate the free-speech rights of educators or students in the public-school setting.

34

Start with educators. The district court suggested that the Act intrudes on educators' rights related to "classroom instruction" and "engagement with curriculum." ROA.977. That is not so.

The Act regulates the in-school conduct and messaging of public-school officials solely in their capacities as state employees. The First Amendment "may be implicated" when public-school employees "speak[ ]" as private "citizen[s] addressing ... matter[s] of public concern." *Kennedy*, 597 U.S. at 528. But when those employees speak "in the course of carrying out [their] job[s]," they engage in "government speech" that is "ineligible for First Amendment protection." *Id.* at 528-29; *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."). So States may "regulate the content of what is or is not expressed" by public-school educators within the scope of their official duties, without raising free-speech concerns. *Rosenberger*, 515 U.S. at 833; *see, e.g.*, *Wood v. Florida Department of Education*, 142 F.4th 1286, 1291-92 (11th Cir. 2025) ("When a public-school teacher speaks in the course of performing her job," "she does so pursuant to her official duties and therefore speaks as a government employee, not a citizen.") (cleaned up). That is what the Act does here: it regulates the in-school conduct and messaging of public-school officials, while they perform their duties as state employees. It

does not implicate "[o]pen speech" by "private citizen[s]." *Garcetti*, 547 U.S. at 428 (Souter, J., dissenting).

The district court (and plaintiffs) stressed that the academic setting "may implicate additional constitutional interests" beyond typical employee-speech cases. ROA.978; *see* ROA.637-639. In *Kennedy v. Bremerton*, the Supreme Court was clear that the employee-speech doctrine applies to "public school employees," who are "government employees paid in part to speak on the government's behalf and convey its intended messages." 597 U.S. at 527. The Court did observe that questions of "academic freedom" "may *or may not* involve 'additional' First Amendment 'interests'" in some cases. *Id.* at 528 (emphasis added). But the possibility that the Court *may*, in some future case, extend additional First Amendment protections in the academic context does not justify granting broad pre-enforcement facial relief against a state law *now*. Far from "preach[ing] that an injunction should issue," that a central basis of plaintiffs' claims is (at best) "undetermined" counsels against awarding such extraordinary relief. *Contra* ROA.978. Indeed, plaintiffs conceded below that "state authorities" can lawfully "choose the course[s]" taught in public schools and "prescribe the[ir] general subject matter." ROA. 188-189. That concession largely dooms plaintiffs' claims related to classroom instruction. Plaintiffs then argued that state authorities cannot, after establishing the broader curriculum, "censor classroom discussion related to that subject matter." ROA.188-189.

Plaintiffs cited nothing to support that claim, which would give public-school educators veto power over a State's curricular choices. As this Court has stressed, States "enjoy broad discretionary powers in the field of public education," which includes "the authority to establish public school curricula which accomplishes the [S]tates' educational objectives." *Chiras*, 432 F.3d at 611. And to carry out its "curricular choices," a State must have "ultimate responsibility" over the "content" of "what [public-school] teachers may (or may not) teach in the classroom." *Evans-Marshall v. Board of Education of Tipp City*, 624 F.3d 332, 340-42 (6th Cir. 2010). Plaintiffs' contrary view is not the law.

Even if the Act did in some applications implicate educators' individual free-speech rights, plaintiffs' claims would still fail—and would certainly fail as a facial matter. A "State has interests as an employer in regulating the speech of its [public-school] employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968). And a State's interests in the "services it performs through its [public-school] employees" can outweigh "teacher[s']" "interests" in "commenting upon matters of public concern," even as private "citizen[s]." *Ibid.* That would be the case for at least many applications of the Act, which addresses invidious discrimination based on race, sex, and similar characteristics. Ultimately, neither the district court nor plaintiffs identified any support

for the view that individual public-school educators can override a legislature's "democratically accountable" judgment that racist, sexist, or otherwise discriminatory conduct and messaging have no place in public schools. *Evans-Marshall*, 624 F.3d at 342.

Plaintiffs have also claimed that, due to principles of academic freedom, "[u]niversity professors have a right to speak free of viewpoint discrimination." ROA.185. Notably, plaintiffs did not make the same argument for other educators (like K-12 teachers), which (once again) shows that plaintiffs' facial claims cannot succeed. *See Evans-Marshall*, 624 F.3d at 343-44 (noting that academic freedom "does not readily apply" to K-12 schools, "where students generally do not choose whether or where they will attend school" and "teachers" generally do not engage in academic "research[ ] or scholars[hip]"); *cf.* ROA.188 (plaintiffs' concession that "teachers" "in K-12 schools" "have less freedom to control the curriculum and the subject matter of classes"). In any event, broadly invoking principles of academic freedom does not justify facial relief against the Act. For one thing, academic freedom does not mean that individual professors have a right "to say anything and everything simply because the words are uttered in the classroom context." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019). And so universities—and legislative bodies, in the case of public schools—may place at least some limitations on professors' in-class speech, without running afoul of academic freedom. On top of all this, the Act expressly preserves

academic freedom. As noted above, the Act carves out "[s]cholarly research" and "creative work[s]" by "faculty," which would include (for example) faculty-created syllabi, course materials, and lecture composition. § 5(b). And the Act also makes clear that it "may not be construed" to "[p]rohibit" "compl[iance] with" "applicable academic accreditation standards or requirements." § 5(j). As plaintiffs themselves have observed, such standards ensure that colleges and universities "preserv[e] and protect[ ] academic freedom." ROA.178-179.

Now take students. The district court apparently adopted plaintiffs' view that the Act violates students' "right to receive the speech of their professors and teachers." ROA.186-189; *see* ROA.976-978. That fails too.

The Supreme Court has recognized that the First Amendment can protect the ability to receive information free from government interference. In *Martin v. City of Struthers*, 319 U.S. 141 (1943), for example, the Court held that a ban on door-to-door distribution of "handbills, circulars[,] or other advertisements" by Jehovah's Witnesses violated the "right to distribute literature" and "the right to receive it." *Id.* at 142-43. And in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), the Court said that the federal government's (lawful) exclusion of a foreign scholar "implicated" the "First Amendment rights" of "American scholars and students" who had invited him to speak. *Id.* at 754-57, 762-65.

But such cases "recogniz[e]" "only" a "negative right against government interference with the exchange of information by private

citizens." *Little v. Llano County*, 138 F.4th 834, 843 (5th Cir. 2025) (en banc). They do not "suggest[ ]" that individuals have a constitutional "right to receive information from the *government*"—which includes public schools and their employees. *Ibid.* As this Court has explained en banc, "[i]t is one thing to tell the *government* it cannot stop *you* from receiving [information] ... . It is another thing for *you* to tell the *government* [what information it must provide]. The First Amendment does not give you the right to demand that." *Id.* at 845; *see Walls v. Sanders*, 144 F.4th 995, 1002 (8th Cir. 2025) (the "right to receive information" "cannot be used to require the government to provide a message it ... is [not] willing to say"). So, "[e]ven assuming that public school students possess a cognizable right to receive information," "that right does not extend," for example, "to the selection of" "instructional material[s]," *Chiras*, 432 F.3d at 620, or to the "maint[enance]" of "a particular curriculum," *Walls*, 144 F.4th at 1003. It is unsurprising, then, that courts (including this one) have consistently held that students have no right to control a public-school curriculum. *E.g.*, *Chiras*, 432 F.3d at 612-15, 618-621; *Walls*, 144 F.4th at 1002-06; *Seyfried v. Walton*, 668 F.2d 214, 216 (3d Cir. 1981) ("no First Amendment right to study a particular [topic]"). Contrary to the district court's view, students' rights do not extend to demanding that public schools espouse harmful views that individuals "should feel ... guilt ... on account of [their] race [or] sex" or that "[m]eritocracy" is "racist or sexist." § 2(e)(vii), (viii). In suggesting

otherwise, the district court wrongly overrode the State's "substantial, if not absolute, discretion in selecting what materials and information to provide in ... public school classrooms." *Walls*, 144 F.4th at 1004.

Plaintiffs have argued that the challenged provisions unlawfully "'cast disapproval on particular viewpoints'" expressed by students. ROA.190 (quoting *Rosenberger*, 515 U.S. at 836). But the Act does not regulate individual students and so does not require them to engage in (or to refrain from engaging in) any speech. The Act does not, for example, force students to refrain from "manifest[ing]" religious "belie[fs]" (*Rosenberger*, 515 U.S. at 823), require students to "salute" the flag (*West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 626 (1943)), bar students from "wearing black armbands" to protest a war (*Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 504 (1969)), or do anything of the sort. To the extent that the Act disfavors certain viewpoints related to DEI, it does so by regulating the conduct and messaging of government officials, which (as explained above) "is controlled by different principles." *Rosenberger*, 515 U.S. at 834. That reality dispenses with much of the district court's (and plaintiffs') reasoning on students.

Even if the Act implicated students' individual free-speech rights in some applications, those rights must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. The Supreme Court has repeatedly reaffirmed "the comprehensive authority

of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.* at 507. And it has made clear that "[a] school need not tolerate student speech that is inconsistent with its basic educational mission"—even where "the government could not censor similar speech outside the school." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266 (1988). State officials thus may limit "student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273; *see id.* at 271-73 (public high school lawfully removed articles on divorce and teenage pregnancy from student newspaper because the paper "b[ore] the imprimatur of the school" and the school's actions were "reasonably related to legitimate pedagogical concerns"). "[T]he makeup of the curriculum," courts have recognized, "is by definition a legitimate pedagogical concern." *Boring v. Buncombe County Board of Education*, 136 F.3d 364, 370 (4th Cir. 1998) (en banc); *see Chiras*, 432 F.3d at 611-13. And schools have a legitimate—indeed, a compelling—interest in discouraging racism, sexism, and other discrimination. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181, 231 (2023); *cf. Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class") (cleaned up). The Act furthers that interest.

3. At the close of the *Moody* analysis, a court must weigh each challenged provision's "unconstitutional applications" against its "constitutional ones," and sustain a facial challenge only if "a substantial number of" the law's "applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." 603 U.S. at 723-24. As shown above, a sound analysis dooms the claim that the Act's "unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. Plaintiffs at least made no showing otherwise, launching as they did a sweeping and indiscriminate facial attack without accounting for the Act's (many) permissible applications.

4. One more point. The preliminary-injunction order is silent as to the level of First Amendment scrutiny the district court was purporting to apply. In the TRO, the court suggested that strict scrutiny likely applies. ROA.703-705; *see* ROA.191 (plaintiffs' claim that strict scrutiny applies because the Act imposes content-based restrictions). That is wrong. The Act regulates the conduct and messaging of government institutions and officials—not the speech of individual students or educators in their private capacities. And when regulating government conduct and speech, a State "may make content-based choices" without implicating heightened scrutiny. *Rosenberger*, 515 U.S. at 833. And even if private speech were implicated, regulation of speech in the public-school context need not satisfy heightened scrutiny and is lawful if "reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484

43

U.S. at 273. The Act meets that standard—at least for most applications—and that dooms the facial relief the district court granted.

## C. The District Court Erred In Ruling That The Challenged Provisions Are Likely Facially Void For Vagueness.

The district court also ruled that the "challenged portions" of the Act are "unconstitutionally vague"—apparently because they "fail[ ] to provide notice to enable ordinary people to make sense of [the Act's] prohibitions." ROA.971; *see* ROA. 971-973, 974, 976-981. The court erred.

1. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see* U.S. Const. amend. XIV, § 1 (guaranteeing "due process of law"). "[P]erfect clarity and precise guidance are not required." *Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018) (cleaned up). A law "is void for vagueness when it is so unclear" that people "must necessarily guess at its meaning and differ as to its application." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023). And to be facially vague, a law must be "impermissibly vague in all of its applications." *Ibid.*

The challenged provisions at issue here are not vague—and certainly not vague in all of their applications. The Act includes (in section 2) comprehensive definitions for many key terms—including

terms used in the challenged provisions—and otherwise uses plain language that is "readily understandable by most people." *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015) (no need to define terms that "are not obscure"). Take section 3(f), which (for example) bars public schools from "[m]aintain[ing] any programs" or "offices" that "promote diversity, equity, and inclusion." The Act defines "diversity, equity, and inclusion"—in detail—to include "[a]ny effort" to "favor[ ]" or to "promote differential treatment" of "individuals" in "employment or admissions" "based on race, sex, color or national origin" or to "require trainings, programming, or activities designed and/or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual orientation." § 2(a)(i)-(iv). The Act does not define "promote," but statutory "context" provides the clarity that a word like "promote[ ]" might lack "[w]hen taken in isolation." *Williams*, 553 U.S. at 294 (relying on "context" to construe "promotes"); *cf. McConnell v. FEC*, 540 U.S. 93, 170 n.64 (2003) (rejecting vagueness challenge to "[t]he word[ ] 'promote'"). In context, section 3(f) bars schools from (for example) maintaining admissions "offices" that "favor" prospective students for "admissions" based on their "race" or that encourage such "differential treatment" on racial grounds. § 2(a)(i)-(iii). That is not only a legitimate (and non-vague) application, but one that is likely required after the Supreme Court's ruling in *Students for Fair Admissions* that race-based admissions practices violate the

45

Constitution. 600 U.S. at 230-31; *see* AG Guidance at 4 ("prioritiz[ing] candidates" for "admission" based on "race" is "unlawful"), bit.ly/47DQyKI. Such applications undermine the view that the challenged provisions are impermissibly vague.

2. As an initial point, and as explained above, the district court did not perform the required *Moody* analysis for plaintiffs' facial vagueness claim. *Supra* Part I-A. The court did not explain how any challenged provision—let alone all of them—fails to provide fair notice or encourages discriminatory enforcement. The court just declared that it "generally agrees with [p]laintiffs' view of" those provisions, and credited plaintiffs' representations on the "difficulties in complying" with them. ROA.976-977. That does not remotely establish that each challenged provision is "impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013. Vacatur is required on that basis alone.

The brief vagueness analysis that the district court did perform does not withstand scrutiny. The court said that plaintiffs "presented extensive evidence that educators and students are unable to determine what speech is permissible and impermissible under each of the challenged provisions." ROA.972. But the court did not engage with that evidence or explain how it actually supports plaintiffs' (facial) claims. When that evidence is viewed against the Act's actual text and purpose—rather than plaintiffs' gloss on the Act—it becomes clear that plaintiffs failed to show that the Act as written is impermissibly vague in all

applications. Consider that plaintiffs' declarations and testimony—which the district court uncritically "accept[ed]" wholesale as to the "difficulties in complying with the challenged [provisions]," ROA.976-977—suggest that the Act could be read to:

- bar all "classroom discussion" on "racism" and "the civil rights movement" (ROA.106) or on the "danger[ ]" of racial "stereotypes" (ROA.111)—even though the Act seeks to prevent "discriminat[ion]" based on, *e.g.*, "race," "color," or "national origin" (§ 1) and rejects harmful stereotypes, such as that certain races are "inherently superior" (§ 2(e)(i));

- prohibit in-class "instruction" about "Martin Luther King, Jr." and his "'I have a dream' speech," (ROA.121)—even though the Act explicitly embraces the view that "[a]n individual's moral character" is not "determined by" "race" (§ 2(e)(v));

- prevent "children," "student group[s]," and "[guest] speakers" from "speaking about" "race," "color," "national origin" or similar topics (ROA.121-122)—even though the Act does not apply to individual students and excepts the non-state-funded "activit[ies]" of "student organization[s]" and "guest speaker[s]" (§ 5(c); *see* §§ 1, 3);

- prohibit assigning students "reflection papers" about subjects related to, *e.g.*, "race," "sex," or "sexual orientation," (ROA.651)—even though the Act excepts "creative work[s] by students" (§ 5(b));

- bar "[d]iscuss[ions]" about "treatments for speech and language pathologies" (ROA.206)—even though the Act carves out "[d]iscussi[on]" about "pathological approaches or experience with students with mental or physical disabilities" (§ 5(i));

- prevent Mississippi colleges, law schools, and school libraries from "complying with" their "accreditation require[ments]" (ROA.112; *see* ROA.115, 118, 125-126)—even though the Act explicitly excepts efforts to "comply[ ] with" "academic accreditation standards or requirements" (§ 5(j)); and

47

- subject educators to "discipline, censure, or other professional consequences" (ROA.117; *see* ROA.135-136) and students to "academic discipline or even expulsion" (ROA.130; *see* ROA.133)— even though the Act includes penalties only for "institution[s]" and says nothing about discipline for educators or students (§ 8).

If the district court performed any semblance of a proper vagueness analysis, it would have discovered that the plaintiffs' facial claims about the challenged provisions do not reflect reality.

In the TRO—which was incorporated by the preliminary-injunction order (*see* ROA.976)—the district court said that the Act "prohibits the dissemination, endorsement, or engagement with [*sic*] 'divisive concepts' and 'gender identity'" and that "[t]hese terms are not given precise definitions within the statutory text." ROA.703 (crediting plaintiffs' claim that the terms do not "have established legal meanings"). "For example," the court said, the Act "forbids the promotion of 'divisive concepts' without clearly identifying what constitutes 'promotion,' or which views are considered 'divisive.'" ROA.703. That is wrong. The Act defines each of the eight "concepts" it identifies as "divisive." *E.g.*, § 2(e)(i) (one "race, sex, color, or national origin is inherently superior to another"); (e)(ii) ("individual[s]" are "inherently racist, sexist, or oppressive" "by virtue of" their "race, sex, color, [or] national origin"). It also defines "[g]ender identity." § 2(j). And as noted, statutory context helps to inform the meaning of "promote."

The district court also appeared to credit plaintiffs' view that the Act's prohibitions "could encompass virtually all educational material in

subjects such as history, sociology, gender studies, or literature." ROA.703. The absurdity of that view should have given the court pause. The Act does not apply to "[s]cholarly research" or "creative work[s]" by students or faculty *at all*. § 2(b). And the language the court seized on— "increas[ing] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin" (ROA.703)— appears in the Act's provisions on "diversity training." *See* §§ 2(d), 3(i). Those provisions—along with broader statutory context—make clear that Act is concerned with DEI "training" that focuses on conduct like "compel[ling]" students and employees to "change their beliefs" on race, sex, gender identity, and similar issues (§ 2(a)(iv)), and not with instructing students on "history" or "literature." Any edge cases involving the Act's potential application to "educational material" could at most support as-applied challenges. But they do not justify pre-enforcement facial invalidation. *See Williams*, 553 U.S. at 302-03; *id.* at 305-06 ("the mere fact that close cases can be envisioned," which is true under "virtually any statute," does not "render[ ] a statute vague").

In the preliminary-injunction order, the district court also speculated that the Act's "regulation" of educational "institutions" "may cast a broad malaise of self-censorship" by students and educators. ROA.977. And it credited plaintiffs' view that the Act might "forbid discussion on historical civil rights issues and developments which shaped our nation, such as studies on Dr. Martin Luther King, Jr., the

Ku Klux Klan, the Fourteenth Amendment, [and] Juneteenth." ROA.978; *see* ROA.977-978 (crediting plaintiffs' fears that the Act may, for example, bar teachings on "Greek mythology and *Of Mice and Men*"). In assessing such claims, this Court should rely on the Act's text, not (as the district court did) on plaintiffs' distortion of that text or "over-caffeinated arguments" that the Act bars most speech. *Little*, 138 F.4th at 838. Indeed, "in determining a facial [First Amendment] challenge to a statute," courts must (where necessary) adopt "a narrowing construction that would make [the statute] constitutional" if the statute is "readily susceptible" to that construction, *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988), not accept a plaintiff's invitation to read the law in the most absurd ways possible.

Next, the district court appeared to credit plaintiffs' view that the Act may require termination of "student group[s]" like Women in Science and Engineering. ROA.977. But the Act's prohibitions do not apply to the "activit[ies]" of "registered student organization[s]" when not specifically funded by the State. § 5(c). And the district court did not explain how student groups like WiSE may run afoul of the Act's prohibitions on discrimination, especially considering those prohibitions apply to the schools themselves and not to individual students.

Last, the district court also appeared to credit plaintiffs' claim about "the possibility that educators and students could be disciplined" for "alleged violations" of the Act—including through "termination" or

"expulsion"—"under the vague provision calling for violations to be 'cure[d].'" ROA. 972. But as noted, the only sanctions in the Act apply to institutions; there are no penalties for educators or students. *See* § 8 ("withhold[ing]" of "funds" from violating "institution[s]"); *e.g.*, ROA.194 (plaintiffs' concession that the Act says nothing about "disciplin[ing]" "educators" or "students"). If an individual educator or student is "disciplined" by a school in connection with the Act, then the individual might have recourse against that school. But that hypothetical is no basis for pre-enforcement facial relief against the operation of the Act itself.

In sum, the Act's "statutory definitions," use of terms with "settled legal meanings," and "narrowing context" from its stated purpose (*Williams*, 553 U.S. at 306) show—at the least—that the Act has a "plainly legitimate sweep" (*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)). That means that plaintiffs' "facial challenge must fail." *Ibid.*

## II. Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction.

The district court also ruled that the equitable factors support plaintiffs, and the court granted universal injunctive relief. ROA.960-961, 975-976, 977-978, 980-981. The district court erred in both respects.

*First*, the equities strongly weigh against injunctive relief. The injunction irreparably harms the State and its citizens. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable

51

harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe in this case because the Act serves the State's compelling interests in ensuring that public-school students and employees are treated based on individual merit and in discouraging racism, sexism, and similar invidious practices. In doing so, the Act also helps to ensure that Mississippi schools continue to comply with state and federal anti-discrimination laws and thus, going forward, retain access to hundreds of millions of dollars in federal funding. *See* U.S. Department of Education, Budget Tables 2023-2025, bit.ly/4pnexVL (Mississippi received $1.592 billion in federal education funds in 2023).

The federal government "has made clear its intent to withhold federal funds" from educational institutions that "fail to comply" with the government's view of federal laws related to DEI. ROA.624-625; *see* Exec. Order No. 14190, 90 Fed. Reg. at 8854 (directing federal government to "eliminat[e] [f]ederal funding" for schools that employ "discriminatory equity ideology"); ROA.565-568 (DOE's warning about "potential loss of federal funding" for DEI-related "discrimination"). And defendants presented evidence that loss of federal funding would devastate Mississippi schools. ROA.581 ("loss of federal funding would impair" "public community colleges[']" "ability" "to provide educational services"); ROA.595-596 (public-school districts "receive" up to "half of their funding from the federal government" and loss of that funding "would significantly impair" schools' "ability to operate"); ROA.604 (charter

schools received "31% of their funding" in FY2025 "from the federal government" and loss of that funding would be "detrimental to their ability" to "meet the needs of their students"). The district court acknowledged the "real threat" of the loss of federal funding and that the "potential loss" of such funding "constitutes a substantial harm" (which the Act aims to prevent). ROA.980. But the court reasoned that this somehow counseled "*in ... favor* of injunctive relief," because it "remind[ed]" the court of the "possible penalties that could engulf Mississippi's educational institutions receiving federal funds if an unconstitutional act is enforced." ROA.980. The court identified no support for its speculation that enforcing the Act's bars on discrimination could jeopardize Mississippi schools' federal funding. And in any event, the "possible penalties" that the district court imagined would fall on "educational institutions" that *belong to the State*, not on plaintiffs.

The district court also said that the Act harms plaintiffs because it may interfere with protected speech. ROA.977-980; *see* ROA.706. That argument falls with the court's merits rulings. *Supra* Parts I-B & I-C.

The public interest is especially harmed by the universal facial relief the district court granted, which blocks the Act in many permissible applications. As the Supreme Court stressed in *Moody*, facial challenges "threaten to short circuit the democratic process" by "preventing duly enacted laws from being implemented in constitutional ways." 603 U.S. at 723. And, as discussed below, "universal injunction[s]" "improperly

intrud[e]" on state governments and unduly "prevent[ ]" them from "enforcing [their] policies." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2251 (2025) (cleaned up). The injunction here does both. This Court should reject it.

*Second*, this Court should at least narrow the injunction, which exceeds the district court's authority. In *Trump v. CASA*, the Supreme Court explained that federal courts do not have the "equitable authority" to issue "relief that extend[s] beyond the parties" to a lawsuit. 145 S. Ct. at 2550-54. And so federal courts cannot issue "universal injunction[s]" that prohibit a State from "enforcing" a law "against nonparties." *Id.* at 2561. Yet the district court here granted "statewide" "relief" that "prevent[s]" the State from "enforcing the [Act's] challenged provisions *in all respects*." ROA.975 (emphasis added). The court refused to issue "an injunction of limited geographical and personal capacity" that would be "limited to the named plaintiffs." ROA.975-976. The court thus ordered the type of universal injunction that the Supreme Court condemned in *CASA*. *See* 145 S. Ct. at 2548 & n.1.

The district court's justifications for the universal relief it ordered do not withstand scrutiny. Purporting to invoke *CASA* itself, the court first suggested that such relief is "necessary to provide complete relief to each plaintiff with standing to sue." ROA.975. But *CASA* clearly explained that "'[c]omplete relief' is not synonymous with 'universal relief.'" 145 S. Ct. at 2557. Rather, it "is a narrower concept" that means

that courts "may administer complete relief *between the parties*." *Ibid.* (And even then "[c]omplete relief is not a guarantee"; a "narrower injunction" may be "appropriate" based on "the necessities of the particular case." *Id.* at 2558.) The district court also said that universal relief was necessary because "institutions" might have difficulty "accommodat[ing]" an injunction limited to the "named [p]laintiff[s]." ROA.976 (noting that schools "may need to craft different classes, textbooks, and curricula" for plaintiffs). The view that potential difficulty in complying with a narrow injunction justifies *broader* relief—and that compliance challenges for *defendants* should work in *plaintiffs'* favor on the equities—is absurd. That view would justify universal relief broadly, in square defiance of *CASA*. The district court also speculated that, without universal relief, plaintiffs would be "harmed" from the Act's "enforcement [as] to third-parties," which (the court surmised) would "deprive[ ]" plaintiffs "of the opportunity to interact with and learn from their fellow students." ROA.976. But again, the Act's prohibitions do not apply to individual students, so that reasoning fails. It also ignores that universal relief *harms* "third-parties"—including students—who would in fact *benefit* from the Act's enforcement.

Last, the district court suggested that universal relief was appropriate because plaintiffs added class-action claims. ROA.975-976. *But see* ROA.976 (stating that universal relief was appropriate "[e]ven absent" plaintiffs' "class-action allegations"). Such an end-run around

*CASA* defies the limits on federal courts' equitable authority. *See* 145 S. Ct. at 2566 (Alito, J., concurring). As the district court itself noted, "classwide relief" may be proper only if a "court[ ] follow[s] proper legal procedures in awarding such a remedy" "under Federal Rule of Civil Procedure 23(b)(2)." ROA.975. The district court did not purport to "follow" the "proper legal procedures" here: it did not even *mention* Rule 23's requirements. Plaintiffs have pointed to the Supreme Court's statement in *AARP v. Trump*, 145 S. Ct. 1364 (2025), that "courts may issue temporary relief to a putative class" prior to class certification under Rule 23. *Id.* at 1369. But *AARP* envisioned nothing like the "all-or-nothing" relief the district court entered here, which already has bound defendants for many months. ROA.975. At most, *AARP* suggested that a court may issue "temporary relief" to a putative class on an emergency basis where "exigent circumstances" justify departing from normal procedures. 145 S. Ct. at 1368, 1369; *see ibid.* (necessary to "temporarily enjoin" the "imminent" removal of aliens "while the question of what notice is due is adjudicated"). Plaintiffs have pointed to nothing like that here. And indeed, plaintiffs did not seek class certification before the district court's preliminary-injunction ruling.

## CONCLUSION

This Court should reverse the district court's preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Justin L. Matheny*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
DANIEL KIM
  *Assistant Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: justin.matheny@ago.ms.gov

*Counsel for Defendants-Appellants*

January 12, 2026

## CERTIFICATE OF SERVICE

I, Justin L. Matheny, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: January 12, 2026

*s/ Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,982 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: January 12, 2026

*s/ Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendants-Appellants*