# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————————————

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAMES THOMAS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; DAWN ZIMMERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; L. E. JIBOL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821; MADISYN DONLEY, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ALEXIS COBBS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; KAREN ADERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, AND ENVIRONMENTS; WOMEN IN SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; GREG POWELL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAKOB CLARK, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ASHLEY ROGERS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

— v. —

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; GEE OGLETREE, IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; STEVEN CUNNINGHAM, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; DONALD CLARK, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; ET AL.,

*Defendants-Appellants*.

————————————

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:25-CV-417

————————————

# BRIEF FOR PLAINTIFFS-APPELLEES

————————————

*(Counsel Listed on Inside Cover)*

JOSHUA TOM
MCKENNA RANEY
AYANNA HILL
BRENDAN HOPKINS
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION, INC.
P.O. Box 2242
Jackson, MS 39225
(601) 354-3408
jtom@aclu-ms.org

AMIR BADAT
BADAT LEGAL PLLC
P.O. Box 15
Tougaloo, MS 39174
(601) 462-9592
amir.badat@gmail.com

ROBERT B. MCDUFF
PALOMA WU
MISSISSIPPI CENTER FOR JUSTICE
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
(601) 259-8484
rmcduff@mscenterforjustice.org

RICHARD ROUCO
QUINN, CONNOR, WEAVER, DAVIES &
ROUCO LLP
2 20th Street North, Suite 930
Birmingham, AL 35203
(205) 870-9989
rrouco@qcwdr.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF INTERESTED PERSONS

1. No. 25-60496, *Jackson Fed of Tchr v. Fitch* [USDC No. 3:25-CV-417]

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

Plaintiffs-Appellees

- Jackson Federation of Teachers
- Barbara Phillips
- James Thomas
- Dawn Zimmerer
- L.E. Jibol
- United Campus Workers Southeast Local 3821, a local union affiliate of Communications Workers of America AFL-CIO, CLC
- Madisyn Donley
- Alexis Cobbs
- Karen Aderer
- Fostering LGBTQ+ Advocacy, Resources, and Environments
- Women in Science and Engineering
- Joy Parikha
- Greg Powell
- Jakob Clark
- Ashley Rogers

Counsel for Plaintiffs-Appellees

- Mississippi Center for Justice
  - Robert B. McDuff
  - Paloma Wu
- Badat Legal PLLC
  - Amir Badat

- American Civil Liberties Union of Mississippi Foundation, Inc.
  - Joshua Tom
  - McKenna Raney
  - Ayanna Hill
  - Brendan Hopkins
- Quinn, Connor, Weaver, Davies & Rouco LLP
  - Nicolas Stanojevich
  - Richard Rouco
  - Andrew Hull

Defendants-Appellants

- All Defendants-Appellants are governmental actors sued in their official capacities, *see* 5th Cir. R. 28.2.1

Counsel for Defendants-Appellants

- Mississippi Attorney General's Office
  - Lynn Fitch
  - Scott G. Stewart
  - Justin L. Matheny
  - Anthony M. Shults
  - Daniel Kim
  - Rex M. Shannon, III
  - Lisa A. Reppeto

Judges

- District Judge Henry T. Wingate
- Magistrate Judge LaKeysha Greer Isaac

Additional Interested Persons

- Public-school students and educators in the State of Mississippi

Dated: March 13, 2026

/s/ *Joshua Tom*
Joshua Tom
*Attorney of Record for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, Plaintiffs-Appellees respectfully request oral argument to address any questions the Court may have about the facts and legal arguments presented in the briefs and record.

Dated: March 13, 2026

/s/ *Joshua Tom*
Joshua Tom
*Attorney of Record for Plaintiffs-Appellees*

# TABLE OF CONTENTS

Certificate of Interested Persons.................................................................................i

Statement Regarding Oral Argument ...................................................................... iii

Table of Authorities ................................................................................................vi

Introduction ...............................................................................................................1

Jurisdictional Statement ...........................................................................................4

Statement of the Issues .............................................................................................5

Statement of the Case ...............................................................................................5

Summary of Argument ..............................................................................................9

Argument.................................................................................................................13

I.   Plaintiffs Are Likely to Prevail on Their First Amendment Claim.................13

    A.   The Challenged Provisions Discriminate Based on Content and
        Viewpoint............................................................................................13

    B.   The First Amendment Protects the Rights of University and
        College Teachers and Students and Prohibits Restrictions Like
        Those Challenged Here........................................................................16

    C.   The First Amendment Protects the Rights of K-12 Teachers and
        Students and Prohibits Restrictions Like Those Challenged
        Here.....................................................................................................19

    D.   The Challenged Provisions Do Not Survive Strict Scrutiny. ...................22

    E.   The Challenged Provisions Are Subject to Strict Scrutiny Despite
        the State's Effort to Label Them as Government Speech. ......................22

    F.   The Challenged Provisions Are Not Reasonably Related to
        Legitimate Pedagogical Concerns and Have No Valid
        Educational Purpose.............................................................................24

II.  Plaintiffs Are Likely to Prevail on Their Vagueness Claim..............................26

III. The Challenged Provisions Are Facially Unconstitutional or,
    Alternatively, Unconstitutional as Applied to Classroom Instruction
    and Extracurricular Activities. ..........................................................................30

    A.   *Brunetti* Governs Plaintiffs' First Amendment Facial Challenge. ..........31

B.    In Any Event, Plaintiffs Have Satisfied a *Moody*-Type Analysis. ...........33

C.    *Moody* Does Not Apply to Facial Vagueness Challenges, and Plaintiffs Satisfied the Applicable Standard...............................38

D.    Alternatively, Plaintiffs' As-Applied Challenge Would Still Justify Relief. ...............................................................................41

IV.   Plaintiffs Have Established the Other Preliminary-Injunction Factors. ..........................................................................................43

A.    Plaintiffs Have Established a Substantial Threat of Irreparable Injury.......................................................................................43

B.    The Balance of Harms and Public Interest Support an Injunction. ..............................................................................43

V.    The Injunction's Scope Was Proper. ...........................................47

A.    The District Court Correctly Granted a Classwide Injunction................47

B.    A Statewide Injunction is Necessary to Provide Complete Relief to Plaintiffs.................................................................................49

Conclusion.........................................................................................50

Certificate of Service...........................................................................51

Certificate of Compliance ...................................................................52

**Cases**

*A.A.R.P. v. Trump*,
    605 U.S. 91 (2025)............................................................. 13, 47

*Abbott v. Perez*,
    585 U.S. 579 (2018)..................................................................44

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
    796 F. Supp. 3d 66 (D. Md. 2025) ...................................45

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)..................................................................35

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)..................................................................22

*Baggett v. Bullitt*,
    377 U.S. 360 (1964)..................................................................26

*Bazaar v. Fortune*,
    476 F.2d 570 (5th Cir. 1973) ............................................16

*Board of Education v. Pico*,
    457 U.S. 853 (1982)..................................................................24

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024).................................... 43, 44

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024)..............................................43

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005)..............................................23

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..................................................................42

*Epperson v. Arkansas*,
    393 U.S. 97 (1968)....................................... 9, 19, 20, 23, 25

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)..................................................................26

**Cases (ctd.)**

*Hazelwood Sch. Dist. v. Kuhlmeier*,
484 U.S. 260 (1988)........................................................ 24, 25

*Healthy Vision Ass'n v. Abbott*,
138 F.4th 385 (5th Cir. 2025)............................... 43, 44, 46

*Hynes v. Mayor of Oradell*,
425 U.S. 610 (1976)................................................................26

*Iancu v. Brunetti*,
588 U.S. 388 (2019).................................................11, 31, 32

*In re Dinnan*,
661 F.2d 426 (5th Cir. Unit B 1981) ................................16

*Johnson v. United States*,
576 U.S. 591 (2015)........................................................ 39, 41

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ........................................................ 10, 21

*Keyishian v. Bd. of Regents*,
385 U.S. 589 (1967)................................ 9, 15, 16, 17, 29

*Kolender v. Lawson*,
461 U.S. 352 (1983)........................................................ 12, 38, 40

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
508 U.S. 384 (1993)................................................................9, 14

*Loc. 8027, AFT-N.H. v. Edelblut*,
651 F. Supp. 3d 444 (D.N.H. 2023) ................................40

*Martin v. City of Struthers*,
319 U.S. 141 (1943)................................................................17

*Matal v. Tam*,
582 U.S. 218 (2017)........................................................ 22, 23, 31

*McClelland v. Katy Indep. Sch. Dist.*,
63 F.4th 996 (5th Cir. 2023)........................................ 39, 40

*McDonald v. Longley*,
4 F.4th 229 (5th Cir. 2021)................................................44

**Cases (ctd.)**

*McRorey v. Garland*,
    99 F.4th 831 (5th Cir. 2024) ................................................. 32

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ........................................................... 19

*Minn. Voters All. v. Mansky*,
    585 U.S. 1 (2018) ..................................................... 14, 22

*Moody v. NetChoice, LLC*,
    144 S. Ct. 478 (2023) ......................................................... 32

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................... *passim*

*NetChoice, LLC v. Paxton*,
    144 S. Ct. 477 (2023) ......................................................... 32

*Papachristou v. City of Jacksonville*,
    405 U.S. 156 (1972) ........................................................... 30

*Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*,
    793 F. Supp. 3d 19 (D.D.C. 2025) ..................................... 48

*Roark & Hardee LO v. City of Austin*,
    522 F.3d 533 (5th Cir. 2008) ............................................. 40

*Roe ex rel. Roe v. Herrington*,
    2023 WL 5759590 (D. Ariz. Aug. 10, 2023) ..................... 48

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) .............................. 13, 14, 17, 18, 19

*SEIU Local 5 v. City of Houston*,
    595 F.3d 588 (5th Cir. 2010) ..................................... 27, 28

*Sessions v. Dimaya*,
    584 U.S. 148 (2018) ........................................................... 39

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ........................................................... 20

*SO Apartments, L.L.C. v. City of San Antonio*,
    109 F.4th 343 (5th Cir. 2024) ........................................... 43

**Cases (ctd.)**

*Sweezy v. New Hampshire,*
 354 U.S. 234 (1957).........................................................................16

*Test Masters Educ. Servs., Inc. v. Singh,*
 428 F.3d 559 (5th Cir. 2005)..........................................................42

*Texas v. United States,*
 126 F.4th 392 (5th Cir. 2025).........................................................42

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
 393 U.S. 503 (1969)........................................... 10, 20, 21, 23

*U.S. Navy Seals 1-26 v. Austin,*
 594 F. Supp. 3d 767 (N.D. Tex. 2022)..........................................48

*United States v. Clark,*
 582 F.3d 607 (5th Cir. 2009)..........................................................41

*United States v. Hansen,*
 599 U.S. 762 (2023)........................................................................34

*United States v. Hicks,*
 980 F.2d 963 (5th Cir. 1992)..........................................................40

*United States v. Stevens,*
 559 U.S. 460 (2010)........................................................................31

*United States v. Westbrooks,*
 858 F.3d 317 (5th Cir. 2017)..........................................................40

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
 455 U.S. 489 (1982)........................................................................41

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011)........................................................................48

*White Hat v. Murrill,*
 141 F.4th 590 (5th Cir. 2025).........................................................38

*Woodlands Pride v. Paxton,*
 2026 WL 523811 (5th Cir. Feb. 25, 2026).............................. 40, 41

**Statutes and Rules**

28 U.S.C. § 1292(a)(1) ................................................4

28 U.S.C. § 1331 ....................................................4

Fed. R. Civ. P. 23(b)(2) ......................................... 47, 48

L.U. Civ. R. 23 ......................................................48

**Other Authorities**

Brief for United States as *Amicus Curiae*, *Moody v. NetChoice, LLC*,
   No. 22-277 (U.S. Aug. 14, 2023)..........................................32

Joint Motion to Dismiss, *NAACP v. U.S. Dep't of Educ.*,
   No. 1:25-CV-1120 (D.D.C. Feb. 6, 2026), ECF No. 40 ....................................46

Joint Motion to Dismiss, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*,
   No. 1:25-CV-91 (D.N.H. Feb. 3, 2026), ECF No. 99..........................................46

Miss. Dep't of Educ., Mississippi College- and Career-Readiness
   Standards for the Social Studies (2023) ......................................21

---

## BRIEF FOR PLAINTIFFS-APPELLEES

---

## INTRODUCTION

In the entirety of their brief, the State officials charged with enforcing the challenged provisions of Mississippi House Bill 1193 barely acknowledge, much less address, the sweeping and unprecedented restriction on classroom and extracurricular speech in public universities, colleges, and K-12 schools that prohibits teachers (and possibly students) from "[e]ngag[ing] in . . . any formal or informal education . . . that focus[es] on increasing awareness or understanding of *issues related to race, sex, color, gender identity, sexual orientation or national origin*." Section 2(d) as incorporated by Section 3(b) (emphasis added). If this provision is applied as written, history teachers will be banned from discussing slavery, the Civil War, discrimination of many kinds, the civil rights movement, the women's suffrage and women's rights movements, the LGBTQ+ rights movement, and many other aspects of life in America and throughout the world that "are related" to these prohibited issues. Constitutional law professors must excise from their textbooks and lectures all references to the Fourteenth Amendment and cases about discrimination. Courses in family law, sociology, and biology must avoid discussions of differences and different treatment related to sex and gender identity. Teachers of English literature must remove from their reading lists, and school

librarians must remove from their shelves, works by authors like Richard Wright, Toni Morrison, William Faulkner, Jane Austen, Rita Mae Brown, and many others. The consequences will be enormous.

Although the State claims that it joined a "growing number of States" in passing legislation in reaction to prior "diversity, equity, and inclusion" (DEI) efforts, Br. 1,[1] it fails to mention that *no other State* has adopted such a broad restriction on classroom and extracurricular discussion. At one point late in its brief, the State claims that this extraordinary provision is not concerned with "instructing students on 'history' or 'literature,'" Br. 49, but otherwise fails to address the provision or explain how public-school teachers throughout Mississippi can rely on this brief statement near the end of an appellate brief when faced with the explicit language of the Act applying the bans to "formal and informal education."[2]

It also fails to explain how banning these subjects, as well as the other subjects encompassed by the challenged restrictions, would achieve the professed goal of "ensur[ing] that public-school students and employees remain free from DEI-related

---

[1] Defendants-Appellants are individual members of the following boards that are charged with enforcing the challenged provisions: the Mississippi Board of Trustees of State Institutions of Higher Learning, Community College Board, State Board of Education, and Charter School Authorizer Board. The Mississippi Attorney General, who plays a role in a certain aspect of enforcement (Sections 8(2) and 9), is also a Defendant-Appellant. For ease of reference, Defendants-Appellants are collectively referred to as "the State."

[2] Section 3(i) contains the same list of banned subjects and appears to prohibit them from being taught in required courses. *See* ROA.997.

discrimination." Br. 5. While this case challenges a handful of free-speech provisions in HB 1193, it does not challenge the provisions that abolish DEI offices; abolish "diversity statements" in hiring and evaluations and promotions; prohibit "giv[ing] preference based on race, sex, color or national origin to an applicant for employment, or when awarding a contract at the institution, college or public school"; and prohibit "[p]enaliz[ing] or discriminat[ing] against a student, employee, faculty, staff or contractor on the basis of his or her refusal to support, believe, endorse, embrace, confess, act upon or otherwise assent to a diversity, equity or inclusion concept as set forth in this section." Sections 3(a), (c)–(e), and (h). Similarly, this case does not challenge any state and federal laws that prohibit discrimination in public schools.

Instead, it challenges the ban on discussing "race, sex, color, gender identity, sexual orientation or national origin" in public schools and other provisions that prohibit "[e]ngage[ment]" with a number of subjects, including certain "divisive concepts" that would effectively ban discussion of particular viewpoints concerning issues like affirmative action, unconscious bias, and collective responsibility. Moreover, at least one of these "divisive concepts" is stated in language so incoherent as to be almost meaningless. And many of the challenged provisions are so vague, confusing, and contradictory that it is difficult for administrators, teachers, and students to distinguish prohibited actions from permissible ones, making the law

particularly susceptible to arbitrary and discriminatory enforcement. Adding to the confusion are certain purported exceptions to the Act, including an alleged exception to protect "freedom of speech pursuant to the First Amendment of the United State[s] Constitution"—but only so long as the First Amendment and other so-called "protected tenets" do not "conflict with the act."

As explained further in this brief, the challenged restrictions violate the rights of teachers and students under the First and Fourteenth Amendments.

In response, the State makes a number of contentions, including that classroom instruction is "government speech" that overrides any First Amendment rights of teachers and the students who learn from them, that the challenged provisions are easily understood, that Plaintiffs fail to meet the test for a facial challenge, that the equities do not support an injunction, and that any injunction should be limited to the individual parties even though the provisions apply to all public-school educators and students in the State. These contentions are addressed in this brief.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. The district court entered a preliminary injunction on August 18, 2025, and the State timely filed a notice of appeal on September 16, 2025. ROA.960–81, 1078–80. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Are Plaintiffs likely to succeed on their claim that the challenged provisions restrict speech in violation of the First Amendment?

2. Are Plaintiffs likely to succeed on their claim that the challenged provisions are void for vagueness in violation of the Fourteenth Amendment?

3. Are Plaintiffs likely to succeed in meeting the standard for a facial challenge so that the preliminary injunction against the challenged provisions should be affirmed, or alternatively, should the preliminary injunction be modified to enjoin the challenged provisions only as applied to classroom instruction and extracurricular activities?

4. Should the statewide preliminary injunction be affirmed in this putative class action given the statewide nature of the challenged provisions and the fact that an injunction limited to the named plaintiffs would be impractical and would not provide complete relief?

## STATEMENT OF THE CASE

A description of the relevant provisions and their text are in an excerpt from the Second Amended Complaint, Tab 1 of Plaintiffs' Record Excerpts, ROA.995–1013. The full text of HB 1193, including the many unchallenged provisions, is in Tab 5 of the State's Record Excerpts.

The structure of HB 1193 is as follows: Section 3 sets forth the actions prohibited by the law. It provides: "[Defendants] shall ensure that each institution, college and public school, as applicable, shall not: . . . ." Section 3 then lists actions, in Sections 3(a)–(i), that are prohibited. Of these, this lawsuit challenges only the prohibitions in Sections 3(b), (f), (g), and (i).

Section 5 lists purported exceptions to the prohibitions. But several of those exceptions—Sections 5(b)–(d) and (h)–(j)—are vague, confusing, and illusory. The exceptions do not restrict or punish speech, but they contribute to the vagueness of the challenged provisions.

Although Section 3 places the onus initially on the members of the relevant boards (who are Defendants here) to ensure that each school adheres to the prohibitions, the consequences contained in Sections 7 through 9 may be severe for educators and students accused of violating them. Section 7(6) requires schools "to cure all actions relating to the violation," but the law does not define "cure." Moreover, if a school has two or more "uncured" "error[s]," "the State of Mississippi shall withhold the disbursement" of "any and all funds appropriated by the Legislature" for the particular school at issue. Sections 7(6)(b) and 8(1). Alleged violations can be made by any student, parent, faculty member, staff member, or contractor, Sections 7(3) and (5), to accuse any administrator, teacher, or student of saying the wrong thing about the wrong subject.

The record in this case includes the live testimony of four witnesses presented by Plaintiffs: a university professor who is also a parent to K-12 children, a law school professor, a representative of a student group at a university, and a parent to K-12 children. ROA.1177–1317. Plaintiffs also submitted declarations from educators at the college and K-12 level, students at the university level, and parents of K-12 students. ROA.102–40, 201–11, 891–915. That evidence demonstrated the chilling effect on their speech, the difficulty of distinguishing what is prohibited from what is not, and the potential consequences for themselves or their children. *Id.*; ROA.1177–1317. By contrast, Defendants presented no live witnesses. They presented four short declarations claiming that community colleges, public K-12 schools, and charter schools rely heavily on federal funds and that universities and community colleges are accredited. ROA.569, 581–82, 595–96, 604. This record amply supported the district court's finding: "This Court further finds Plaintiffs' witnesses credible and accepts their testimony with respect to the imminent dangers, uncertainty, and obvious difficulties in complying with the challenged portions of HB 1193 as presently enacted." ROA.976–77. The district court noted the "dearth of evidence on the defense side." ROA.977.

Although the State raised the specter of losing federal funds if it engaged in "DEI-related discrimination," Br. 8–9, it presented no evidence or argument that the

free-speech restrictions challenged here were necessary to avoid losing that funding or that other States without these restrictions have lost federal funding.

In its brief, the State claims "there are no penalties for educators or students." Br. 51. It also claims "the Act does not regulate individual students and so does not require them . . . to refrain from engaging in[] any speech," Br. 41, and the relevant provisions "along with broader statutory context—make clear that Act is concerned with DEI 'training' . . . and not with instructing students on 'history' or 'literature.'" Br. 49. But the State's reassurances don't appear in the Act itself. The people who would be speaking about the prohibited issues are likely teachers and students. A "cure" would seem to include the possibility of penalizing them for doing so, and nothing says otherwise. Section 5(c) creates an exception for "[a]n activity of a registered student organization . . . as long as state funds are not used," but there is no exception for unregistered student organizations or individual students. Section 5(b) creates an exception for "[s]cholarly research or a creative work by students, faculty, employee or staff," implying that students are covered for everything other than "[s]cholarly research or a creative work." And Section 3(b)'s incorporation of Section 2(d) prohibits "[e]ngag[ing] in . . . any formal or informal education . . . that focus[es] on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." "[F]ormal or informal education" would seem to include instructing students on history or literature.

The State never provided these assurances in the district court, and the boards to which Defendants belong have not stated this in any of their regulations. And even if students and teachers could not be penalized and students could not be regulated in their speech, the banned subjects still could not be taught in the classrooms of the State given the language covering "formal or informal education." Accordingly, we address the rights of educators and students in this brief.

## SUMMARY OF ARGUMENT

**First Amendment:** The challenged provisions are content and viewpoint discriminatory. They allow teachers to explain how economics, class, religion, and political party play a role in history and society, but not "issues related to race, sex, color, gender identity, sexual orientation or national origin." Just as "[i]t discriminates on the basis of viewpoint to . . . present[] . . . all views . . . except those dealing with the subject matter from a religious standpoint," *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist*., 508 U.S. 384, 393 (1993), so it does here.

This viewpoint discrimination casts a "pall of orthodoxy over the classroom" and violates First Amendment rights at the college level and the K-12 level. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). In *Epperson v. Arkansas*, 393 U.S. 97 (1968), a case involving K-12 and college-level public schools, the Supreme Court emphasized the duty of federal courts "to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental

values of freedom of speech and inquiry." *Id.* at 104. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), and *Kennedy v. Bremerton School District*, 597 U.S. 507, 527 (2022), recognized those rights at the K-12 level. These rights exist despite the authority of the State to prescribe the curriculum, an authority which the State's brief labels as "government speech." Even if K-12 teachers have less freedom to control the curriculum and the subject matter of classes than at the college level, they still cannot, for example, be prohibited from teaching in an American history course that one of the causes of the Civil War was slavery, an "issue[] related to race," without violating the First Amendment. *Tinker* confirms that "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" and "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511.

These First Amendment rights exist in extracurricular activities as well as in the classroom, and they belong to student groups as well as individual students (including the right to receive funding along with other student groups). The challenged restrictions do not survive strict scrutiny. The State's professed objective of prohibiting discriminatory practices cannot be achieved by silencing a set of disfavored viewpoints. This lawsuit challenges only a handful of free-speech restrictions and not the other provisions of HB 1193 that are more directly targeted at the DEI measures and purported discrimination referenced by the State.

**Fourteenth Amendment:** Statements by the Attorney General in her brief for the State Defendants confirm the vagueness and confusion in HB 1193 and the challenged provisions. That brief states "there are no penalties for educators or students," Br. 51, and "the Act does not regulate individual students and so does not require them . . . to refrain from engaging in[] any speech." Br. 41. The Act itself does not support this. This confusion over who the law covers and whether they can be penalized proves at the outset that these restrictions are unconstitutionally vague. Furthermore, educators and students will have difficulty knowing what is prohibited due to the confusing language of the challenged provisions and the exceptions. Indeed, the State's brief also said the Act is not concerned "with instructing students on 'history' or 'literature,'" Br. 49, which is particularly confusing given that the bans encompass "formal or informal education."

**Facial and As-Applied Challenges:** The State argues that Plaintiffs fail to meet the standard in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), which requires in certain First Amendment facial challenges that the unconstitutional applications of a statute be weighed against the constitutional ones. But in *Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019), the Supreme Court explained that this analysis does not apply to a "viewpoint-discriminatory law." *Moody* was not a viewpoint-discrimination case; this one is. So *Moody* does not govern; *Brunetti* does.

Even if the *Moody* analysis applied, Plaintiffs meet that standard. With respect to the wholesale ban on "[e]ngag[ing] in . . . issues related to race, sex, color, gender identity, sexual orientation or national origin," the unconstitutional applications far outweigh any constitutional ones, and the same is true with the other provisions as well. Plaintiffs are likely to prevail on the merits in this regard. Even if this Court orders a remand for a further *Moody* analysis, this Court should leave the preliminary injunction in place to prevent the chaos that will ensue in Mississippi's public schools if the challenged provisions are enforced.

Regarding the Fourteenth Amendment, the challenged provisions "fail to meet constitutional standards for definiteness and clarity" and are "unconstitutionally vague *on [their] face* because [they] encourage[] arbitrary enforcement by failing to describe with sufficient particularity" what is prohibited and what is not. *Kolender v. Lawson*, 461 U.S. 352, 361–62 (1983) (emphasis added).

Alternatively, Plaintiffs are likely to prevail on the alternative as-applied challenge to the classroom and extracurricular speech of public-school educators and students in Mississippi under the First and Fourteenth Amendments. ROA.637. In that scenario, this Court can modify the injunction and limit it to the challenged provisions in the classroom and extracurricular settings.

**Balance of the Equities and Scope of the Injunction:** Plaintiffs satisfied all of the factors governing a preliminary injunction. Furthermore, the second amended

complaint, which the State did not oppose, raises putative class action claims that justify the district court's exercise of its equitable authority to grant preliminary-injunctive relief to all members of the putative classes. *See A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) (holding that "courts may issue temporary relief to a putative class" and "need not decide whether a class should be certified . . . in order to temporarily enjoin the Government from [irreparably harming] putative class members"). Additionally, as the district court found: "[A]n injunction limited to the named plaintiffs would . . . be unsatisfying as to granting them complete relief" and would be "impracticable if not impossible" because "institutions may need to craft different classes, textbooks, and curricula to accommodate named Plaintiff teachers and students," and "Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state" about the banned concepts. ROA.976. Thus, the classwide preliminary injunction is appropriate.

## ARGUMENT

### I. Plaintiffs Are Likely to Prevail on Their First Amendment Claim.

#### A. The Challenged Provisions Discriminate Based on Content and Viewpoint.

In *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819 (1995), the Supreme Court explained that viewpoint-based discrimination is presumptively unconstitutional and subject to strict scrutiny:

> Discrimination against speech because of its message is presumed to be unconstitutional. . . . [T]he government offends the First Amendment when it imposes . . . burdens on certain speakers based on the content of their expression. When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination.

*Id.* at 828–29 (citation modified). As the Court later noted, "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11 (2018).

By prohibiting "[e]ngage[ment]" that "increas[es] awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin," Section 3(b)'s incorporation of Sections 2(d) and 3(i) discriminate on the basis of content. But they also discriminate on the basis of viewpoint by allowing teachers to explain how issues of economics, class, religion, and political party play a role in shaping society, but not issues related to race, sex, color, gender identity, sexual orientation, and national origin. Just as "[i]t discriminates on the basis of viewpoint to permit school property to be used for the presentation of all views about family issues and child rearing except those dealing with the subject matter from a religious standpoint," *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993), it discriminates on the basis of viewpoint to permit classes to present all views about history and sociology except those related to race, sex, and gender. Indeed, in *Rosenberger*, the Court explained that "[i]f the topic of debate is,

for example, racism, then exclusion of [targeted] views on that problem is . . . offensive to the First Amendment." 515 U.S. at 831. Surely it is just as offensive to exclude the subject of racism altogether when the topic is problems in American history or American society.

Section 3(b)'s incorporation of Section 2(e), Section 3(f), and Section 3(g) explicitly single out the State's prohibited concepts and other disfavored ideas—"transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege," as well as diversity, equity, and inclusion—and ban any viewpoints on those concepts that the State disfavors. These provisions make an "authoritative selection" as to which ideas are permissible, and which must be censored based on viewpoint. *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). By prohibiting instruction that "[e]ngage[s]" or "promote[s]" particular views, the law "effects a sweeping restriction" that covers any "advoca[cy] [of] a philosophic position that rests upon" those views. *Rosenberger*, 515 U.S. at 836.

The challenged provisions cast an unconstitutional "pall of orthodoxy over the classroom" in all of Mississippi's public schools. *Keyishian*, 385 U.S. at 603.

**B. The First Amendment Protects the Rights of University and College Teachers and Students and Prohibits Restrictions Like Those Challenged Here.**

*Keyishian* involved the First Amendment rights of college and university professors. The Court noted that "academic freedom . . . is of transcendent value to all of us" and "is therefore a special concern of the First Amendment." *Id.*; *see also In re Dinnan*, 661 F.2d 426, 430 (5th Cir. Unit B 1981) ("Time after time the Supreme Court has upheld academic freedom in the face of government pressure."). Over 50 years ago, this Circuit recognized that precedent "leave[s] no room for the view that . . . First Amendment protections should apply with less force on college campuses than in the community at large." *Bazaar v. Fortune*, 476 F.2d 570, 572, 580 (5th Cir. 1973), *affirmed as modified*, 489 F.2d 225 (5th Cir. 1973) (en banc) (per curiam).

The First Amendment harms inflicted by HB 1193 are particularly clear "in the social sciences, where few, if any, principles are accepted as absolutes[,] . . . [and t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (plurality opinion). But the challenged provisions go further than the social sciences and into biology and medical school courses and other scientific disciplines where issues of sex and other prohibited subjects are relevant.

By prohibiting educators from teaching disfavored concepts, HB 1193 also denies students the right to learn from and openly discuss those viewpoints. The Supreme Court has long held that the First Amendment protects not only the right to speak but also to receive speech. "The right of freedom of speech and press . . . embraces the right to distribute literature and necessarily protects the right to receive it." *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (citation modified).

Students can be prepared for participation in democratic society only if they are "trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603 (citation modified). The challenged provisions deny students that training and deny them the opportunity to sharpen their minds by engaging in debate on certain subjects and with differing viewpoints.

Individual students and student groups have First Amendment rights. In *Rosenberger*, the Supreme Court held that a university funding policy violated the First Amendment because it "cast disapproval on particular viewpoints." 515 U.S. at 836. There, a student group followed university procedures to request funding for its newspaper, "Wide Awake: A Christian Perspective at the University of Virginia." *Id.* at 826. Its funding request was denied based on guidelines prohibiting funding for activities that "primarily promote[] or manifest[] a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 825. The Supreme Court explained that the denial

of funding—and the guidelines themselves—violated the First Amendment because they "risk[ed] the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." *Id.* at 836.

Here, Plaintiff student group WiSE (Women in Science and Engineering) at the University of Southern Mississippi seeks to help women, LGBTQ+ people, and others succeed in STEM fields. ROA.102–04. Plaintiff student group FLARE (Fostering LGBTQ+ Advocacy, Resources, Environments) at Mississippi State University advocates for improved support for the LGBTQ+ community on campus; holds educational events to increase awareness of issues related to gender identity, gender, and sexual orientation; and hosts social gatherings on campus to foster community with and support for LGBTQ+ people. ROA.131–33.

Section 5(c) excludes from the Act's provisions "[a]n activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used*." (Emphasis added). These two organizations along with many others have received state funds. The challenged provisions would seem to preclude them from receiving state funds because of their viewpoints and missions regarding sex, gender identity, sexual orientation, DEI, and related concepts. As in *Rosenberger*, this provision, and the denial of funding, violates the First Amendment because it "risks the suppression of free speech and

creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses." 515 U.S. at 836.

### C. The First Amendment Protects the Rights of K-12 Teachers and Students and Prohibits Restrictions Like Those Challenged Here.

While these rights of teachers and students apply with particular force at the college level, they also apply in K-12 education. The Supreme Court in *Meyer v. Nebraska*, 262 U.S. 390 (1923), struck down a state law prohibiting students in eighth grade or lower from learning a foreign language, holding that this violated the rights of teachers and parents of students. In *Epperson v. Arkansas*, 393 U.S. 97 (1968), the Supreme Court struck down a law prohibiting the teaching of evolution in K-12 public schools, as well as public colleges and universities. Although the Court relied on the Establishment Clause, it emphasized the duty of federal courts "to apply the First Amendment's mandate in our educational system where essential to safeguard the fundamental values of freedom of speech and inquiry." *Id.* at 104. Indeed, the Court in *Epperson*, which involved a tenth-grade biology teacher, highlighted First Amendment principles from *Shelton v. Tucker*, which involved both high school and college teachers, and *Keyishian*, which involved college professors:

> By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values. On the other hand, "*[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.*" As this Court said in Keyishian v. Board of

Regents, *the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom."*

*Epperson*, 393 U.S. at 104–05 (first quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960); and then quoting *Keyishian*, 85 U.S. at 603) (emphases added).

In *Tinker v. Des Moines Independent Community School District*, the Supreme Court held:

*First Amendment rights*, applied in light of the special characteristics of the school environment, *are available to teachers and students*. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. This has been the unmistakable holding of this Court for almost 50 years.

393 U.S. 503, 506 (1969) (emphases added). There, the Supreme Court concluded that the Des Moines schools violated the First Amendment rights of two high school students and one junior high student by suspending them after they wore black armbands to school to protest the Vietnam War. The Court explained:

*In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved.* In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Id.* at 511 (emphasis added).

Of course, in K-12 schools, teachers have less freedom to control the curriculum and the subject matter of classes than they do at the college level. But once state authorities choose the course and subject matter, they cannot censor

classroom discussion related to that subject matter. If the course involves history and the subject matter includes the Civil War, the State cannot prohibit teachers and students from talking about the role slavery (which is an "issue related to race") played in causing the war. *See* MISS. DEP'T OF EDUC., MISSISSIPPI COLLEGE- AND CAREER-READINESS STANDARDS FOR THE SOCIAL STUDIES 39 (2023) (fourth-grade standards: "Analyze Mississippi's role in the Civil War," including by "[o]utlin[ing] the cause and effects of slavery that led Mississippi to secede from the Union in 1861 and subsequently enter the Civil War."). As the Court said in *Tinker*, students "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511.

In addition to the classroom, teachers and students have free-speech rights in extracurricular activities. "The principle of these cases is not confined to the supervised and ordained discussion which takes place in the classroom." *Id.* at 512. The Supreme Court recently reaffirmed that "the First Amendment's protections extend to 'teachers and students,' neither of whom 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022) (quoting *Tinker*, 393 U.S. at 506). The Court in *Bremerton* not only reaffirmed *Tinker*'s reasoning but also recognized that the free-speech rights of public-school teachers exist on campus even outside of classroom hours, which confirms those rights for students as well.

**D. The Challenged Provisions Do Not Survive Strict Scrutiny.**

 "[R]estrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Mansky*, 585 U.S. at 11. The challenged provisions fail strict scrutiny, as they are not "narrowly tailored to serve a compelling governmental interest." *Ashcroft v. ACLU*, 542 U.S. 656, 661 (2004). To the extent the government's objective is prohibiting discriminatory practices, this case challenges a handful of free-speech provisions in HB 1193, but does not challenge much of the law, including Sections 3(a), (c)–(e), and (h), or any state and federal laws that prohibit discrimination in public schools.

The State of Mississippi can prevent discrimination without prohibiting educators and students from discussing particular subjects and particular views.

**E. The Challenged Provisions Are Subject to Strict Scrutiny Despite the State's Effort to Label Them as Government Speech.**

The State attempts to label these provisions as "government speech"—including the right to "devis[e] the state curriculum"—to which the prohibition on viewpoint discrimination does not apply. Br. 32–33 (citation modified). But the Supreme Court has warned that the government-speech doctrine "is susceptible to dangerous misuse": "If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Matal v. Tam*, 582 U.S. 218, 235 (2017).

"For this reason," courts must "exercise great caution before extending [the Supreme Court's] government-speech precedents." *Id.*

While the Supreme Court has emphasized "[t]he State's undoubted right to prescribe the curriculum for its public schools," the Court held in *Epperson* that it "does not carry with it the right to prohibit . . . the teaching of a scientific theory or doctrine where that prohibition is based upon reasons that violate the First Amendment." 393 U.S. at 107. As the Court noted:

> Arkansas' law cannot be defended as an act of religious neutrality. Arkansas did not seek to excise from the curricula of its schools and universities all discussion of the origin of man. The law's effort was confined to an attempt to blot out a particular theory because of its supposed conflict with the Biblical account, literally read.

*Id.* at 109. Similarly, Mississippi has chosen to teach American history, English literature, sociology, biology, and other subjects. Its effort to "blot out" all discussion of "issues related to race, sex," and the other prohibited subjects "cannot be defended as an act of [viewpoint] neutrality."

*Tinker* confirms this, noting that "students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate" and "may not be confined to the expression of those sentiments that are officially approved." 393 U.S. at 511.[3]

---

[3] The State cites *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), but that case involved only the State's right to choose a textbook, not to impose the sort of broad bans on all discussion of certain issues that were imposed here.

In *Board of Education v. Pico*, 457 U.S. 853 (1982), Justice Rehnquist's three-Justice dissent "cheerfully concede[d]" that Justice Brennan's four-Justice plurality was right when it said:

> If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students . . . . The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of *ideas*.

*Id.* at 870–71 (plurality opinion); *id.* at 907 (Rehnquist, J., dissenting). Although that case involved school libraries, surely the same would be true if a state legislature banned discussion of the Republican Party but not the Democrats in American Government courses, or banned all discussion of racial integration but not racial segregation in sociology courses. That same principle applies in the present case. The invocation of "government speech" does not insulate this law from strict scrutiny.

### F. The Challenged Provisions Are Not Reasonably Related to Legitimate Pedagogical Concerns and Have No Valid Educational Purpose.

The State argues that the First Amendment does not apply here because "State officials . . . may limit 'student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns.'" Br. 42 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988)). The *Kuhlmeier* Court went on to say that when school censorship "has no valid

educational purpose," "the First Amendment is so 'directly and sharply implicate[d]' as to require judicial intervention to protect students' constitutional rights." 484 U.S. at 273 (quoting *Epperson*, 393 U.S. at 104).

Here, the challenged provisions are not reasonably related to legitimate pedagogical concerns and have no valid educational purpose. The State's only claim is that "schools have a legitimate—indeed, a compelling—interest in discouraging racism, sexism, and other discrimination." Br. 42. But abolishing all discussion of race, sex, color, gender identity, sexual orientation, and national origin—whether in extracurricular activities or in the classroom studying history, biology, English literature, or a whole host of other subjects—has no valid educational purpose and is not a reasonable way to discourage racism, sexism, and other discrimination.

The State's brief quotes *Kuhlmeier*: "[A] school need not tolerate student speech that is inconsistent with its basic educational mission." *Id.* (quoting 484 U.S. at 266 (citation modified)). But talking about subjects like race and sex is integral to the mission of informing and educating students about history, biology, sociology, literature, and so much more in the public schools of Mississippi. If this injunction is vacated and the State is allowed to enforce the challenged restrictions, Mississippi will be the only State in the Union where students are prohibited by law from learning about and discussing these subjects. It is the challenged restrictions

themselves, not the speech of public-school students and teachers, that is inconsistent with the basic educational mission of the State of Mississippi.

## II. PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR VAGUENESS CLAIM.

A piece of legislation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). In the First Amendment context, vagueness is especially deleterious since vague laws force potential speakers to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation modified). The Court insists on the legislation being even clearer when it "abuts upon sensitive areas of basic First Amendment freedoms." *Grayned*, 408 U.S. at 109 (citation modified). For laws which affect speech, such as here, the Supreme Court insists that the "test of vagueness applies with particular force." *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976).

Vagueness robs an individual of due notice because the law's vague scope does not provide "a reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108. Also, "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them" in order to avoid "the attendant dangers of arbitrary and discriminatory application." *Id.* at 108–09.

The operative complaint in this case describes the relevant provisions, ROA.995–1013, and explains how many of the prohibitions are vague and confusing. (All of these pages are in Plaintiffs' Record Excerpts.) The complaint also describes the exceptions, explaining how they add to the vagueness and confusion, ROA.1003–10, and how the policies and procedures exacerbate the vagueness and confusion.[4]

The State's claims that "there are no penalties for educators or students" and "the Act does not regulate individual students" demonstrate how confusing this whole business is. An educator or a student, or a school board investigating a complaint, might agree with the Attorney General on these points, particularly now that she has stated it in writing, but others, including other school boards investigating a complaint, could look at the text and come to the opposite conclusion. Educators and students have no notice of whether and how they can be penalized, and students have no notice of whether the challenged provisions apply to them. The vagueness allows for arbitrary enforcement from district to district. In *SEIU, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010), this Court held a permitting ordinance unconstitutionally vague because the phrase "public gathering" was not

---

[4] Paragraph 65 of the operative complaint contains an opening sentence that should not be there. It was inadvertently copied and pasted from the first sentence of the subsequent paragraph.

defined and the places the ordinance applied were so unclear that groups did not know whether they were covered:

> [P]ermitting obligations require more than a loose understanding. We perceive no manner by which a group of reasonable persons, perhaps somewhat small in number, . . . *would know what they are obligated to do and to avoid doing*.

*Id.* at 605 (emphasis added). The same is true here.

The problem is also illustrated by the State's claim that the relevant provisions are not concerned with "instructing students on 'history' or 'literature,'" Br. 49, even though the bans cover "formal or informal education." Indeed, the State describes as "over-caffeinated" Plaintiffs' concerns and the district court's findings that the challenged provisions would prevent discussion of civil rights history, Dr. Martin Luther King, Jr., the Ku Klux Klan, the Fourteenth Amendment, Juneteenth, and the novel *Of Mice and Men*. Br. 47. But all of those seem to be "issues related to race," and therefore encompassed by Section 3(b)'s prohibition on "[e]ngage[ment]" with the issues listed in Section 2(d). The Attorney General apparently believes these are not "issues related to race," which foreshadows the vagueness and confusion that will ensue if the challenged provisions go into effect. The examples could go on and on.

Similarly, the language of "related formulation of these concepts" is included in Section 3(f). ROA.1001. Moreover, multiple provisions, including Sections 3(f) and (g), ban "promot[ing]" and "endors[ing]" certain concepts, which raises the

question of whether simply discussing them violates the bans. ROA.1001–03; *see Keyishian*, 385 U.S. at 600 (the use of undefined terms like "advocating," "advising," and "teaching" contributes to the unconstitutional vagueness of the prohibition at issue). The same is true of Section 3(b)'s use of the word "[e]ngage" with respect to Section 2(d) and the list of "divisive concepts" in Section 2(e). If a history teacher describes the prevailing doctrine of white supremacy during much of our history, will the teacher be "[e]ngag[ing] in divisive concepts" by describing the beliefs of most white people during those times that their race was "inherently superior to another race" (to quote Section 2(e)(i)) and that "an individual's moral character is necessarily determined by his or her race" (to quote Section 2(e)(v))? *See also* ROA.997–1000.

The State refers to the exceptions for "scholarly research" and "creative work" in Section 5(b) and for "applicable academic accreditation standards or requirements" in Section 5(j). But most classroom lessons and discussions are not based on the scholarly research and creative work of the particular teacher. While teachers and students are free to "[e]ngage" with the banned subjects in their own work, the question remains whether they can thereby inject the banned subjects into the class discussion. The accreditation standards are phrased in different terms than the banned subjects, and both educators and students will have a difficult time deciding whether the standard or the Act controls. The same is true for Section 5(h)'s

29

exception for conflicts with federal and state law. Most educators are not lawyers, and weighing the risk of following this law or an apparently contrary law is a hazardous enterprise. These are just some of the confusing problems posed by the exceptions in Section 5 of the Act. *See* ROA.1003–10.

All of this vagueness is compounded by the fact that, if educators and students can be penalized as part of the "cure," nothing prevents them from being penalized even if they did not know they violated the Act. The absence of a state-of-mind requirement is an additional indication of unconstitutional vagueness. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162–63 (1972).

In light of the foregoing, and the problems spelled out in more detail in the operative complaint, ROA.995–1013, the relevant provisions of the Act— individually and collectively—fail adequately to define whose behavior is covered, whose actions are subject to penalty, and what speech is prohibited. If the injunction is lifted, educators and students in the public schools in Mississippi will not know what the law requires of them and what the consequences of a violation are. Plaintiffs are likely to succeed on their Fourteenth Amendment vagueness claim.

## III. The Challenged Provisions Are Facially Unconstitutional or, Alternatively, Unconstitutional as Applied to Classroom Instruction and Extracurricular Activities.

Against that backdrop, the State's lead argument is that facial relief is improper because the district court failed to conduct a *Moody*-type analysis. *See* Br.

3–4, 23–28 (citing *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)). That argument fails for four reasons.

### A. *Brunetti* Governs Plaintiffs' First Amendment Facial Challenge.

In *Iancu v. Brunetti*, 588 U.S. 388, 398–99 (2019), the Supreme Court addressed the argument that the State now makes: that a viewpoint-discriminatory statute was "salvageable by virtue of its constitutionally permissible applications." *Id.* at 398. Like the State here, the Government in *Brunetti* argued that the viewpoint-discriminatory statute's "unconstitutional applications [were] not 'substantial' relative to 'the statute's plainly legitimate sweep.'" *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)); *see* Br. 43.

Justice Kagan's majority opinion rejected that argument. *Brunetti*, 588 U.S. at 398–99. The *Brunetti* majority explained that the Supreme Court "has never" applied that standard—and "unlikely" ever "would" apply it—to a "viewpoint-discriminatory law" (such as a statute prohibiting, say, "'divisive' . . . speech"):

> [T]his Court has never applied that kind of analysis to a viewpoint-discriminatory law. In *Tam*, for example, we did not pause to consider whether the disparagement clause might admit some permissible applications (say, to certain libelous speech) before striking it down. The Court's finding of viewpoint bias ended the matter. And similarly, it seems unlikely we would compare permissible and impermissible applications if Congress outright banned "offensive" (or to use some other examples, "divisive" or "subversive") speech. Once we have found that a law "aim[s] at the suppression of" views, why would it matter that Congress could have captured some of the same speech through a viewpoint-neutral statute? *Tam*, [582 U.S. at 248] (opinion of Kennedy, J.).

*Id.*

Justice Kagan's majority opinion in *Moody* is consistent with her majority opinion in *Brunetti*. The First Amendment issue in *Moody* related to the right of social media platforms to exercise their own editorial judgment (irrespective of viewpoint) over whether and how to display third-party posts. 603 U.S. at 717. The Supreme Court decided *Moody* on the premise that the challenged statutes were *not* viewpoint-discriminatory: The Fifth and Eleventh Circuits both rejected the viewpoint-discrimination claims, and the Supreme Court denied certiorari on that issue.[5] So *Moody* invoked the decades-old standard governing First Amendment facial challenges of non-viewpoint-discriminatory statutes. *See* 603 U.S. at 723–24, 743–44. All to say, Justice Kagan's majority opinion in *Moody* had no occasion to address (much less abandon) her majority opinion in *Brunetti*. *Brunetti* remains binding.[6]

The State's one-paragraph argument to the contrary is unpersuasive. Br. 27–28.

---

[5] *See Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023) (granting certiorari "limited to Questions 1 and 2 presented by the Solicitor General"); *NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (2023) (same); Brief for United States as *Amicus Curiae* at i, 12, 22–24, *Moody v. NetChoice, LLC*, No. 22-277 (U.S. Aug. 14, 2023) (recommending that the Court deny certiorari on Question 4: whether the state statutes were "motivated by viewpoint discrimination," even though "the Fifth and Eleventh Circuits rejected those arguments").

[6] Even if the relevant passage of *Brunetti* were dicta, the Fifth Circuit is "generally bound by Supreme Court dicta, especially when it is recent and detailed." *McRorey v. Garland*, 99 F.4th 831, 837 (5th Cir. 2024) (citation modified).

*First*, the State submits that *Moody* applies to "all 'facial challenges'—including those 'based on the First Amendment.'" Br. 28 (quoting *Moody*, 603 U.S. at 723). The State argued otherwise below. *See* ROA.1387–88 (conceding that *Brunetti* may apply to viewpoint-discriminatory statutes that do not implicate government speech).

*Second*, the State asserts that "*Moody* itself involved claims that state laws were content- and viewpoint-based." Br. 28 (citing district-court orders). But again, the viewpoint-discrimination claims were not before the Supreme Court in *Moody*.

And *third*, the State submits that "the Act here regulates government speech." *Id.* That argument fails for the reasons discussed above. *Supra* pp. 22–24.

Thus, *Moody* does not apply to this case.

## B. In Any Event, Plaintiffs Have Satisfied a *Moody*-Type Analysis.

The district court correctly concluded that, even if *Moody* governed Plaintiffs' First Amendment claim, Plaintiffs satisfied a *Moody*-type analysis at the preliminary-injunction stage. ROA.979–80.

In the First Amendment context where the *Moody* analysis applies, "[i]f the challenger demonstrates that [a] statute prohibits a substantial amount of protected speech relative to its plainly legitimate sweep, then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will

hold the law facially invalid." *United States v. Hansen*, 599 U.S. 762, 770 (2023) (citation modified).

Under the *Moody* analysis, a court follows two analytical steps. First, it must "determine what the law covers": "[w]hat activities, by what actors," the law's provisions "prohibit or otherwise regulate." *Moody*, 603 U.S. at 724–25 (citation modified). And second, it must "decide which of the law['s] applications violate the First Amendment" and "measure them against the rest." *Id.* at 725. That two-step analysis allows a court to make the familiar bottom-line determination: whether "a substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 723 (citation modified).

Under that standard, the district court correctly concluded that Plaintiffs satisfied a *Moody*-type analysis. ROA.979–80.

At step one, the district court agreed with Plaintiffs about what the challenged provisions cover. Starting with text, the district court "generally agree[d]" with Plaintiffs' arguments, given the challenged provisions' "very wording." ROA.976–77. The district court further agreed that—given the "sweeping definitions" and funding-withdrawal penalty—the challenged provisions "almost assuredly" burden the speech of educators, administrators, students, and state-funded registered student organizations alike. ROA.976–77. Turning to actual fact, the district court found Plaintiffs' witnesses credible and accepted their testimony. *Id.* The district court

added: "Plaintiffs, through declarations, testimony, and logical argumentation, have identified many concrete examples of books, historical concepts, subjects, student organizations, and even fields of study that are arguably on the chopping block." ROA.979–80.

At step two, the district court agreed that the challenged provisions' text "fails to treat speech in a viewpoint-neutral manner" and poses "serious risks of terrible consequences with respect to the chilling of expression and academic freedom." ROA.976. Turning to actual fact, the district court found a "broad, chilling effect across public institutions and community organizations." ROA.708; *see* ROA.976 (incorporating TRO). Indeed, the district court found that schools had often "err[ed] on the side of caution by canceling or defunding programming," which only "accelerated" as the threat of state-funding withdrawal became "more imminent." ROA.705. Given Plaintiffs' evidence, the district court found "serious risks" of a "broad malaise of self-censorship that would necessarily trickle down to classroom instruction, teacher-student engagement with curriculum, and the ability of students to associate with respect to certain affinity or subject-matter groups." ROA.977. As in *Bonta*, Plaintiffs have established a "widespread burden" on First Amendment rights that justifies facial relief. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618–19 (2021).

And even if the district court's *Moody* analysis needed to be supplemented by the district court in the future, one of the issues for purposes of this preliminary-injunction appeal is Plaintiffs' likelihood of success on the merits. Plaintiffs are likely to succeed in demonstrating that the challenged provisions' unconstitutional applications "substantially outweigh" their constitutional ones. *Moody*, 603 U.S. at 724.

Starting with "what actors" are regulated, the challenged provisions are expansive. *Id.* at 724–25. They apply to teachers, administrators, and others who work for schools—as the State puts it, to "public schools and their employees." Br. 1, 31. Although the bans do not apply to an "activity of a registered student organization, guest speaker or performer . . . as long as state funds are not used," the bans seemingly do apply if state funds are used. *See* Br. 12, 31 (quoting Section 5(c)). The State's claims that the challenged provisions "do[] not regulate individual students," Br. 41, and that "there are no penalties for educators or students," Br. 51, are discussed elsewhere in the brief. But even if they regulated only administrators and teachers, and even if there are no penalties, restrictions on what they can discuss in this wide array of forums limit what students can hear and learn.

As for "[w]hat activities" are covered, the challenged provisions are sweeping. *Moody*, 603 U.S. at 724–25. While the provisions, exceptions, and policies and procedures collectively engender vagueness and confusion, they clearly

cover a lot. The broadest of the challenged provisions—Section 3(b)'s prohibition on all public K-12 schools, colleges, and universities from "[e]ngag[ing]" in "diversity training," as defined in Section 2(d) to include "formal or informal education, seminars, workshops or institutional program[s] that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin"—is barely mentioned in the State's brief. "Engage[ment]" would seem to include discussion, and "formal or informal education, seminars, workshops or institutional program[s]" encompass most of the school-sponsored intellectual activity on a campus. This ban on anything that "increas[es] awareness or understanding" of this wide array of issues will drastically restrict discussion in a large number of classes, as well as a host of extracurricular activities, gatherings, and discussions on school campuses. The same is true for Section 3(i), which applies to required courses and contains the same broad prohibition as Section 3(b)'s incorporation of Section 2(d).

Whatever the universe of constitutionally permissible applications of these sweeping restrictions on speech, the impermissible applications cut so deeply into public education as to "substantially outweigh" any permissible ones. *Moody*, 603 U.S. at 724. It is hard to imagine any constitutional application of these sweeping restrictions on speech across a wide array of public-school forums. The State has not suggested one in either the district court or this Court.

In sum, even if *Moody*'s standard governed, Plaintiffs satisfied it at the preliminary-injunction stage. If this Court believes *Moody* does apply and decides to remand the case for further review, Plaintiffs are likely to prevail on the merits on remand, and this Court should leave the preliminary injunction in place pending further review.

### C. *Moody* Does Not Apply to Facial Vagueness Challenges, and Plaintiffs Satisfied the Applicable Standard.

The State next argues that (1) *Moody* applies to facial vagueness challenges and (2) Plaintiffs failed to establish that the challenged provisions are vague in all of their applications. Br. 23–25, 27, 44–46. Both arguments fail. Plaintiffs have established that the challenged provisions are facially vague.

To begin, *Moody* does not address vagueness challenges. In *Moody*, Justice Alito observed that a vagueness claim was "not before [the Court] because the District Court did not rule on the vagueness issue." 603 U.S. at 772 n.8 (Alito, J., concurring in the judgment). Post-*Moody*, the Fifth Circuit has continued to analyze vagueness facial claims distinctly from First Amendment facial claims. *See White Hat v. Murrill*, 141 F.4th 590, 603–07 (5th Cir. 2025).

Instead, *Kolender v. Lawson* instructs that laws are "unconstitutionally vague *on [their] face*" when they "fail to meet constitutional standards for definiteness and clarity" or "encourage[] arbitrary enforcement by failing to describe with sufficient particularity" what is prohibited and what is not. 461 U.S. 352, 361–62 (1983)

(emphasis added). That requires facial invalidation of the challenged provisions. Indeed, Section 3(b)'s ban on "[e]ngage[ment]" with Section 2(e)'s list of "divisive concepts," Section 3(f), Section 3(g), and Section 3(i) are all laden with confusing language that prevents educators and students from understanding what is permissible and what is not. And some of the exceptions to the bans contained in Section 5 of the Act add to the confusion. Because educators and students cannot ascertain what speech is and is not permitted, these prohibitions are facially unconstitutional. *Supra* pp. 26–30.

In response, the State argues: "[T]o be facially vague, a law must be 'impermissibly vague in all of its applications.'" Br. 44 (quoting *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023)). That argument fails for three reasons.

*First*, the Supreme Court rejected the all-applications standard in *Johnson* and *Dimaya*. In *Johnson*, Justice Scalia's majority opinion explained that, although some "statements" from earlier decisions "could be read to suggest otherwise," the Court's "*holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). *Dimaya* reiterated what *Johnson* "made clear." *Sessions v. Dimaya*, 584 U.S. 148, 159 n.3 (2018). Given the Supreme Court's rejection of the all-applications standard, other courts have

declined to apply it. *See, e.g.*, *Loc. 8027, AFT-N.H. v. Edelblut*, 651 F. Supp. 3d 444, 446–47, 455–59 (D.N.H. 2023), *appeal filed*, No. 24-1690 (1st Cir. July 24, 2024) (addressing a "divisive concepts" statute, surveying lower-court decisions rejecting the all-applications standard, and concluding that "the Supreme Court has decisively rejected" that standard). Although this Court has invoked the all-applications standard post-*Johnson*, Plaintiffs are aware of no cases from this Court addressing whether and how it comports with *Johnson*.[7]

*Second*, even if the all-applications standard survived *Johnson*, it would not apply here. Pre-*Johnson* cases clarified that the all-applications standard did not apply to laws that reach a "substantial amount of constitutionally protected conduct." *United States v. Hicks*, 980 F.2d 963, 972 (5th Cir. 1992) (citation modified); *see also, e.g.*, *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 546, 548 (5th Cir. 2008); ROA.948 (the State conceding that point). After all, the all-applications language came from *Hoffman Estates*, which itself "permit[ted] a facial challenge if a law reaches 'a substantial amount of constitutionally protected conduct.'" *Kolender*, 461 U.S. at 358 n.8 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982)); *Woodlands Pride v. Paxton*, No. 23-20480,

---

[7] *But see, e.g.*, *United States v. Westbrooks*, 858 F.3d 317, 325 (5th Cir. 2017), *cert. granted, judgment vacated on unrelated grounds*, 584 U.S. 901 (2018) ("Westbrooks rightly argues that, after *Johnson* . . . , [the challenged statute] is not saved by the fact that some conduct clearly falls within [its] prohibition."). In *McClelland*, that issue was not briefed or addressed. *Compare* Brief of Appellees at 41, No. 21-20625 (5th Cir. July 22, 2022), *with* 63 F.4th at 1013 & n.85.

2026 WL 523811, at *9 (5th Cir. Feb. 25, 2026) ("[F]acial vagueness challenges are permissible when constitutionally protected activity is implicated."). And here, the challenged provisions reach a substantial amount of protected conduct. *Supra* pp. 13–30. For that reason, too, the all-applications standard is inapplicable.

And *third*, even if the all-applications standard applied here, Plaintiffs have satisfied it. A law is "vague in all its applications where it subjects the exercise of a right to an ascertainable standard or if, in other words, men of common intelligence must necessarily guess at its meaning." *United States v. Clark*, 582 F.3d 607, 613 (5th Cir. 2009) (citation modified); *see also Johnson*, 576 U.S. at 591 (explaining that the "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: If we hold a statute to be vague, it is vague in all its applications"). The challenged provisions lack an ascertainable standard. *Supra* pp. 26–30.

For those reasons, Plaintiffs have established that the challenged provisions are facially vague.

### D. Alternatively, Plaintiffs' As-Applied Challenge Would Still Justify Relief.

Even if facial invalidation were improper as to any of the challenged provisions, Plaintiffs alternatively raised as-applied challenges under the First and Fourteenth Amendments. ROA.637.

"[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).

Here, Plaintiffs established that the challenged provisions are unconstitutional under the First and Fourteenth Amendments. *Supra* pp. 13–30. So even if any of the challenged provisions have a legitimate sweep with respect to, say, faculty workshops or other forums outside of classroom and extracurricular activities that is not substantially outweighed by their unconstitutional applications, Plaintiffs' alternative as-applied challenge would still justify relief.

Accordingly, even if this Court concluded that the district court should not have enjoined some or all of the challenged provisions in their entirety, this Court can modify the injunction to limit it to classroom instruction and extracurricular activities. *See Texas v. United States*, 126 F.4th 392, 422 (5th Cir. 2025). Or this Court can order the district court to modify the injunction consistent with this Court's instructions. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005). Either approach would avoid the irreparable harm and confusion that would result if the challenged provisions went into effect and certain subjects suddenly had to be excluded from classroom instruction and extracurricular activities throughout Mississippi's public schools and colleges.

## IV. PLAINTIFFS HAVE ESTABLISHED THE OTHER PRELIMINARY-INJUNCTION FACTORS.

The State briefly submits that the equities weigh against injunctive relief. Br. 51–54. The State is wrong.

### A. Plaintiffs Have Established a Substantial Threat of Irreparable Injury.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340–41 (5th Cir. 2024) (citation modified). That is because "[t]he loss of constitutional freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *SO Apartments, L.L.C. v. City of San Antonio*, 109 F.4th 343, 353 (5th Cir. 2024) (citation modified). Here, Plaintiffs have shown that the challenged provisions violate their rights under the First and Fourteenth Amendments. The district court correctly concluded that Plaintiffs have established a substantial threat of irreparable injury. *See, e.g.*, ROA.705, 976–77.

### B. The Balance of Harms and Public Interest Support an Injunction.

Turning to the third and fourth factors, the balance of harms and the public interest "merge when the government opposes an injunction." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 254 (5th Cir. 2024).

And the Fifth Circuit has repeatedly held that "injunctions protecting First Amendment freedoms are always in the public interest." *E.g.*, *Healthy Vision Ass'n*

*v. Abbott*, 138 F.4th 385, 408 (5th Cir. 2025) (citation modified). The district court correctly concluded that the balance of harms and the public interest support an injunction. *See, e.g.*, ROA.706–08, 976–77, 980.

The State raises four arguments to the contrary. Each is unpersuasive.

*First*, the State submits that this injunction inflicts a general harm: inability to enforce a duly enacted statute. Br. 51–52. But "the State and the public won't be injured by an injunction of a statute that likely violates the [Constitution]." *Book People*, 91 F.4th at 341.[8]

*Second*, the State argues that this injunction inflicts a particular harm: preventing the enforcement of some statutory provisions that assertedly "help[] to ensure that public-school students and employees remain free from DEI-related discrimination." Br. 5; *see also* Br. 21, 52. But "case law counsels against advancing those interests in that way." *Healthy Vision Ass'n*, 138 F.4th at 408. The "harm" of having to advance governmental interests within constitutional bounds "is really no harm at all." *McDonald v. Longley*, 4 F.4th 229, 255 (5th Cir. 2021) (citation modified). Just so here, where Plaintiffs only challenged—and the district court only enjoined—certain provisions of HB 1193 that violate the First and Fourteenth Amendments.

---

[8] The State relies on *Abbott*, which held that a State suffers harm from inability to enforce a state statute—"[u]nless that statute is unconstitutional." *Abbott v. Perez*, 585 U.S. 579, 602 & n.17 (2018); *see* Br. 51–52.

*Third*, the State argues that the public interest is "especially harmed" because the district court granted facial relief on a universal basis. Br. 53–54. That argument fails because facial relief was proper, *supra* pp. 30–40, and so was the scope of the injunction, *infra* pp. 47–49.

And *fourth*, the State argues that this injunction risks "devastat[ing]" harm, given the Trump administration's threat to withhold federal funds from schools that "'fail to comply' with the government's view of federal laws related to DEI."[9] That argument fails for several reasons. For starters, a federal court has vacated and set aside the administration's "Dear Colleague Letter"—on First Amendment and vagueness grounds.[10] After dismissing its appeal, the administration stipulated that the vacated Letter "will not be relied on in any way by Defendants including by way of seeking to enforce [its] substance through [Department of Education], [Office for Civil Rights], or Department of Justice civil rights investigation or enforcement

---

[9] Br. 52–53 (quoting State's memorandum, ROA.624–25, which principally cited the administration's "Dear Colleague Letter," ROA.565–68); *see also id.* at 5, 7–9 (similar). Below, the State likewise relied on the threat that the administration would enforce its "Dear Colleague Letter." ROA.560–69, 595, 1318–19, 1392.

[10] *Am. Fed'n of Tchrs. v. Dep't of Educ.*, 796 F. Supp. 3d 66, 111–13, 116–17, 123 (D. Md. 2025) (holding that the Letter was "textbook viewpoint discrimination" and "chill[ed] the lawful and societally beneficial speech of regulated persons who [did] not understand what DEI- or race-related speech might be allowed" (citation modified)), *appeal dismissed per stipulation*, Order, No. 25-2228 (4th Cir. Jan. 22, 2026), ECF No. 27.

procedures."[11] In any case, even if the administration had proceeded to enforce the vacated Letter's substance, the State has "never explain[ed] how a federal court injunction against the challenged provisions would cause the State to violate Title VI or the [*Students for Fair Admissions v. Harvard*] decision, much less that it would lead to the withholding of federal funds." ROA.644.[12] Meanwhile, the injunction rightly avoids a harm that the State acknowledged would be (at least) "as financially devastating" for many schools: the withholding of all *state* funding based on two uncured violations of the challenged provisions. ROA.980 (quoting State's proposed findings of fact, ROA.953).[13] And lastly, again, "injunctions protecting First Amendment freedoms are always in the public interest." *Healthy Vision Ass'n*, 138 F.4th at 408 (citation modified).

---

[11] Joint Motion to Dismiss at 2, *NAACP v. U.S. Dep't of Educ.*, No. 1:25-CV-1120 (D.D.C. Feb. 6, 2026), ECF No. 40; *see also* Joint Motion to Dismiss at 2, *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, No. 1:25-CV-91 (D.N.H. Feb. 3, 2026), ECF No. 99 (similar).

[12] The State argues that the district court "acknowledged the 'real threat' of the loss of federal funding." Br. 53 (quoting ROA.980). But the district court was quoting what "Defendants . . . argue[d]" in their proposed findings of fact. ROA.980; *see* ROA.953.

[13] The State's evidence below showed that most schools received more in state funds than they received in federal funds. *See* ROA.581–94, 595–98, 604–06. Even so, the State interprets the district court's order to hold that enforcing the challenged provisions "could jeopardize Mississippi schools' *federal* funding." Br. 53 (emphasis added). But in context, the order was reiterating the district court's concern that enforcing the challenged provisions would jeopardize *state* funding. *See* ROA.969–70, 972, 980 (quoting ROA.953); *see also, e.g.*, ROA.1403–06.

## V. THE INJUNCTION'S SCOPE WAS PROPER.

The district court properly issued a statewide preliminary injunction on two independent bases: (1) to protect statewide classes of individuals from irreparable harm; and (2) to provide complete relief to Plaintiffs who have suffered and will suffer irreparable injury to their constitutional rights.

### A. The District Court Correctly Granted a Classwide Injunction.

The district court may rely on its equitable authority to grant preliminary injunctive relief to all members of the putative classes at this initial stage in the litigation. *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025) (holding that "courts may issue temporary relief to a putative class" and "need not decide whether a class should be certified . . . in order to temporarily enjoin the Government from [irreparably harming] putative class members"). Here, the operative complaint requested relief for putative classes of plaintiffs across the State of Mississippi. ROA.1019–22. The classes include all educators, students, and parents or guardians of minor students at public K-12 schools, colleges, and universities in Mississippi. *Id.* The State did not oppose the filing of the operative complaint and has not moved to dismiss it. Plaintiffs timely filed a Motion for Class Certification on March 5, 2026, seeking certification of two classes, each with two subclasses, pursuant to Federal Rule of Civil Procedure 23(b)(2). ECF No. 85. The district court has not ruled on the motion. Local Rule 23 requires that the class action motion be filed by the date set out in the

case management order. L.U. Civ. R. 23. No case management order has been issued, and no class action deadline has been set.

Rule 23(b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). As such, this case is one quintessentially qualified for class certification, for "civil rights cases against parties charged with unlawful, class-based discrimination are prime examples of what [Rule 23](b)(2) is meant to capture." *Id.* at 361 (citation modified).

In fact, courts have routinely certified classes in such civil rights cases brought against government defendants for injunctive or declaratory relief, when the legality of the policy does not turn on how it impacts specific individuals. *See, e.g.*, *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 99–100 (D.D.C. 2025), *appeal filed*, No. 25-5243 (D.C. Cir. July 2, 2025); *Roe ex rel. Roe v. Herrington*, No. 4:20-CV-484, 2023 WL 5759590, at *3 (D. Ariz. Aug. 10, 2023), *appeal filed*, Nos. 25-6970 & 25-6980 (9th Cir. Nov. 4, 2025); *U.S. Navy Seals 1-26 v. Austin*, 594 F. Supp. 3d 767, 779 (N.D. Tex. 2022), *appeal dismissed as moot*, 72 F.4th 666, 669 (5th Cir. 2023).

Because this case is a putative class action, and one that, should it proceed, will likely proceed as a class action, the district court properly granted the preliminary injunction on a classwide basis. The absent class members become

parties such that the Court's statewide preliminary injunction grants relief as to all parties to the case, without the injunction "being broader than necessary to provide complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861.

## B. A Statewide Injunction is Necessary to Provide Complete Relief to Plaintiffs.

Any injunction must "provide complete relief to each plaintiff with standing to sue." *Id.*

The district court stated plainly, "[s]omething less than a statewide preliminary injunction would be insufficient to afford complete relief to these putative plaintiffs." ROA.976.

As the district court found: "[A]n injunction limited to the named plaintiffs would . . . be unsatisfying as to granting them complete relief" and would be "impracticable if not impossible" because "institutions may need to craft different classes, textbooks, and curricula to accommodate named Plaintiff teachers and students," and "Plaintiff students would be deprived of the opportunity to interact with and learn from their fellow students at schools across the state" about the banned concepts. *Id.* Accordingly, the injunction was necessary to afford complete relief to the parties.

# CONCLUSION

This Court should affirm the district court's preliminary-injunction order. Alternatively, this Court should order that the preliminary injunction be modified to enjoin the challenged provisions as applied to classroom instruction and extracurricular activities.

Dated: March 13, 2026

Respectfully submitted,

/s/ *Joshua Tom*

JOSHUA TOM
MCKENNA RANEY
AYANNA HILL
BRENDAN HOPKINS
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION, INC.
P.O. Box 2242
Jackson, MS 39225
(601) 354-3408
jtom@aclu-ms.org

AMIR BADAT
BADAT LEGAL PLLC
P.O. Box 15
Tougaloo, MS 39174
(601) 462-9592
amir.badat@gmail.com

ROBERT B. MCDUFF
PALOMA WU
MISSISSIPPI CENTER FOR JUSTICE
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
(601) 259-8484
rmcduff@mscenterforjustice.org

RICHARD ROUCO
QUINN, CONNOR, WEAVER, DAVIES &
ROUCO LLP
2 20th Street North, Suite 930
Birmingham, AL 35203
(205) 870-9989
rrouco@qcwdr.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I, Joshua Tom, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: March 13, 2026          /s/ *Joshua Tom*
                               Joshua Tom
                               *Attorney of Record for Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2, this document contains 11,761 words.

2. This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This document's footnotes are in 12-point Times New Roman font, per Fifth Circuit Rule 32.1.

Dated: March 13, 2026

/s/ *Joshua Tom*
Joshua Tom
*Attorney of Record for Plaintiffs-Appellees*