**Case No. 25-60496**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, INDIVIDUALLY AND ON BEHALF OF A
CLASS OF ALL OTHERS SIMILARLY SITUATED; JAMES THOMAS, INDIVIDUALLY AND AS NEXT FRIEND
TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; DAWN
ZIMMERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; L. E.
JIBOL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF
ALL OTHERS SIMILARLY SITUATED; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821;
MADISYN DONLEY, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
SITUATED; ALEXIS COBBS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
SITUATED; KAREN ADERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY
SITUATED; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, AND ENVIRONMENTS; WOMEN IN
SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR
CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; GREG POWELL,
INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL
OTHERS SIMILARLY SITUATED; JAKOB CLARK, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR
CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ASHLEY ROGERS,
INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL
OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

– v. –

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; GEE OGLETREE,
IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS
OF HIGHER LEARNING; STEVEN CUNNINGHAM, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE
BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, IN THEIR
OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF
HIGHER LEARNING; DONALD CLARK, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE
BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; ET AL.,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:25-CV-417

# BRIEF FOR PLAINTIFFS-APPELLEES

*(Counsel Listed on Inside Cover)*

JOSHUA TOM
MCKENNA RANEY
AYANNA HILL
BRENDAN HOPKINS
AMERICAN CIVIL LIBERTIES UNION
OF MISSISSIPPI FOUNDATION, INC.
P.O. Box 2242
Jackson, MS 39225
(601) 354-3408
jtom@aclu-ms.org

AMIR BADAT
BADAT LEGAL PLLC
P.O. Box 15
Tougaloo, MS 39174
(601) 462-9592
amir.badat@gmail.com

ROBERT B. MCDUFF
PALOMA WU
MISSISSIPPI CENTER FOR JUSTICE
210 E. Capitol Street, Suite 1800
Jackson, MS 39201
(601) 259-8484
rmcduff@mscenterforjustice.org

RICHARD ROUCO
QUINN, CONNOR, WEAVER, DAVIES &
ROUCO LLP
2 20th Street North, Suite 930
Birmingham, AL 35203
(205) 870-9989
rrouco@qcwdr.com

*Counsel for Plaintiffs-Appellees*

# RECORD EXCERPTS
## TABLE OF CONTENTS

**TAB**                                         **RECORD CITATION**

1      Excerpts from Second Amended Complaint        ROA.995-1013

**TAB**

**1**

**Excerpts from Second Amended Complaint**

regulations and sets standards and policies for the organization, operation, management, planning, budgeting and programs of the State Department of Education.

37.     Defendant Marcy Scoggins is the Chair of the Mississippi Charter School Authorizer Board and the members of the Board are Jay Carney, Sandra McKiernon, Erin Meyer, Ben Morgan, Candace Robins, and Jennifer Jackson Whittier. All are sued in their official capacities. The Mississippi Charter School Authorizer Board ("Charter School Board") is an independent state agency that holds exclusive chartering jurisdiction in Mississippi. The mission of the Charter School Board is to authorize and oversee charter schools.

## THE CHALLENGED LAW, HOUSE BILL 1193

38.     Section 3 of HB 1193 sets forth the various actions prohibited by the new law. It provides: "The [Defendants] shall ensure that each institution, college and public school, as applicable, shall not:". It then lists several different actions, in Sections (a) through (i), that will be prohibited. Of these, this lawsuit challenges the prohibitions in Sections 3(b), 3(f), 3(g), and 3(i), which will be discussed in more detail.

39.     Section 5 of the act lists certain purported exceptions to the prohibitions. But several of those exceptions – contained in Sections 5(b), 5(c), 5(d), 5(h), 5(i) and 5(j) – are vague, confusing, and illusory. Although the exceptions do not restrict or punish speech, they contribute to the vagueness that infects the prohibitions in certain portions of Section 3.

40.     Although the requirements contained in Section 3 place the onus initially on the Defendants to ensure that each school adheres to the prohibitions, the consequences may be severe for educators and students accused of violating them. As explained in the discussions of Sections 7–9 of the act later in this Complaint, it appears that schools may penalize teachers, administrators, and students as part of their statutory mandate to "cure" any violations,

14

potentially leading to termination or expulsion or other discipline and perhaps to a judgment for money damages in chancery court. If there are two or more uncured violations in a particular school, its state funding must be withheld, which likely would require the school to close, the teachers to be discharged, and the students sent home without further education.

41.     This complaint speaks of "educators," which includes teachers, librarians, and administrators. To the extent that administrators, including Ashley Rogers and those who are members of Plaintiffs UCW, are responsible for designing and administering programming to faculty and students that could violate the free speech bans in the act, they are subject to discipline and even termination for any violations they cause. In addition, they are in the unusual position of being called upon to enforce the act's prohibitions on teachers, librarians, and students. This will violate their own free speech rights when forced to enforce speech restrictions they disagree with, and they are subject to discipline and termination if they fail to "cure" any alleged violations of the act.

## THE BANS

### *The Prohibition of Awareness and Understanding of Issues Relating to Race, Sex, Color, Gender Identity, Sexual Orientation, and National Origin*

42.     The most striking of HB 1193's prohibited actions is in Section 3(b), which lists the following as a prohibited action: "Engage in divisive concepts as defined in *Section 2(d) and (e) of this act*[.]" (Emphasis added). Of these two Sections, 2(e) lists eight so-called "divisive concepts." The other Section, 2(d), is a definition of "diversity training" which is described as "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." In other words, the school shall not "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual

15

orientation or national origin." Of course, the very purpose of schools is to increase understanding and awareness.

43.    Similarly, Section 3(i) describes one of the prohibited actions as follows: "Require any 'diversity training' as defined in Section 2 or any other policies or procedures that result in any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin."

44.    Whether through the definition of "diversity training" in Section 2(d) or in the rest of the language about "policies and procedures," Section 3(i), like Section 3(b), prohibits "any formal or informal education, seminars, workshops or institutional program that focus on increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." The difference is that Section 3(i) prohibits "[r]equir[ing]" a "focus on increasing awareness or understanding" of these issues, while Section 3(b) prohibits any sort of "engage[ment]" with the issues. Section 3(i) applies to any required courses, including required history, literature, and constitutional law courses, or any required readings in elective courses. And Section 3(b) applies to any courses, required or elective.

45.    These restrictions imposed by Section 3(b)'s incorporation of Section 2(d), and also imposed by Section 3(i), are based on content. Speech is prohibited regarding "issues related to race, sex, color, gender identity, sexual orientation, or national origin," but speech is permitted on other important issues. including economics and religion and political party and a host of other matters. This content restriction is not justified by any compelling state interest.

*The Prohibition on "Engagement" with Eight "Divisive Concepts"*

16

46.     As mentioned previously, Section 3's prohibitions include the actions set forth in Section 3(b): "Engage in divisive concepts as defined in *Section 2(d) and (e)* of this act[.]" (Emphasis added). The prior section of this complaint discussed Section 2(d). Section 2(e) provides the following definition:

(e) "Divisive concepts" are concepts that:

(i)     One (1) race, sex, color, or national origin is inherently superior to another race or sex;

(ii)    An individual, by virtue of his or her race, sex, color, national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(iii)   An individual should be discriminated against or treated adversely solely because of their race, sex, color, or national origin;

(iv)    Members of one (1) race, one (1) sex, one (1) color, one (1) national origin cannot and should not attempt to treat others without respect to race, color, national origin or sex, gender identity, sexual orientation, or national origin;

(v)     An individual's moral character is necessarily determined by his or her race, color, sex, or national origin;

(vi)    An individual, by virtue of his or her race, color, sex or national origin, bears responsibility for actions committed in the past by other members of any class listed herein;

(vii)   An individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race, color, sex, or national origin; or

(viii)  Meritocracy or traits such as hard work ethic are racist or sexist, or were created by a particular class to oppress another class.

47.     This provision is extremely broad, prohibiting any sort of "engage[ment]" with any of the "divisive concepts." Each of the "divisive concepts" is framed as a viewpoint that is banned by the act. Meanwhile, the act permits "engage[ment]" with certain viewpoints contrary

17

25-60496.998

to the "divisive concepts." In other words, the act prohibits those viewpoints with which the legislature disagrees, while allowing other viewpoints.

48.     For example, Section 2(e)(viii)'s reference to "[m]eritocracy," which is not necessarily a racist concept, was often used in history in conjunction with the theory that other races were inferior to the white race and that segregation and exclusion of other races from certain professions, from government, from voting, from education, and from other arenas of public life were justified by "meritocracy." In that sense, "meritocracy" was used – and occasionally is still used today – as a racist concept. The same theory was used – and occasionally still is used – as a sexist concept to exclude women from many aspects of public life. But the prohibition on "engage[ment]" of this idea, contained in Section (viii), can be read to ban any sort of discussion of it, even in a history or sociology class.

49.     Similarly, Section 2(e)(ii) prohibits engagement with the idea that "[a]n individual by virtue of his or her race, sex, color, national origin, is inherently racist, sexist, or oppressive, whether consciously or unconsciously." This prohibition could apply to discussions of ideas such as implicit bias, whether in a sociology, psychology, medical school, or other class, while allowing engagement with the viewpoint that implicit bias does not exist.

50.     Section 2(e)(iii) bans engagement with the concept that "[a]n individual should be discriminated against or treated adversely solely because of their race, sex, color, or national origin." This can be read to prohibit discussion of, as well as support of, the concept of affirmative action to remedy prior discrimination, which has been and still is a feature of American law and public life.

51.     Other sections, particularly Section 2(e)(vi) – "[a]n individual, by virtue of his or her race, color, sex or national origin, bears responsibility for actions committed in the past by

18

other members of any class listed herein" – can be interpreted to prohibit discussion of, as well as support of, the principle of collective responsibility. The notion of collective responsibility and collective remedial action is a legitimate subject for study and discussion, including in a history, sociology, philosophy, or law class about Nazi Germany, apartheid in South Africa, racism and sexism in America, or discrimination in a host of countries around the world.

52.     These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

53.     These "divisive concepts" also suffer from compounding layers of ambiguity. Each of them includes undefined words and phrases that do not make clear what topics would fall within the ban and would subject the school, its educators, and its students to liability under the act. Moreover, the vague and ambiguous language defining the "divisive concepts" will allow and empower arbitrary and discriminatory enforcement.

54.     For example, Section 2(e)(iv) states that speakers *cannot* "engage in" the idea of whether "[m]embers of one (1) race, one (1) sex, one (1) color, one (1) national origin *cannot and should not* attempt to treat others *without* respect to race, color, national origin or sex, gender identity, sexual orientation, or national origin." (Emphasis added). The triple-negative prohibition is completely incoherent and fails to provide any direction to educators and students as to what speech would subject them to liability.

55.     Whether individually or taken as a whole, the ban on engagement with these "divisive concepts," and the definitions of the "divisive concepts," can be read to encompass important matters of public concern and are restrictions on free speech, but also are so vague, confusing, and elastic that educators and students will be forced to guess what runs afoul of this law and what does not.

19

*The Prohibition on "Promot[ing]" Certain Ideas and "Endors[ing]" Certain Concepts*

56.     Section 3(f) states that it is unlawful to: "Maintain any programs, including academic programs or courses, or offices that promote diversity, equity and inclusion, endorse divisive concepts or concepts promoting transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege or any related formulation of these concepts."

57.     Similar to Section 3(b), this section's prohibition singles out viewpoints "endors[ing]" the "divisive concepts" listed in Section 2(e), along with additional concepts "promoting" a host of undefined terms related to gender and sex "or any related formulation of these concepts." In addition, it bans viewpoints "promot[ing] diversity, equity and inclusion."

58.     These restrictions are based on content and viewpoint and are not justified by any compelling state interest.

59.     There is no definition of "promote," "endorse," "transgender ideology, gender-neutral pronouns, deconstruction of heteronormativity, gender theory, sexual privilege," or "related formulation of those concepts." If a constitutional law professor discusses the issue of affirmative action and speaks of it favorably, is the professor teaching a "course[] that promote[s] diversity, equity and inclusion"? If a teacher uses a student's preferred gender-neutral pronoun, discusses transgender rights in a history course, or sexual privilege in a sociology or psychology course, is the teacher "endorsing" those concepts? Or if freshman advisors consider warning female students about the possibility of date-rape, is that an "endorsement" of the "related formulation" of "sexual privilege"? These are among the many examples in this legislation of vague language that makes it difficult for educators and students to navigate the boundaries of the free-speech restrictions it imposes.

20

*The Prohibition on "Diversity, Equity, and Inclusion Training"*

60.     Section 3(g) prohibits "[r]equir[ing], as a condition of enrolling at, accepting employment with, or being awarded a contract at an institution, college or public school, or as a requirement of continuing enrollment, employment or contractual obligation at an institution, college or public school, any person to participate in diversity, equity and inclusion training."

61.     While Section 2(1)(a) defines "diversity, equity and inclusion" and Section 2(1)(d) defines "diversity training," there is no definition of "diversity, equity and inclusion training" in the act. It is therefore ambiguous what type of "training" would be permitted under the act and what would be prohibited.

62.     Even if one assumes that "diversity, equity and inclusion training" refers to any "training" on "diversity, equity and inclusion" as defined in Section 2(1)(a), the provision is still ambiguous due to the ambiguity in the definition of "diversity, equity and inclusion." Section 2(1)(a) defines that term to include:

(i)      Any effort to select or influence the composition of the faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin;

(ii)     Any effort to promote differential treatment of or provide special benefits to individuals in employment or admissions based on race, sex, color or national origin;

(iii)    Any effort to promote or promulgate policies and procedures designed or implemented to favor individuals based on race, color or national origin, except as otherwise permitted in state and federal law;

(iv)     Any effort to require trainings, programming, or activities designed and\or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual orientation[.]

63.     Section 3(g) prohibits requiring "training" – another undefined term – on any such "effort" described in Section 2(1)(a). The convoluted language of this ban leaves little guidance to students and educators about what is permissible and what is not.

21

64.     For example, would a required constitutional law course that covers affirmative action be considered "training" on "[a]ny effort to select or influence the composition of the faculty, staff, employee or student body by favoring applicants based on race, sex, color or national origin"? Would a required course for a business major that covers how preferences for minority businesses can address systemic disparities be considered training on "[a]ny effort to promote or promulgate policies and procedures designed or implemented to favor individuals based on race, color or national origin"? Would a requirement that all psychology or social work majors take a course that addresses how implicit bias can disadvantage people of color be considered a "training" on "[a]ny effort to require trainings, programming, or activities designed and\or implemented to compel participants to change their beliefs with reference to race, color, national origin, gender identity or sexual orientation"? The statute fails to provide sufficient guidance on any of these questions, leaving students and educators confused and the school subject to potential liability.

## THE VAGUE, CONFUSING, AND ILLUSORY EXCEPTIONS

65.     Section 5(d) states as an exception: "An activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used.*" Section 5 of the act lists certain things that the act "may not be construed to apply and/or prohibit." Although none of these provisions restricts or punishes speech, some of them are so vague, confusing, and illusory that they contribute to the uncertainty created by the language of the unconstitutional prohibitions in Section 3. And some provisions of Section 5 appear to confirm that the prohibitions of Section 3 apply to students.

*The Application of the Prohibition on Students,*
*Student Organizations, Guest Speakers, and*
*Performers in Certain Circumstances*

22

66.     Section 5(d) states as an exception: "An activity of a registered student organization, guest speaker or performer at an institution, college or public school *as long as state funds are not used.*" (Emphasis added). In other words, if state funds are used, a guest speaker, performer, or person attending an activity of a registered student organization is bound by the act and therefore cannot, for example, "engage in . . . increasing awareness or understanding of issues related to race, sex, color, gender identify, sexual orientation or national origin" as prohibited by Sections 3(b) and 2(d).

67.     The act does not make clear when "state funds are used." If the student organization or a guest speaker or performer makes a presentation in the school auditorium under the supervision of, or in the presence of, faculty and the school administration, who are paid by the state, it would seem that "state funds are . . . used" and the prohibitions apply. This may even cover student council meetings and programs, after-school activities of student clubs with a faculty supervisor, and a whole host of other student events. And even if faculty or staff is not present, the prohibitions could apply if the student organization, speaker, or performer, is in a campus building that was constructed with state funds, with utilities paid by state funds, and with the state-paid janitorial staff cleaning up afterwards. And maybe state funds are used if the student organization receives funding from the school and chooses to purchase refreshments for the event or reimburse a speaker's travel expense from its treasury. It is unclear which of these instances contravene the law.

68.     The vagueness of the law has already led the University of Mississippi to withdraw funding for the 2025 Oxford Pride Parade, citing efforts to comply with HB 1193. The University of Mississippi had first sponsored the Oxford Pride Parade in 2016.

25-60496.1004

69.     Beyond that, the prohibitions of the act appear to cover the actions of individual students. Given that Section 5(d) states that the act does not apply to the actions of "registered student organization[s]" when "state funds are not used," it appears that the restrictions of the act clearly do apply to unregistered student organizations. And given that the act applies to unregistered student organizations, it may well apply to individual students. There is no language in the act – including in the exceptions to the Act in Section 5 – stating that the prohibitions do not apply to students. All of this raises the distinct possibility that students are banned from, among other things, making statements in the classroom regarding "divisive concepts" or "issues related to race, sex, color, gender identity, sexual orientation or national origin" as prohibited by Sections 3(b) and 2(d).

*The Purported Exception for "Scholarly Research"*
*and "Creative Work"*

70.     Section 5's list of matters that the act "may not be construed to apply to and/or prohibit" includes Section 5(b), which creates an exception for "[s]cholarly research or a creative work by students, faculty, employee or staff at an institution, college or public school or the dissemination of that work." But what if the subject of the research or creative work is about, or touches on, one of the legislature's disfavored concepts that educators and students are prohibited from "engag[ing]" in? Can the scholarship or creative work be discussed in class? What if students in a particular class are assigned to conduct scholarly research or write a creative work on a subject of their own choice, and one or more students chooses one of the banned concepts pursuant to the alleged protection of Section 5(b)? Can the students discuss their work in the classroom in the same manner as other students who discuss their work? And can the teacher respond to the students' presentations or allow students to ask questions and engage in a classroom debate the same way they can with other subjects? Or is that prohibited

24

"engage[ment]"? Like other provisions of the act, this exception is vague and further confuses what is and what is not prohibited by the law.

71.     Moreover, given that the exception covers "scholarly research or a creative work by students," it implies that students are not otherwise excepted from the prohibitions in Section 3. Therefore, it is possible students could be subject to discipline for speech in or out of the classroom that do not qualify as "scholarly research or a creative work." For example, a student writing an article in a student newspaper that discusses a "divisive concept" or that "increas[es] awareness or understanding" of a disfavored topic banned by the state may violate the law.

*The Purported Exception for Complying*
*with State and Federal Law*

72.     Section 5(h) states that the act does not prohibit: "[a]n institution, college or public school from requiring or taking action against a student, employee, faculty, staff or contractor for failing to comply with federal or state law." Although the sentence is confusing, it appears to say that schools can require compliance with federal and state law. But what if federal or state law conflicts with the prohibitions of Section 3 of this act? Which law are institutions, administrators, teachers, and students supposed to follow?

73.     The problem is highlighted by the fact that some of the prohibitions of the challenged law conflict with existing provisions of Mississippi law. For example, while certain provisions of the act prohibit "enage[ment]" with certain subjects, discussion and support of certain concepts, and the use of state funds by student groups with respect to the those subjects and concepts, another provision of Mississippi law guarantees students the right to "engage" in political expression, to "organize" political groups or clubs, and to have "access to school facilities for assembling" for these groups "during and after the school day" to the same extent

students and student groups are allowed to engage in nonpolitical expression and activities. That

statute, Miss. Code Ann. § 37-11-77, states:

> Students in public schools may engage in political activities or political or
> philosophical expression before, during and after the school day in the same manner
> and to the same extent that students may engage in nonpolitical activities or
> expression. Students may organize partisan or nonpartisan political groups, political
> clubs, political rallies, or other politically themed gatherings before, during and
> after school to the same extent that students are permitted to organize other
> noncurricular student activities and groups. Partisan and nonpartisan political
> groups must be given the same access to school facilities for assembling as is given
> to other noncurricular groups without discrimination based on the political content
> of the students' expression permitting public school student political expression.

74.     Similarly, Miss. Code Ann. § 37-11-79(1) prohibits public schools from denying

access to meeting space on school grounds to students based on the content of their speech. "It

shall be unlawful for any public school which has a limited open forum to deny equal access or a

fair opportunity to, or discriminate against, any students who wish to conduct a meeting within

that limited open forum on the basis of the political, philosophical, ideological or other content

of the speech at such meetings."

75.     Thus, a student or student group who wishes to use school facilities to discuss

"issues related to race, sex, color, gender identity, sexual orientation or national origin" or issues

of affirmative action or collective responsibility, and a faculty sponsor of that group, will be in

danger of violating Section 3(b), even though they are exercising rights protected by Miss. Code

Ann. §§ 37-11-77 and 37-11-79(1).

76.     These conflicts add to the confusion for administrators, educators, and students,

and make it difficult to determine what speech violates the law and what doesn't.

*The Purported Exception that Commands State*
*And Local Officials to Ignore the First Amendment*

26

25-60496.1007

77.     Among the other items listed in Section 5, Section 5(d) states that the act "may not be construed to apply to and/or prohibit" "[a] policy to limit or restrict freedom of speech pursuant to the First Amendment of the United States Constitution or Section 13 of the Mississippi Constitution or academic course instruction that undermines the duty of a public school, or public postsecondary educational institution to protect academic course instruction, intellectual diversity and true expression *provided that none of these protected tenets conflict with the act*." (Emphasis added). In other words, the prohibitions of the act prevail over "the First Amendment of the United State Constitution [and] Section 13 of the Mississippi Constitution . . . [and] the duty of a public school, or public postsecondary educational institution to protect academic course instruction, intellectual diversity and true expression." The language of the act is telling state and local officials, particularly education officials, that in the event of a conflict, they must apply the act and ignore the First Amendment, Section 13, and the duty of a school to protect course instruction and true expression.

*The Purported Exception for Complying with*
*Accreditation Standards and Requirements*

78.     Section 5(j) states that the act does not "[p]rohibit a public school or public postsecondary education institution from complying with any applicable academic accreditation standards or requirements." But many accreditation standards require respect for academic freedom that is inconsistent with HB 1193's prohibitions on engagement with the legislature's disfavored subjects and concepts.

79.     For example, all colleges and universities in Mississippi are accredited by the Southern Association of Colleges and Schools Commission on Colleges. That organization's manual states that institutions of higher learning must "preserv[e] and protect[] academic freedom." The manual adds: "Academic freedom respects the dignity and rights of others while

27

fostering intellectual freedom of faculty to teach, research, and publish." *Southern Association of Colleges and Schools Commission on Colleges, Resource Manual for The Principles of Accreditation,* Section 6.4 (4th ed. 2024). Read literally, this accreditation standard would wipe out the bans on free speech that are challenged in this lawsuit. But teachers face a difficult choice of whether to rely on this exception and risk being disciplined and terminated or to comply with the unconstitutional restrictions on their free speech contained in the act.

80.     In addition, the University of Mississippi School of Law is accredited by the American Bar Association ("ABA") and must comply with its Standards and Rules of Procedure. ABA Standard 303c demands that: "A law school shall provide education to law students on bias, cross-cultural competency, and racism: (1) at the start of the program of legal education, and (2) at least once again before graduation. For students engaged in law clinics or field placements, the second educational occasion will take place before, concurrently with, or as part of their enrollment in clinical or field placement courses."

81.     Interpretation 303-6 of the ABA Standards provides further: "With respect to 303(a)(1) [addressing professional responsibility and the values of the profession], the importance of cross-cultural competency to professionally responsible representation and the obligation of lawyers to promote a justice system that provides equal access and eliminates bias, discrimination, and racism in the law should be among the values and responsibilities of the legal profession to which students are introduced."

82.     Interpretation 303-7 of the ABA Standards adds: "Standard 303(c)'s requirement that law schools provide education on bias, cross-cultural competency, and racism may be satisfied by, among other things, the following: (1) Orientation sessions for incoming students; (2) Lectures on these topics; (3) Courses incorporating these topics; or (4) Other educational

28

experiences incorporating these topics. While law schools need not add a required upper-division course to satisfy this requirement, law schools must demonstrate that all law students are required to participate in a substantial activity designed to reinforce the skill of cultural competency and their obligation as future lawyers to work to eliminate racism in the legal profession."

83.    It is entirely unclear how the "accreditation exception" will be applied by IHL in administrative proceedings or Mississippi chancery courts considering actions for damages. If professors at the University of Mississippi School of Law address in their classes matters of critical race theory, gender identity and the law, systemic racism in policing, or redlining by financial institutions in a manner consistent with ABA Standard 303c and ABA Interpretations 303-6 and 303-7, might they nonetheless run afoul of Mississippi law and be subject to discipline, dismissal, or a claim for civil damages?

## POLICIES AND PROCEDURES REQUIRED BY THE ACT

84.    Sections 7(1)–(2) require Defendants to adopt certain policies and procedures within ninety days of the effective date of the act:

(1) Within ninety (90) days of the effective date of this act, the Board of Trustees of State Institutions of Higher Learning shall adopt a complaint process, investigative procedures, and all other policies and procedures for appropriately investigating violations of this act.

(2) (a) Within ninety (90) days of the effective date of this act, the Mississippi Community College Board, the State Board of Education in conjunction with Mississippi School Board Association and the Mississippi Charter School Authorizer Board shall adopt a model complaint process, investigative procedures and all other policies and procedures for appropriately investigating violations of this act.

(b) Within ninety (90) days of adoption of model rules, every local school board, governing board of a charter school, and board of trustees for junior and community colleges shall adopt policies and procedures for appropriately investigating

29

violations of this act. The State Board of Education, as the governing board for state-operated schools, shall adopt such rules for these schools.

85.      Although these policies and procedures are not due for 90 days after the act takes effect, Section 11 states that "this act shall take effect and be in force from and after its passage." Section 7(3) states that any complaint regarding a violation must be filed within "thirty (30) days of the alleged violation." This raises the question of whether schools, teachers and students can be penalized as the result of an alleged violation of the act prior to the adoption of the policies and procedures.

86.      Moreover, nothing in these policies will ameliorate the unconstitutionality of the provisions banning a wide array of legitimate speech at Mississippi schools. As required by Sections 7(1)–(2), the policies and procedures will relate only to the process for submitting complaints to schools about violations of those provisions and to investigating the teachers, students, and administrators accused of saying the wrong words about the wrong things. They will not resolve the ambiguities as to what speech would violate the provisions of the act and what speech would be permissible. This requirement of formal policies and procedures for people to accuse teachers, administrators, and students, and for the government to investigate them, illustrates the pernicious and punitive nature of the free-speech witch hunt that will be unleashed by this legislation.

**CONSEQUENCES FOR TEACHERS, ADMINISTRATORS, AND STUDENTS**

87.      Although the statute's requirements as contained in Section 3 are placed initially on the boards to ensure that each school not engage in these matters, the consequences for teachers, administrators, and students can be severe.

88.      Section 7 provides that the relevant board – whether one of the statewide Defendant boards or a local school board – must investigate any reported violation of the act, and

30

Section 7(6) provides that the school must "cure all actions relating to [any] violation" found by the board. The statute does not define what is necessary to "cure all actions relating to [any] violation," but this language seems to allow the school to terminate or otherwise discipline any educator who, contrary to Section 3(b), "engages in divisive concepts," including (to quote Section 2(d)) by "increasing awareness or understanding of issues related to race, sex, color, gender identity, sexual orientation or national origin." Under Sections 7(3) and (4), a complaint of a violation can be made by any employee, faculty, staff or contractor, student, or parent, guardian, or next friend of a student under 18.

89.     Obviously, complaints can and will be made against teachers, librarians, and other administrators. But it stands to reason they will also be made against students who speak or write about the banned subjects. The previous discussions about the exceptions in Sections 5(b) and 5(d) seem to confirm that individual students can be charged. Also, Section 3(h) states that students and educators cannot be penalized for refusing to support an undefined "diversity, equity or inclusion concept," implying that students can be penalized for actually supporting such a concept. In the face of these indications that students are covered, there is nothing in the act that states the prohibitions cannot be applied to students, that complaints cannot be made against students, and that students cannot be disciplined as part of the "cure [of] all actions relating to [any] violation."

90.     Further, Section 7(7) provides that any person who complains to one these boards of an alleged violation and who is aggrieved by a formal final finding of the board may file an appeal de novo in chancery court. If the chancery court finds a violation has occurred, it "may award relief in the form of an injunction and/or actual damages."

25-60496.1012

91.     On top of that, Section 9 allows the Attorney General, after notification by a complainant of aggrievement of the action or inaction of the respective board, to file a writ of mandamus in the chancery court, which can then "award relief in the form of an injunction and/or actual damages." The act does not specify whether the injunction and damages obtained through either of these routes can be awarded only against the school or can be awarded against the teacher, administrator, or student who allegedly committed the violation.

92.     The potential consequences for schools, administrators, teachers, and students are exacerbated by the absence of an explicit scienter requirement in the statute. There is no direction or guidance for administrators, teachers, and students of whether the law is violated, and whether the schools must "cure all actions relating to the violation" if the teacher or student did not realize that their words allegedly violated the act.

93.     Finally, and most ominously, Section 8 provides that if a school violates the law by failing to cure all actions relating to two or more specific violations, "the State of Mississippi *shall withhold* the disbursement" of "any and all funds appropriated by the Legislature" for the particular university, community college, junior college, or K-12 public school at issue. (Emphasis added). Thus, if there are two uncured violations – whether caused by a teacher, a student, an unregistered student organization, a registered student organization if state funds are determined to have been used, or a guest speaker or performer if state funds are determined to have been used – all state funds "shall" be withheld and the school would likely close, all students would be sent home, and all teachers and other employees would be terminated.

## HARMS

94.     The challenged provisions of HB 1193 violate the First and Fourteenth Amendment rights of the named Plaintiffs and class members in this case. The plaintiffs who are

25-60496.1013

## CERTIFICATE OF SERVICE

I, Joshua Tom, hereby certify that a true and correct copy of the foregoing record excerpts has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: March 13, 2026                    /s/ *Joshua Tom*
                                         Joshua Tom
                                         *Attorney of Record for Plaintiffs-Appellees*