No. 25-60496

# In the United States Court of Appeals
## for the Fifth Circuit

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAMES THOMAS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; DAWN ZIMMERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; L. E. JIBOL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821; MADISYN DONLEY, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ALEXIS COBBS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; KAREN ADERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, AND ENVIRONMENTS; WOMEN IN SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; GREG POWELL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAKOB CLARK, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ASHLEY ROGERS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs-Appellees,*

v.

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; GEE OGLETREE, IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; STEVEN CUNNINGHAM, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; DONALD CLARK, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; ET AL.,

*Defendants-Appellants,*

On Appeal from the United States District Court for the Southern District of Mississippi, No. 3:25-cv-00417 (Wingate, J.)

## BRIEF OF *AMICUS CURIAE* NATIONAL CENTER FOR YOUTH LAW IN SUPPORT OF PLAINTIFFS-APPELLEES

*(Counsel Listed on Inside Cover)*

DAVID HINOJOSA
ALYSSA WILSON*
NATIONAL CENTER FOR YOUTH LAW
818 Connecticut Ave NW, Ste. 425
Washington, D.C. 20006
dhinojosa@youthlaw.org
awilson@youthlaw.org
(510) 835-8098
* Fifth Circuit Application
Forthcoming

JILL BOGGS
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, D.C. 20001
jill.boggs@stblaw.com
(202) 636-5917

AMY H. CANDIDO
    *Counsel of Record*
SIMPSON THACHER & BARTLETT LLP
One Market Plaza, Suite 3800
San Francisco, California 94105
amy.candido@stblaw.com
(415) 426-7250

TIMOTHY J. CONKLIN
SIMPSON THACHER & BARTLETT LLP
855 Boylston Street, 9th Floor
Boston, Massachusetts 02116
timothy.conklin@stblaw.com
(617) 778-9018

MARISSA BUCCI
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
marissa.bucci@stblaw.com
(212) 455-7102

*Counsel for Amici Curiae National Center for Youth Law*

## CERTIFICATE OF INTERESTED PERSONS

**Case No. 25-60496, *Jackson Federation of Teachers et al. v. Lynn Fitch et al.***

The undersigned counsel of record certifies that the following listed persons and entities, as described in Fifth Circuit Rules 28.2.1, 29.2, have an interest in the *amicus* brief:

| *Plaintiffs-Appellees* | *Counsel for Plaintiffs-Appellees* |
|---|---|
| Jackson Federation of Teachers | Mohammed Amir Badat |
| Barbara Phillips, Individually and on behalf of a class of all others similarly situated | BADAT LEGAL, P.L.L.C. |
| James Thomas, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | Robert Bruce McDuff<br>MCDUFF LAW<br><br>Joshua Tom |
| Dawn Zimmerer, Individually and on behalf of a class of all others similarly situated | McKenna Raney<br>Ayanna Hill<br>Brendan Hopkins |
| L.E. Jibol, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | AMERICAN CIVIL LIBERTIES UNION OF MISSISSIPPI |
| United Campus Workers Southeast Local 38221 | Paloma Wu<br>MISSISSIPPI CENTER FOR JUSTICE |
| Madisyn Donley, Individually and on behalf of a class of all others similarly situated | Nicolas Stanojevich |
| Alexis Cobbs, Individually and on behalf of a class of all others similarly situated | Richard Paul Rouco<br>Andrew Hull<br>QUINN, CONNOR, WEAVER, DAVIES & |
| Karen Aderer, Individually and on behalf of a class of all others similarly situated | ROUCO LLP |
| Fostering LGBTQ+ Advocacy, Resources, and Environments | |
| Women in Science and Engineering | |

| | |
|---|---|
| Joy Parikha, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | |
| Greg Powell, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | |
| Jakob Clark, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | |
| Ashley Rogers, Individually and as next friend to minor children and on behalf of a class of all others similarly situated | |

| *Defendants-Appellants* | *Counsel for Defendants-Appellants* |
|---|---|
| Lynn Fitch, in her official capacity as Attorney General of Mississippi | Lynn Fitch<br>Scott G. Stewart<br>Justin Lee Matheny<br>Anthony M. Shults<br>Daniel Kim<br>Rex Morris Shannon, III<br>Lisa A. Repetto<br>MISSISSIPPI ATTORNEY GENERAL'S OFFICE |
| Gee Ogletree, in their official capacity as President of the Board of Trustees of State Institutions of Higher Learning | |
| Steven Cunningham, in their official capacities as Members of the Board of Trustees of State Institutions of Higher Learning | |
| Amy Arrington, in their official capacities as Members of the Board of Trustees of State Institutions of Higher Learning | |
| Donald Clark, Jr., in their official capacities as Members of the Board of Trustees of State Institutions of Higher Learning | |

| *Judges* |
|---|
| District Judge Henry T. Wingate<br>Magistrate Judge LaKeysha Greer Isaac |

ii

| *Amicus Curiae* | *Counsel for Amicus Curiae* |
| --- | --- |
| National Center for Youth Law | Amy H. Candido<br>Timothy J. Conklin<br>Marissa Bucci<br>Jill Boggs<br>SIMPSON THACHER & BARTLETT LLP<br><br>David Hinojosa<br>Alyssa Wilson<br>NATIONAL CENTER FOR YOUTH LAW |

Respectfully Submitted,

*/s/ Amy H. Candido*

AMY H. CANDIDO
SIMPSON THACHER & BARTLETT LLP
One Market Plaza, Suite 3800
San Francisco, California 94105
amy.candido@stblaw.com
(415) 426-7250

iii

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ...............................................................1

INTRODUCTION .......................................................................................2

ARGUMENT ..............................................................................................5

I.  H.B. 1193 Unconstitutionally Restricts Student Speech. ...................5

    A.  H.B. 1193's Restrictions Include Student Speech. ..................5

    B.  H.B. 1193 Unconstitutionally Restricts Student Speech. .........9

II. H.B. 1193 Unconstitutionally Violates Students' Right to Receive Information. ......................................................................................15

    A.  This Court Should Apply *Hazelwood* to H.B. 1193. ............17

    B.  H.B. 1193 Fails *Hazelwood* Because Its Restrictions Are Not Reasonably Related to Legitimate Pedagogical Concerns. ........................................20

    C.  *Chiras* Does Not Control. ...................................................24

CONCLUSION .........................................................................................26

CERTIFICATE OF COMPLIANCE .........................................................27

CERTIFICATE OF SERVICE ..................................................................28

iv

# TABLE OF AUTHORITIES

**Cases**

*Apter v. HHS,*
  80 F.4th 579 (5th Cir. 2023) ...................................................................14

*Arce v. Douglas,*
  793 F.3d 968 (9th Cir. 2015) ............................................................ 17, 18

*B.B. ex rel. Boyle v. Capistrano Unified Sch. Dist.,*
  2026 WL 670427 (9th Cir. Mar. 10, 2026)...........................................11

*Board of Education v. Pico,*
  457 U.S. 853 (1979)...............................................................................15

*Brown v. Bd. of Educ.,*
  347 U.S. 483 (1954)................................................................................15

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011)................................................................................22

*Canady v. Bossier Paris Sch. Bd.,*
  240 F.3d 437 (5th Cir. 2001) ..................................................................10

*Chi. Bldg. Design, P.C. v. Mongolian House, Inc.,*
  770 F.3d 610 (7th Cir. 2014) ..................................................................25

*Chiras v. Miller,*
  432 F.3d 606 (5th Cir. 2005) ......................................................... passim

*Epperson v. Arkansas,*
  393 U.S. 97 (1968)........................................................................... 15, 17

*Food Mktg. Inst. v. Argus Leader Media,*
  588 U.S. 427 (2019)..................................................................................6

*Hazelwood Sch. Dist. v. Kuhlmeier,*
  484 U.S. 260 (1988)........................................................................ passim

*Jackson Fed'n of Tchrs. v. Fitch,*
  799 F.Supp.3d 571 (S.D. Miss. 2025) ..................................... 3, 13, 22

*Keyishian v. Bd. of Regents*,
  385 U.S. 589 (1967)................................................................ 2, 22

*Lee v. Weisman*,
  505 U.S. 577 (1992)....................................................................20

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*,
  594 U.S. 180 (2021)............................................................ 2, 9, 15

*N.J. by Jacob v. Sonnabend*,
  37 F.4th 412 (7th Cir. 2022) ........................................................10

*Reed v. Taylor*,
  923 F.3d 411 (5th Cir. 2019) ..........................................................6

*Shelton v. Tucker*,
  364 U.S. 479 (1960).......................................................................2

*Stanley v. Georgia*,
  394 U.S. 557 (1969).....................................................................15

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957).......................................................................2

*Texas v. Trump*,
  127 F.4th 606 (5th Cir. 2025) ......................................................7, 8

*Tinker v. Des Moines Independent Community School District*,
  393 U.S. 503 (1969)............................................................. passim

*TRW Inc. v. Andrews*,
  534 U.S. 19 (2001).........................................................................7

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)................................................................ 4, 15

*Walls v. Sanders*,
  144 F.4th 995 (8th Cir. 2025) .......................................................19

*Zamecnik v. Indian Prairie Sch. Dist.*,
  636 F.3d 874 (7th Cir. 2011) ........................................................10

**Statutes**

Ark. Code Ann. § 6-16-156(c) (West 2024)..................................................... 19, 20

N.H. Rev. Stat. Ann. § 193:40(I) (2025) ....................................................21

Okla. Stat. tit. 70, § 24-157 (B)(1) (West 2025).......................................21

**Other Authorities**

*Engage*, Black's Law Dictionary (12th ed. 2024) .......................................6

**Rules**

5th Cir. R. 29.2 ...........................................................................................3

## INTEREST OF *AMICI CURIAE*[1]

The National Center for Youth Law (NCYL) submits this *amicus* brief in support of Plaintiffs-Appellees and affirmance.  NCYL is a private, non-profit legal organization that works to fundamentally transform our nation's approach to education, health, immigration, foster care, and youth justice.  Among other work in education, NCYL created a comprehensive resource guide to serve as a tool for advocates to better understand legal protections and supports that can help students, families, and educators push back against racial discrimination and censorship in schools.  NCYL also serves as counsel in two separate Mississippi school-desegregation cases: for plaintiffs in *Cowan v. Bolivar Cnty. Bd. of Educ.*, No. 2:65-cv-00031-DMB-JMV (N.D. Miss.), and for plaintiff-intervenors in *United States v. Lawrence Cnty. Sch. Dist.*, 2:67-cv-02216-HSO-BWR (S.D. Miss.).

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* certify that no person or entity, other than *amici*, their members, or their counsel, paid for or otherwise contributed to the preparation or submission of this brief.

**INTRODUCTION**

The Supreme Court has long held that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). As "the nurseries of democracy," *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 594 U.S. 180, 190 (2021), public schools expose young people to the "marketplace of ideas" and teach them through "wide exposure to th[e] robust exchange of ideas" rather "than through any kind of authoritative selection," *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). The Court has warned that "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957). Thus, a student's First Amendment rights encompass both curricular speech—*i.e.*, "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271 (1988)—and the many categories of non-curricular speech, *Mahanoy*, 594 U.S. at 187–88.

The challenged provisions of the statute at issue here—H.B. 1193—violate the First Amendment rights of Mississippi's public-school students by prohibiting the expression of any "divisive concepts" and by arbitrarily denying students access

to ideas that violate these broad concepts.[2] The district court preliminarily enjoined it for that reason. *Jackson Fed'n of Tchrs. v. Fitch*, 799 F.Supp.3d 571 (S.D. Miss. 2025). Given *amici*'s background and expertise, this brief analyzes how H.B. 1193 violates students' constitutional rights in Mississippi's K-12 public schools, though these arguments apply with equal or greater force in the public-university setting.[3]

**First**, the statute restricts student speech in violation of the First Amendment. Contrary to the State's bald assertion, the statute's ordinary meaning and structure demonstrate that its prohibition restricts student speech in both non-curricular and curricular settings. The statute's sweeping prohibitions dictate that public schools shall not "[e]ngage in divisive concepts." As enacted, the statute contains no limiting language as to speaker or context; thus, it forbids an in-class discussion on the Civil Rights Movement or a student ***outside*** the classroom wearing a "Black Lives Matter" T-shirt.

Unable to defend the law as written, the State draws on the law's claimed purpose—fighting discrimination—in an effort to salvage it. For example, reasoning

---

[2] When this brief generally refers to the unconstitutionality of H.B. 1193, it refers only to the provisions that Plaintiffs challenged in the district court.

[3] As Plaintiffs explained in their principal brief, Opp. at 9–10, 13–15, first and foremost, the challenged provisions of H.B. 1193 are content and viewpoint discriminatory and do not survive strict scrutiny. We do not repeat that argument here. *See* 5th Cir. R. 29.2 (noting that an amicus brief "should avoid the repetition of … legal arguments contained in the principal brief").

3

that the aim of fighting discrimination can be achieved through regulating teachers and administrators only, the State effectively rewrites the statute, claiming student speech is excluded from its reach. But neither the statute's text nor structure excludes student speech from its broad restrictions. And such an outcome-oriented reading would improperly render entire provisions of the statute—*e.g.*, its exemption for student "scholarly research or creative works"—surplusage. Indeed, Section 1 explicitly *includes* students within its ambit, announcing that the statute "seeks to ensure that . . . *student engagement*" is based on non-discriminatory terms.[4] The State's reading improperly amends the statute through litigation, narrowing a vague, know-it-when-you-see-it standard into something it hopes is more likely to survive judicial review.

**Second**, the statute's curricular limitations restrict students' right to receive information in violation of the First Amendment. The Supreme Court has long held that the robust exchange of ideas in a classroom's "marketplace of ideas" is essential for preparing young people to be democratic citizens. Though the State has broad authority to determine curriculum and educate public-school students, that authority is not absolute. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943) (finding the state and school boards must perform their educational functions "within

---

[4] All emphasis is added, quotations cleaned up, and citations omitted unless noted.

the limits of the Bill of Rights"). The State cannot arbitrarily restrict students' First Amendment rights with no reasonable pedagogical justification and avoid judicial review.

NCYL therefore respectfully urges this Court to apply the Supreme Court's test in *Hazelwood* and hold that curricular limitations cannot be upheld when those limitations are not "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. H.B. 1193 fails this test because its prohibitions are not reasonably related to its purported pedagogical goal of preventing discrimination for at least three reasons: (1) the statute's restrictions extend far beyond curricula; (2) its vague restrictions and punitive enforcement mechanisms needlessly chill otherwise lawful student speech; and (3) its exemptions are unfocused, inconsistent, and not reasonably related to preventing discrimination.

The district court should be affirmed.

## ARGUMENT

### I.   H.B. 1193 UNCONSTITUTIONALLY RESTRICTS STUDENT SPEECH.

#### A.   H.B. 1193's Restrictions Include Student Speech.

The State contends that H.B. 1193 "does not regulate individual students and so does not require them to engage in (or to refrain from engaging in) any speech."

5

Br. at 41. But the plain language of Section 3(b) does *exactly* that.[5] Section 3(b) dictates that public schools shall not "[e]ngage in divisive concepts as defined in Section 2(d) and (e)." Dkt. 11-14 § 3(b).[6] By broadly prohibiting public schools from engaging in divisive concepts, H.B. 1193 unambiguously restricts the speech of *everyone* in the public-school environment—teachers and students alike. The State offers no support for its counter-textual reading, and there is none.

The State is stuck with the statute it passed. When interpreting a statute, the court "must take [the legislature] at its word, presume it meant what it said, and refuse to revise statutes under the guise of interpreting them." *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019). That includes an "examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Section 3(b)'s requirement that public schools shall not "engage in divisive concepts" contains no limitation to teachers. Engage means: (1) "[t]o employ or involve oneself"; (2) "to take part in"; or (3) "to embark on." *Engage*, Black's Law Dictionary (12th ed. 2024). And because it is a general term—

---

[5] Plaintiffs argue that the statute unconstitutionally restricts student speech, contending that it is *ambiguous* whether it directly applies to students. *E.g.*, Opp. at 1, 6, 8. But these differing readings of the statute only underscore H.B. 1193's hopelessly vague, confusing, contradictory, and thus unconstitutional nature.

[6] All "Dkt." references are to the district court docket, No. 3:25-cv-00417-HTW-LGI (S.D. Miss.).

*i.e.*, it is not defined in the statute and no other provision limits or modifies its meaning, *see* Dkt. 11-14 § 2—it must "be accorded [its] full and fair scope" and should not "be arbitrarily limited," *Texas v. Trump*, 127 F.4th 606, 616 (5th Cir. 2025).

H.B. 1193 unequivocally announces its intent to regulate "***student engagement***" in Section 1 and effectuates that intent by restricting student speech, including in Section 3(b). In fact, interpreting Section 3(b) as restricting both teachers' and students' speech is the only reading consistent with the remainder of the statute. Section 5, for example, exempts "[s]cholarly research or a creative work by ***students***, faculty, employee or staff at … [a] public school or the dissemination of that work," as well as "[a]n activity of a registered ***student*** organization … as long as state funds are not used." Dkt. 11-14 § 5(b)–(c). Those exemptions would be "wholly superfluous" if Section 3's prohibition did not regulate the speech of individual students and unregistered student organizations. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (rejecting party's construction of a statute that would "render[]" an "express exception … insignificant, if not wholly superfluous"). Thus, Section 3's prohibitions should be read to encompass ***student*** speech, since Section 5 exempts student scholarly research, student creative works, and non-state-funded registered student organizations from Section 3's prohibitions.

The State's argument that H.B. 1193 does not restrict student speech hinges on its bald assertion that the statute does not require students to engage in (or to refrain from engaging in) any speech, followed by several examples of unrelated speech that the statute does not prohibit. Br. at 41. Its contrary reading of the statute is conclusory, lacking any discussion of the statute's language or its structure. *Id.* The State also fails to mention that its examples—*i.e.*, whether H.B. 1193 restricts student speech concerning religious beliefs, saluting the flag, or war protests—have no bearing on whether a statute primarily concerned with race, sex, color, national origin, and diversity, equity and inclusion programs, restricts student speech. Instead, the State argues by analogy that the statute does not cover student speech because it does not, for example, "bar students from 'wearing black armbands' to protest a war." *Id.* (quoting *Tinker*, 393 U.S. at 504). But as explained below, the State ignores that H.B. 1193 would bar students from wearing a Black Lives Matter armband (or T-shirt) to protest racial issues.

Simply put, the State must defend the statute it enacted. It cannot amend the statute on appeal by litigating away its unconstitutional restrictions on student speech. *Trump*, 127 F.4th at 614 ("[T]he presumed point of using general words is to produce general coverage—not to leave room for courts to recognize ad hoc exceptions.").

8

**B.      H.B. 1193 Unconstitutionally Restricts Student Speech.**

H.B. 1193's prohibition on engaging in divisive topics covers student speech in public schools.   As written, the statute triggers straight-forward, textbook examples of First Amendment violations in both non-curricular and curricular settings.

**1.      H.B. 1193 Unconstitutionally Restricts Non-Curricular Speech.**

The First Amendment protects a student's right to express her opinions, "even on controversial subjects," so long as she does "so without materially and substantially interfering with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others." *Tinker*, 393 U.S. at 513.[7]  That right recognizes that opinionated discussions among students are "not only inevitable" but "an important part of the educational process." *Id.* at 512. A school may not prohibit those inevitable expressions merely "to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 509.  Indeed, *Tinker* held that public schools cannot regard students as "closed-circuit recipients of only that which the State chooses to communicate," or

---

[7] The Supreme Court has recognized that schools may also regulate student speech (1) that is "indecent, lewd, or vulgar [when] uttered during a school assembly on school grounds," or (2) "that promotes illegal drug use," *Mahanoy*, 594 U.S. at 187–88, but those categories of speech are not relevant here.

"confine[] [them] to the expression of those sentiments that are officially approved." *Id.* at 511.

H.B. 1193 flouts the First Amendment principles articulated in *Tinker*. For example, as this Circuit has recognized, "[a] student may choose to wear shirts or jackets with written messages supporting political candidates or important social issues." *Canady v. Bossier Paris Sch. Bd.*, 240 F.3d 437, 440 (5th Cir. 2001) (holding that "[w]ords printed on clothing qualify as pure speech and are protected under the First Amendment"). Under H.B. 1193, however, if a student wears a T-shirt that purportedly speaks to one of the statute's broad "divisive concepts"— perhaps a Black Lives Matter T-shirt —and the school does not require removal of the T-shirt, or a teacher talks to the student or the class about the message of the T-shirt, the school has unquestionably engaged in a divisive concept in violation of Section 3(b). Yet it is beyond dispute that requiring the removal of the T-shirt would violate the student's First Amendment rights. *E.g.*, *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 422 (7th Cir. 2022) (finding school's prohibition of a student from wearing a T-shirt with a gun-rights group's logo was "materially indistinguishable from the black armbands in *Tinker*"); *Zamecnik v. Indian Prairie Sch. Dist.*, 636 F.3d 874, 875–76, 882 (7th Cir. 2011) (finding school violated *Tinker* by prohibiting student from wearing T-shirt with controversial opinion).

10

The statute's broad ban on engaging in divisive concepts does not stop at the classroom, but encompasses all aspects of public-school life, from sports and clubs to conversations with teachers, coaches, counsellors, and other professionals. These conversations regularly happen before, during, and after school. For example, a teacher testified that students regularly talk to teachers outside of the classroom and engage on topics that the statute categorizes as "divisive" because "[t]eachers become … the first person they approach with difficult questions or upsetting stories." Dkt. 66-2 ¶¶ 8–9; *see also B.B. ex rel. Boyle v. Capistrano Unified Sch. Dist.*, 2026 WL 670427, at *2, *8–9 (9th Cir. Mar. 10, 2026) (published) (per curiam) (finding genuine dispute whether principal violated *Tinker* for disciplining an elementary student for handing a classmate a picture with a message that said "Black Lives Mater [sic] … any life").

As a fallback argument, the State maintains that even if the law's prohibition implicates student speech, it does not violate the First Amendment. Br. at 41–42. But in making that claim, the State cites only curriculum-speech cases, which apply a different standard. *Id.* Under *Tinker*, to regulate the non-curricular student speech at issue here, the State must show that engaging in a divisive concept "would materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." 393 U.S. at 509. The State has not and could not possibly make such a showing. Thus, H.B. 1193's prohibitions cannot be sustained.

11

*Id.* (finding "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" insufficient).

### 2.    H.B. 1193 Unconstitutionally Restricts Curricular Speech.

The statute also unconstitutionally restricts students' curricular speech. Student curricular speech includes both students' speech in the traditional classroom setting and "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school," like "school-sponsored publications" or "theatrical productions." *Hazelwood*, 484 U.S. at 271. Such activities "may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* A school may restrict student curricular speech so long as the school's "actions are reasonably related to legitimate pedagogical concerns," *id.* at 273, because a State enjoys broad discretionary power to oversee a public school's curriculum, *Chiras v. Miller*, 432 F.3d 606, 611 (5th Cir. 2005).

However, H.B. 1193's restrictions on students' curricular speech violate the First Amendment because they are not reasonably related to legitimate pedagogical concerns. While the State has a legitimate pedagogical interest in prohibiting discrimination in establishing and teaching a school's curriculum, it has no such interest in censoring students' questions and commentary during classroom

discussion on those subjects through the vague, confusing, and contradictory restrictions present in H.B. 1193. Here, a student will violate H.B. 1193 by engaging with a divisive concept during an open-ended class discussion or asking a question during class; indeed, a parent testified that he is fearful that his teenage son will violate the statute by doing exactly that. Dkt. 66-3 ¶ 6; *id.* 66-6 ¶¶ 3–4 (same). Another parent testified that she is fearful that her children will violate the statute if during an in-class, oral-history project, they describe the racism their grandparents experienced when they came to the United States. *Id.* 66-4 ¶ 5. And teachers will likely shut down that classroom discussion altogether to avoid accusations that they, or their students, violated the statute. The President of the Jackson Federation of Teachers, for example, testified that she fears teachers will "self-censor the content of [their] discussions[.]" *Id.* 66-1 ¶ 12.

The district court correctly observed that the statute covers such curricular speech. *Fitch*, 799 F.Supp.3d at 585–86. The State calls this observation "absurd[]" because, in its view, the statute is "clear[ly] … concerned with DEI training … not with instructing students on history or literature." Br. at 49. But if that were so, there would be no need to exempt a student's scholarly research or creative work from the statute's reach. Dkt. 11-14 § 5(b). And the statute's stated purpose would not include "student engagement" in addition to "employment [and] academic

13

opportunities." *Id.* § 1. Unable to respond to these points, the State attempts to waive them away as irrelevant "edge cases." Br. at 49. Hardly so.

As one example, any fundamental lesson in an American History class will necessarily involve constant risk of engagement on divisive concepts. Students of diverse perspectives will freely discuss their viewpoints on core historical events like the origins and history of slavery in the United States, the birth and progress of the Women's Suffrage Movement, the Civil Rights Movement, and how those markers relate to current events.[8] Violations will be commonplace, not edge cases.

To soften these frequent and blatant constitutional violations, the State suggests that they are the result of "distortion[s]" of the statute and an "invitation to read the law in the most absurd ways possible." *See* Br. at 50. Rather than defend the statute and its plain meaning, the State hangs its hat exclusively on the statute's stated purpose of preventing discrimination as providing "narrowing context." Br. at 34, 46–47, 51; Dkt. 11-14 § 1. But a statute's stated purpose "cannot override … [its] operative language." *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023). The statute as enacted is unconstitutional because it violates students' non-curricular and curricular First Amendment speech rights.

---

[8] At first glance, the exemption under Section 5(d) could conceivably protect such viewpoints under freedom-of-speech principles, but the exemption ***does not apply*** when a "protected tenent[] conflict[s] with the act."

14

## II.    H.B. 1193 UNCONSTITUTIONALLY VIOLATES STUDENTS' RIGHT TO RECEIVE INFORMATION.

H.B. 1193's broad restrictions also violate students' First Amendment right to receive information. Dkt. 75 ¶¶ 130–32. It is "well established that the Constitution protects the right to receive information and ideas" because that right is "fundamental to our free society." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) (collecting cases); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968) (recognizing "the fundamental values of freedom of speech and inquiry" in our K-12 educational system). As the Supreme Court recognized in *Board of Education v. Pico*, 457 U.S. 853, 866–68 (1979) (plurality), that right applies in the school setting too. The Court reasoned that exposing students to the marketplace of ideas in the classroom is necessary for students to meaningfully exercise their First Amendment rights and prepares them "for participation as citizens." 457 U.S. at 864.

Though *Pico* is non-precedential, its analysis is consistent with the Supreme Court's long-held view that "America's public schools are the nurseries of democracy." *Mahanoy*, 594 U.S. at 190; *accord Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954) (describing public education as "the very foundation of good citizenship"). And *Pico* is consistent with nearly a century of Supreme Court precedent protecting students' First Amendment rights in public schools. *See, e.g.*, *Barnette*, 319 U.S. at 642 (holding that compelling students to salute the flag and recite the pledge of allegiance violates the First Amendment); *Mahanoy*, 594 U.S. at

15

190 (holding that a school "has an interest in protecting a student's unpopular expression" because "[o]ur representative democracy only works if we protect the 'marketplace of ideas'"). Simply put, that precedent mandates that students' First Amendment rights, including the right to receive information, should not be restricted absent "a specific showing of constitutionally valid reasons to regulate" those rights. *See, e.g.*, *Tinker*, 393 U.S. at 509–11; *Hazelwood*, 484 U.S. at 273.

Here, the record is devoid of any constitutionally valid reason to restrict Mississippi students' right to receive information and ideas in public schools. Thus, guided by fundamental First Amendment principles, this Court should apply a test that preserves **both** a state's broad authority to design its own curriculum **and** judicial review of restrictions that violate students' basic First Amendment rights. The Supreme Court's decision in *Hazelwood* strikes that balance and this Court should apply its holding here: that is, a state's restriction of curricular speech that restricts a student's access to information or ideas "does not offend the First Amendment … so long as [the restrictions] are reasonably related to legitimate pedagogical concerns." 484 U.S. at 273. As detailed below, this circuit should (a) adopt that standard, (b) find that it is not met here, and (c) reject the State's conclusory argument that this Court is bound by *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005).

16

**A.     This Court Should Apply *Hazelwood* to H.B. 1193.**

This Court should adopt a test that respects a state's "broad …. authority to establish public school curricula," *Chiras*, 432 F.3d at 611, without preventing judicial review of curricular-speech restrictions that "directly and sharply implicate basic constitutional values," *id.* (quoting *Epperson*, 393 U.S. at 104). Contrary to the State's characterizations, the students here do not assert a "right to control" the curriculum, Br. at 40, through what is functionally a line-item veto. Nor do they assert that they have a First Amendment right to a curriculum of their choice. Instead, they assert only that the First Amendment provides *some* judicial review of curricular-speech restrictions.

*Hazelwood* provides the structure for that review. By focusing on the ***reasonableness*** of a state's curricular-speech restrictions and their relationship to legitimate pedagogical concerns, *Hazelwood* gives a state ample latitude to craft curriculum without foreclosing students' ability to challenge constitutional violations. 484 U.S. at 273. This test also prevents courts from having to weigh the policy merits of each curricular-speech restriction because such restrictions would violate the First Amendment only when challengers can demonstrate that the limitations are not reasonably related to a legitimate pedagogical concern.

This Court would not be breaking new ground in applying *Hazelwood* to a right-to-receive claim. The Ninth Circuit did so in *Arce v. Douglas*, 793 F.3d 968,

17

973 (9th Cir. 2015). In *Arce*, the Ninth Circuit examined legislation that ended a Mexican American Studies program in Tucson public schools. Motivated by the belief that the program "promot[ed] ethnocentrism and reverse racism," the superintendent of education sponsored and implemented legislation that prohibited public schools from offering any class that, among other things, "[p]romote[d] resentment toward a race or class of people." *Id.* If a school failed to comply with the program, the department of education could withhold ten percent of the district's state funding. *Id.* Two students sued alleging that the statute violated their First Amendment right to receive information. *Id.* Acknowledging that the analysis "necessarily implicates the delicate balance between a student's First Amendment rights and a state's authority in educational matters," the *Arce* Court applied *Hazelwood*, holding that "the state may not remove materials otherwise available in a local classroom unless its actions are reasonably related to legitimate pedagogical concerns." *Id.* at 982–83. Applying that test, the *Arce* Court then found some provisions of the statute constitutional and others not, noting that "[g]ranting [the state] wider discretion has the potential to substantially hinder a student's ability to develop the individualized insight and experience needed to meaningfully exercise her rights of speech, press, and political freedom." *Id.* at 983, 985–86. That decision, which the State never cites in its brief, demonstrates *Hazelwood*'s utility in this context.

18

The State briefly cites the Eighth Circuit's decision in *Walls v. Sanders*, 144 F.4th 995 (8th Cir. 2025). Br. at 40–41. The *Walls* Court—for reasons that are not present in this case—foreclosed a students' right to receive claim in response to students' demand to be taught critical race theory, which was banned by state law. 144 F.4th at 999, 1003. Unlike the Plaintiffs in this case, the students in *Walls* argued that the First Amendment prohibits a curricular limitation if "the government is alleged to have changed a pre-existing curriculum for 'partisan or political' reasons." *Id.* at 1005. *Walls* rejected that test because of constitutional and practical concerns, *id.* at 1005–06, that *Hazelwood* eliminates. *Hazelwood* focuses solely on whether the curricular limitations are **reasonably** related to a legitimate pedagogical concern while ignoring partisan interests.[9] *Hazelwood*, 484 U.S. at 273. By permitting, rather than foreclosing, judicial review of potentially problematic restrictions, *Hazelwood* helps ensure students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506.

The State insists that "students have no right to control a public-school curriculum"—a position Plaintiffs do not assert in this case—and refuses to acknowledge the full scope of students' First Amendment rights in the public-school

---

[9] Moreover, unlike H.B. 1193, the Arkansas statute at issue in *Walls* exempted "the discussion of: (1) ideas and the history of the [prohibited] concepts … or public policy issues of the day and related ideas that individuals may find unwelcome, disagreeable, or offensive." Ark. Code Ann. § 6-16-156(c) (West 2024).

classroom.  Br. at 40–41.  By doing so, the State defies a century of Supreme Court precedent establishing the critical importance of public-school education to democracy in favor of a State's unfettered and unreviewable control over curriculum.  *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("[T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").  The Court should reject that course and adopt the reasonable line drawn in *Hazelwood*.

### B.     H.B. 1193 Fails *Hazelwood* Because Its Restrictions Are Not Reasonably Related to Legitimate Pedagogical Concerns.

Like the legislature in *Arce*, the Mississippi Legislature's stated objective in enacting H.B. 1193 was to prevent discrimination.  Dkt. 11-14 § 1.  That is a legitimate pedagogical concern.  But H.B. 1193's broad prohibition on "engage[ment]" with vaguely defined "divisive concepts," its cumbersome and significant enforcement, and its potentially severe penalties are not reasonably related to that pedagogical concern for at least three reasons.

*First*, H.B. 1193's prohibition on engaging in divisive concepts is not limited to curriculum.  Indeed, the statute is not even limited to engaging in those topics ***in the classroom***.  Unlike other state statutes that have sought to address similar pedagogical concerns, H.B. 1193's prohibitions are not limited to teaching or instruction.  *Compare*, Dkt. 11-4 § 3(b) (requiring that public schools shall not "[e]ngage in divisive concepts"), *with* Ark. Code Ann. § 6-16-156(a)(2) (West 2024)

(requiring the "Department of Education to identify [and eliminate] any items that may, purposely or otherwise, promote *teaching* that would indoctrinate students with ideologies such as Critical Race Theory"), *and* N.H. Rev. Stat. Ann. § 193:40(I) (2025) ("No pupil … shall be *taught*, *instructed*, *inculcated* or *compelled to express belief in*, *or support for* [a prohibited concept]…."), *and* Okla. Stat. tit. 70, § 24-157 (B)(1) (West 2025) ("No teacher, administrator or other employee … shall require or *make part of a course* the following [prohibited] concepts"). Instead, it imposes a blanket requirement that public schools may not engage in divisive concepts. That includes not only "any formal or informal education," but all other speech in the school environment, including conversations in the hallway, at an unregistered student organization, at lunch, or in the bleachers of a Friday night football game.[10] Dkt. 11-14, §§ 2(d), 3(b).

*Second*, the statute's breadth and punitive enforcement mechanism chills student (and teacher) speech. Plaintiffs presented credible evidence that the statute's breadth—which is compounded by its vagueness—leaves students and teachers with no guidance or comfort on what they are permitted to say and will force them to self-censor. *E.g.*, Dkt. 66-2 ¶¶ 12, 15 (testimony from a teacher responsible for enforcing the bill describing her concern that teachers and administrators will "self-censor the

---

[10] As discussed above, the State offers no argument why the ordinary meaning of the statute does not include these non-classroom activities.

content of our discussions or will risk discipline for violating the challenged provisions"); *id.* (parent describing fear that "my children and others may self-censor … if they ask questions or make comments about the banned topics"); *Fitch*, 799 F.Supp.3d at 585. That chilled speech harms students because they are deprived of "wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues (rather) than through any kind of authoritative selection." *Keyishian*, 385 U.S. at 603–04 ("The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed.").

Even more concerning, H.B. 1193 forces a teacher to navigate that ambiguity under the threat of investigation and potential loss of the school's ***entire*** funding. Dkt. 66-2 ¶¶ 12, 15 (expressing concern that if teachers don't self-censor, they will be forced to "risk discipline for violating the challenged provisions"). Those severe penalties only amplify the chilling effect caused by the statute's vagueness. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 807 (2011) (Alito, J., concurring) ("Vague laws force potential speakers to steer far wider of the unlawful zone … than if the boundaries of the forbidden areas were clearly marked."). The statute permits anyone—a student, teacher, parent (in the case of a minor student), or even the school janitor, who hears whispers of a divisive concept—to file a complaint against an alleged offender. Dkt. 11-14 § 7(3)–(4). Even a frivolous complaint bears

22

consequences for the accused: if the mandatory investigation reveals no violation, "a formal final finding" must be delivered to the complainant and the school. Dkt. 11-4 § 6. On the other hand, if the investigator concludes there were at least two violations, and the offending institution fails to cure the violations, the statute *requires* the State withhold from a public school "any and all state funds appropriated by the Legislature." *Id.* § 8(1). And the statute offers no guidance regarding what it means to "cure[]" a violation. *Id.*

*Third*, the statute's exemptions reveal that its prohibitions are unfocused, inconsistent, and not reasonably related to the pedological concern of preventing discrimination. For example, the statute states that it "may not be construed to apply to and/or prohibit: [p]rograms for Military Veterans." Dkt. 11-14 § 5(a). It makes no sense why those programs would be given special permission to engage in divisive concepts, especially when no aspect of veteran status inherently engages a divisive concept. The same is true of Section 5(d), which is incoherent. To the extent any sense could be made from the subsection, it carves out policies that implicate the First Amendment. Dkt. 11-14 § 5(d). But that carve-out does not apply if the policy conflicts with H.B. 1193; in other words, if a policy violates the First Amendment and H.B. 1193, H.B. 1193 wins. That cannot possibly be right.

23

Even assuming that the statute seeks to address a legitimate pedagogical concern of preventing discrimination, it does so through an unreasonable prohibition guaranteed by a punitive enforcement mechanism.

### C.   *Chiras* Does Not Control.

In an underdeveloped argument, the State suggests that *Chiras* controls the outcome in this case. Br. at 40 (citing *Chiras* for the proposition that "courts (including this one) have consistently held that students have no right to control a public-school curriculum"). Even assuming the State adequately presented the argument, *Chiras* does not answer the question presented in this case.

In *Chiras*, two "conservative think-tank organizations" successfully opposed a textbook's inclusion in the curriculum. 432 F.3d at 609. Two plaintiffs—the textbook's author and a high school student—sued, alleging that the textbook's exclusion violated their First Amendment rights. *Id.* at 607. Most of the analysis focused on the author's First Amendment right-of-access claim, which turned on whether the school's list of textbooks was a forum "to which textbook authors and publishers might claim a right of access." *Id.* at 616. This Court found it was not because "the selection and use of textbooks in the public school classrooms constitute[d] government speech." *Id.* at 616. That foreclosed **the author's** claim only. *Id.* at 618.

24

This Court also held that "[t]he conclusion that no forum exists in this case does *not* necessarily preclude … [the student's] right … to receive [claim]." *Id.* Though *Chiras* held that *Pico*'s "narrowly partisan or political" test was not binding, it applied the analysis for the sake of argument, concluding that the student plaintiff failed to meet that test. *Id.* at 619–20. With no additional analysis, *Chiras* concluded that "even assuming that public school students possess a cognizable right to receive information, that right does not extend to the selection of textbooks for use in the classroom." *Id.* at 620. Because H.B. 1193 is not merely (or even primarily) concerned with the selection of textbooks, *Chiras* is not controlling here.

But even if the Court finds *Chiras* to be on point, relying on that decision to reverse the district court's order would require this Court to expand *Chiras* substantially. Unlike the narrow, single-textbook challenge in *Chiras*, Plaintiffs are challenging a prohibition on sweeping, vague "divisive concepts" that apply far beyond the curriculum. By the State's own admission, H.B. 1193 is not limited to the discretionary authority of selecting curriculum but covers a school's "activities and messaging." Br. at 33. And this Court would be covering that ground without fulsome briefing from the State. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 618 (7th Cir. 2014) (noting that "it would be imprudent … to venture an opinion" on an issue with "implications far beyond this case" based on underdeveloped argument). This Court should not do so here. *See id.*

## CONCLUSION

This Court should affirm the district court's decision.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and 32(a)(7)(A) because it contains 6,133 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).  This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

Dated: March 20, 2026

/s/ Amy Candido
Counsel for Amici Curiae National Center for Youth Law

**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I electronically filed the foregoing document using the Court's CM/ECF system, which will send notification of such filing to all registered users, via electronic mail.

/s/ *Amy Candido*
Counsel for *Amici Curiae* National Center for Youth Law

28