No. 25-60496

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

JACKSON FEDERATION OF TEACHERS; BARBARA PHILLIPS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAMES THOMAS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; DAWN ZIMMERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; L. E. JIBOL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; UNITED CAMPUS WORKERS SOUTHEAST LOCAL 3821; MADISYN DONLEY, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ALEXIS COBBS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; KAREN ADERER, INDIVIDUALLY AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; FOSTERING LGBTQ+ ADVOCACY, RESOURCES, AND ENVIRONMENTS; WOMEN IN SCIENCE AND ENGINEERING; JOY PARIKHA, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; GREG POWELL, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; JAKOB CLARK, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED; ASHLEY ROGERS, INDIVIDUALLY AND AS NEXT FRIEND TO MINOR CHILDREN, AND ON BEHALF OF A CLASS OF ALL OTHERS SIMILARLY SITUATED,
*Plaintiffs-Appellees*,

*v.*

LYNN FITCH, IN HER OFFICIAL CAPACITY AS ATTORNEY GENERAL OF MISSISSIPPI; GEE OGLETREE, IN THEIR OFFICIAL CAPACITY AS PRESIDENT OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; STEVEN CUNNINGHAM, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; AMY ARRINGTON, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; DONALD CLARK, JR., IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING; ET AL.,
*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Mississippi
No. 3:25-cv-00417-HTW-LGI

## DEFENDANTS-APPELLANTS' REPLY BRIEF

LYNN FITCH
  *Attorney General*
SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
DANIEL KIM
  *Assistant Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: justin.matheny@ago.ms.gov
*Counsel for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION .............................................................................. 1

ARGUMENT ..................................................................................... 3

I.  This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional ........................................... 3

    A.  The District Court Failed To Perform The Demanding Facial Analysis That Applies To Plaintiffs' Claims ........................... 4

    B.  The District Court Erred In Ruling That The Challenged Provisions Likely Facially Violate The First Amendment ..... 7

    C.  The District Court Erred In Ruling That The Challenged Provisions Are Likely Facially Void For Vagueness ............ 16

II. Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction ....................... 22

CONCLUSION ................................................................................. 26

CERTIFICATE OF SERVICE .............................................................. 27

CERTIFICATE OF COMPLIANCE ....................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AARP v. Trump,*
145 S. Ct. 1364 (2025) (per curiam) .................................................. 24

*Ashcroft v. ACLU,*
542 U.S. 656 (2004) ...................................................................... 8

*Board of Education, Island Trees Union Free
School District No. 26 v. Pico,*
457 U.S. 853 (1982) ................................................................ 10, 11

*Buchanan v. Alexander,*
919 F.3d 847 (5th Cir. 2019) ............................................................ 12

*Chiles v. Salazar,*
146 S. Ct. 1010 (2026) ................................................................... 8

*Chiras v. Miller,*
432 F.3d 606 (5th Cir. 2005) ......................................................... 9, 12

*Doe I v. Landry,*
909 F.3d 99 (5th Cir. 2018) ............................................................. 21

*Epperson v. Arkansas,*
393 U.S. 97 (1968) ................................................................... 10, 13

*Evans-Marshall v. Board of Education of Tipp City,*
624 F.3d 332 (6th Cir. 2010) ............................................................ 12

*Hazelwood School District v. Kuhlmeier,*
484 U.S. 260 (1988) ..................................................................... 15

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ...................................................................... 4

*Kennedy v. Bremerton School District,*
    597 U.S. 507 (2022)..............................................................11-12, 13

*Keyishian v. Board of Regents of University of State of New York,*
    385 U.S. 589 (1967)..................................................................... 8, 13

*Lamb's Chapel v. Center Moriches Union Free School District,*
    508 U.S. 384 (1993)........................................................................... 8

*La Union del Pueblo Entero v. Abbott,*
    167 F.4th 743 (5th Cir. 2026) ................................................. 6, 19, 21

*Little v. Llano County,*
    138 F.4th 834 (5th Cir. 2025) (en banc) ................................ 10-11, 14

*Martin v. City of Struthers,*
    319 U.S. 141 (1943)......................................................................... 14

*Matal v. Tam,*
    582 U.S. 218 (2017).......................................................................... 10

*McClelland v. Katy Independent School District,*
    63 F.4th 996 (5th Cir. 2023) ............................................................... 6

*Minnesota Voters All. v. Mansky,*
    585 U.S. 1 (2018).............................................................................. 8

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024)....................................................... 1, 2, 4, 5, 6, 12

*NetChoice, LLC v. Fitch,*
    134 F.4th 799 (5th Cir. 2025) ............................................................. 5

*NetChoice, LLC v. Paxton,*
    121 F.4th 494 (5th Cir. 2024) ........................................................ 5, 6

*Pleasant Grove City v. Summum,*
    555 U.S. 460 (2009).......................................................................... 9

iii

*Rosenberger v. Rector & Visitors of University of Virginia,*
515 U.S. 819 (1995)........................................................ 8, 12, 15, 16

*SEIU, Local 5 v. City of Houston,*
595 F.3d 588 (5th Cir. 2010) .......................................................... 19

*Tinker v. Des Moines Independent Community School District,*
393 U.S. 503 (1969)................................................................. 14, 15

*Trump v. CASA, Inc.,*
145 S. Ct. 2540 (2025)......................................................................24

*United States v. Uhlenbrock,*
125 F.4th 217 (5th Cir. 2024) ..........................................................6

*United States v. Williams,*
553 U.S. 285 (2008)................................................................. 19, 21

*Walls v. Sanders,*
144 F.4th 995 (8th Cir. 2025) ..........................................................9

*White Hat v. Murrill,*
141 F.4th 590 (5th Cir. 2025) ..........................................................5

*Woodlands Pride v. Paxton,*
168 F.4th 293 (5th Cir. 2026) ................................................... 4, 17

## Constitutional Provisions

U.S. Const. amend. I ...................................... 1, 2, 5, 6, 8, 11, 14, 16, 22

U.S. Const. amend. XIV ...............................................................2, 17

## Statute

2025 H.B. 1193 ..................................................................... 1-22, 25

**Rule**

Fed. R. Civ. P. 23 .................................................................................. 24

**Other Authorities**

General Services Administration,
*Information Collection; System for Award Management Registration*
*Requirements for Financial Assistance Recipients,*
91 Fed. Reg. 3726 (Jan. 28, 2026) ...................................................... 23

Office of the Attorney General,
Guidance for Recipients of Federal Funding Regarding Unlawful
Discrimination (July 29, 2025) ............................................................ 23

Trump DOJ Investigating Possible Race Discrimination
At UC San Diego, Stanford Medical Schools,
L.A. Times (Mar. 26, 2026) .................................................................. 23

U.S. Department of Justice,
Justice Department Joins Lawsuit Against Racial Discrimination
in Admissions at UCLA's Medical School (Jan. 28, 2026) .................. 23

U.S. Department of Justice,
Justice Department Sues Harvard University for Withholding
Race-Related Admissions Documents (Feb. 13, 2006) ........................ 23

Webster's Third New International Dictionary (1993) ........................... 18

**INTRODUCTION**

This Court should reject the preliminary injunction.

HB 1193 combats discrimination in public schools. That is reasonable and should not be controversial. So plaintiffs do not attack the Act as written. They attack it based on fanciful, insupportable hypotheticals that defy the Act's text; they peddle the absurd pretense that the Act bars all discussion of civil rights, women's suffrage, and most literature; and they claim that a law that regulates only government speech and conduct stifles students' and teachers' private speech. The district court uncritically accepted that atextual narrative. This Court should reject it. Plaintiffs' contrary arguments fail.

In defending an injunction that awards sweeping and indiscriminate facial relief, plaintiffs insist that the demanding burden for facial challenges—reaffirmed in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024)—simply does not apply. That view defies *Moody* itself, which squarely governs facial claims across the board. And it defies this Court's precedents holding that *Moody* governs facial First Amendment challenges like this one. Plaintiffs alternatively—and, given their adamant refusal to make a facial showing, remarkably—claim that they carried their facial burden. The record refutes that claim. Plaintiffs did not remotely carry their burden: rather than identify the Act's full set of actual applications and show that those applications are overwhelmingly unconstitutional, plaintiffs ignored the Act's many valid applications and

instead staked their case on a handful of insupportable hypotheticals. Instead of rejecting that effort, the district court excused plaintiffs from meeting their burden: it did not even try to conduct the *Moody*-mandated facial analysis. Vacatur is required on that basis alone.

On their First Amendment claims, plaintiffs insist that the challenged provisions flunk heightened scrutiny because they discriminate based on viewpoint and bar all in-school discussion of race, sex, and similar subjects. But by their terms the challenged provisions regulate the conduct and messaging of public-school institutions and officials, which (plaintiffs concede) States have the "undoubted right" to regulate. Br. 23. So the First Amendment's viewpoint-neutrality requirement does not apply, and the Act does not trigger heightened scrutiny. In any event, plaintiffs are wrong that the challenged provisions bar discussion of disfavored topics. The Act instead prevents school officials from participating in or endorsing invidious discrimination, while leaving ample space to explore difficult issues inside and outside the classroom. That presents no First Amendment problem.

On their vagueness claim, plaintiffs double down on their view that the challenged provisions bar all discussion of Dr. Martin Luther King, Jr., the Fourteenth Amendment, *Of Mice and Men*, and more. And they claim that the Act threatens penalties for students and teachers for exercising their free-speech rights. That heap of hallucinations does not survive contact with the Act's plain text. By its terms, the Act combats

discriminatory conduct by educational institutions and does not penalize teachers or students at all. And—for any fair-minded person willing to read the Act for what it says rather than indulge a gross distortion of it— the Act gives ample notice of what it bars.

On the equities, plaintiffs dispute that the Act prevents DEI-related discrimination and helps to ensure that Mississippi schools retain access to federal funding. But they do not dispute that the challenged provisions target such discrimination or that the federal government is actively challenging funding eligibility for schools that employ DEI. On the injunction's scope, plaintiffs do not dispute that the Supreme Court has condemned universal injunctions that cover non-parties. Plaintiffs say that the district court properly ordered that very relief here because they brought class-action claims and (recently) filed a class-certification motion. But the district court never certified any classes or gave any sound basis for the extraordinary relief it ordered. There is no basis for the injunction the district court ordered. This Court should reject it.

## ARGUMENT

This Court should reject the preliminary-injunction order.

**I.    This Court Should Reverse The Preliminary-Injunction Order Because The District Court Erred In Ruling That The Mississippi Act Is Likely Facially Unconstitutional.**

The district court erred on the merits. State Br. 22-51.

## A.    The District Court Failed To Perform The Demanding Facial Analysis That Applies To Plaintiffs' Claims.

The district court failed to perform a proper facial analysis. State Br. 23-28. That alone requires vacatur.

As the State has explained, the district court conducted nothing like the rigorous "inquiry" required to assess whether plaintiffs "carr[ied]" the demanding "burden" that applies to "facial challenges." *Moody v. NetChoice, LLC*, 603 U.S. 707, 718, 723, 744 (2024); *see* State Br. 23-27. The district court never "explore[d]" the challenged provisions' "full range of applications." 603 U.S. at 726. Nor did the court account for the provisions' permissible applications or "compare" those applications to any properly found impermissible ones. *Ibid.* Instead, the court simply block-quoted some challenged provisions, speculated that they "arguably" bar protected speech, and accepted plaintiffs' invitation to ignore their permissible applications. ROA.979-980; *see* ROA.967-969. This failure to conduct the requisite facial analysis dooms the injunction.

Plaintiffs' contrary arguments (Br. 30-42) lack merit.

First, invoking "dicta" from *Iancu v. Brunetti*, 588 U.S. 388 (2019), plaintiffs argue that the *Moody* analysis "does not apply" to laws alleged to be "viewpoint-discriminatory." Br. 32 n.6, 33; *see* Br. 31-33. This Court's precedent rightly forecloses that argument. *E.g.*, *Woodlands Pride v. Paxton*, 168 F.4th 293, 307-08 (5th Cir. 2026) (vacating ruling that drag-show ban was impermissibly content- and viewpoint-based and

4

remanding for district court to "reconsider the plaintiffs' facial First Amendment challenges" under "[t]he *Moody* framework for facial free speech challenges"); *White Hat v. Murrill*, 141 F.4th 590, 607-09 (5th Cir. 2025) (invoking *Moody* in assessing claim that trespass statute was a "viewpoint[-]" and "content-based law" that triggered "strict scrutiny"); *NetChoice, LLC v. Fitch*, 134 F.4th 799, 807-09 (5th Cir. 2025) (vacating and remanding for "factual inquiry" under *Moody* in challenge to social-media regulation as content- and viewpoint-based). Even without this precedent, plaintiffs' argument would fail: the Act regulates government speech and conduct, so any First Amendment viewpoint-neutrality requirement does not apply. *See infra* Part I-B.

Second, plaintiffs argue that even if *Moody* applied to their First Amendment claims, they have "satisfied a *Moody*-type analysis at the preliminary-injunction stage." Br. 33; *see* Br. 33-38. Nonsense. Plaintiffs did not attempt to satisfy—and the district court did not apply—*Moody*'s "rigorous standard." 603 U.S. at 723. (That is unsurprising, since plaintiffs have maintained throughout that *Moody* does not apply. *E.g.*, ROA.927-928.) Under *Moody*, "[i]t is plaintiffs' burden to develop a factual record" that demonstrates "'the full range of activities'" and "'actors'" that the challenged provisions' "regulate[ ]." *NetChoice, LLC v. Paxton*, 121 F.4th 494, 498-99, 500 (5th Cir. 2024) (quoting *Moody*, 603 U.S. at 724). It is not enough to invoke the provisions' "heartland applications" or to speculate on some potential applications that

plaintiffs disfavor. *Id.* at 498. Plaintiffs must make a detailed "factual" presentation that allows the district court to assess "*every* hypothetical application of the challenged [provisions]." *Id.* at 498-99 (emphasis added). Plaintiffs have never done that. *Compare* Br. 37 (claiming that "[i]t is hard to imagine any constitutional application[s]" of the challenged provisions) *and* ROA.635, 928 (similar), *with, e.g.,* State Br. 26, 45-46 (giving examples of valid applications). And even if plaintiffs had done that, the district court did not perform the necessary "fact-intensive" analysis. *Paxton,* 121 F.4th at 498. The court did not even mention *Moody* in its analysis of plaintiffs' First Amendment claims—which spans less than 2.5 pages of the preliminary-injunction order—let alone assess all the challenged provisions' hypothetical applications. *See* ROA.976-978.

Third, plaintiffs disagree that a law is "facially vague" only if it is "impermissibly vague in all of its applications." Br. 39; *see* Br. 38-41. But plaintiffs do not dispute that this Court applies that standard to facial vagueness claims. *E.g., La Union del Pueblo Entero v. Abbott,* 167 F.4th 743, 756 (5th Cir. 2026); *United States v. Uhlenbrock,* 125 F.4th 217, 224 (5th Cir. 2024); *McClelland v. Katy Independent School District,* 63 F.4th 996, 1013 (5th Cir. 2023). That is certainly true where—as here, given the Act's focus on government speech—a plaintiff fails to show that the challenged law "reaches a substantial amount of constitutionally protected conduct." *Uhlenbrock,* 125 F.4th at 224. In any event, as

explained below, plaintiffs' facial vagueness claim fails under any conception of the applicable facial standard. *See infra* Part I-C.

Fourth, plaintiffs argue that even if they failed to carry their facial burden then they would still be entitled to relief based on their "alternative[ ]" "as-applied challenges." Br. 41; *see* Br. 41-42. But they did not bring any as-applied challenges. As they have reaffirmed, they brought only facial claims. ROA.1106 ("[t]his is a facial challenge"); *see* Complaint ¶¶ 126-41 & pp. 44-45 (ROA.1022-1026); ROA.1108-1109; ROA.636-637. In suggesting otherwise, plaintiffs cite one sentence in their preliminary-injunction reply brief, which is too late to inject such (wholly undeveloped) claims into the case. Br. 41 (citing ROA.637). And even if that were sufficient to raise as-applied challenges on "classroom and extracurricular speech," ROA.637; *see* Br. 42, plaintiffs have not shown that such applications are likely unlawful on an as-applied basis. *See infra* Parts I-B & I-C. Anyway, even a successful as-applied challenge would not justify the sweeping relief that the district court ordered (or the classwide relief that plaintiffs continue to seek). *See infra* Part II.

**B.    The District Court Erred In Ruling That The Challenged Provisions Likely Facially Violate The First Amendment.**

The district court erred in ruling that the challenged provisions likely facially violate the First Amendment. State Br. 28-44. Plaintiffs' responses (Br. 13-26) lack merit.

1. To start, plaintiffs claim that the challenged provisions are "subject to strict scrutiny" and "presumptively unconstitutional" because they "discriminate based on content and viewpoint." Br. 13 (formatting altered); *see* Br. 13-15, 22-24; 28(j) Letter, Dkt. 74. But the authorities that plaintiffs rely on for that claim are inapposite: they concern private speech. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1017, 1024 (2026) (restrictions on "talk therapy" by private "medical professionals"); *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 5, 11-12 (2018) (ban on "private" political "speech" by voters); *Ashcroft v. ACLU*, 542 U.S. 656, 659-63 (2004) (restrictions on private online speech); *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 823, 833-35 (1995) (restrictions on students' right to "manifest" "private" religious "belie[fs]"); *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 386-87 (1993) (denial of church's access to government property due to its "religious" messaging); *Keyishian v. Board of Regents of University of State of New York*, 385 U.S. 589, 591-93, 597-605 (1967) (bar on state employment based on private "beliefs and associations"). Several of those cases also involve other considerations—like infringement on free-exercise or associational rights—that are absent here. *E.g.*, *Rosenberger*, 515 U.S. at 833-35; *Lamb's Chapel*, 508 U.S. at 386-87; *Keyishian*, 385 U.S. at 591-93, 597-605. By contrast, the challenged provisions here regulate the conduct and messaging of government institutions and employees. State Br. 28-39. And when the

8

government regulates its own speech and conduct, it may make content- and viewpoint-based choices without triggering heightened scrutiny. State Br. 32-37.

Plaintiffs dispute that the government-speech doctrine "insulate[s]" the Act "from strict scrutiny." Br. 24; *see* Br. 22-24. Their arguments fail.

Plaintiffs' many concessions in their brief confirm that the government-speech doctrine applies to (at the least) the vast majority of the Act's applications. Plaintiffs agree that the "challenged provisions" "regulate[ ]" "teachers, administrators, and others who work for [public] schools," Br. 36—that is, government employees. Plaintiffs also agree that States have the "undoubted right to prescribe the curriculum for [their] public schools." Br. 23. And plaintiffs do not meaningfully dispute that in "'devis[ing] the state curriculum' and 'select[ing]' the material that 'teachers will teach to the students,'" "'it is the [S]tate [that is] speaking.'" State Br. 33 (quoting *Chiras v. Miller*, 432 F.3d 606, 613, 614-15 (5th Cir. 2005)); *see also Walls v. Sanders*, 144 F.4th 995, 1002-06 (8th Cir. 2025). Plaintiffs suggest that the challenged provisions go beyond permissible regulation of government speech because they "blot out all discussion of issues related to race, sex[,]" and "other prohibited subjects." Br. 23 (cleaned up). That would not help plaintiffs even if it were true: "[t]he Free Speech Clause ... does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *see Walls*, 144 F.4th at 1003. Anyway, that view is wrong. It ignores the

9

challenged provisions' text, context, and animating purpose, which show that the provisions do not bar all discussion of race, sex, and related topics by educators and do not regulate individual students. State Br. 28-29, 47-50. That is especially clear given the Act's stated purpose to "prohibit" "discriminatory practices" by "educational institutions" (§ 1) and its exceptions for "[s]cholarly research," "creative work[s]," and "compl[iance] with" "applicable academic accreditation standards" (§ 5(b), (j)). *See infra* Part I-C; State Br. 30-31, 38-39, 48-49.

The cases that plaintiffs invoke do not support their arguments. *Contra* Br. 22-24. In *Matal v. Tam*, 582 U.S. 218 (2017), for example, the Supreme Court held that the government-speech doctrine did not apply to a ban on offensive trademarks because "[t]rademarks are private, not government, speech." *Id.* at 233-36, 239. *Matal* reaffirmed that "[t]he Free Speech Clause does not require [the] government to maintain viewpoint neutrality when"—as is also true here—"its officers and employees['] spe[ech]" is at issue. *Id.* at 234. The Court in *Epperson v. Arkansas*, 393 U.S. 97 (1968), did not decide any free-speech issues and held only that a criminal law barring the teaching of evolution on religious grounds violated the Establishment and Free Exercise Clauses. 393 U.S. at 98-99, 103, 106. The challenged provisions here present no such concerns. And the splintered decision in *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982), also did not reach any free-speech holding. *See Little v. Llano County*, 138

10

F.4th 834, 843 (5th Cir. 2025) (en banc) ("*Pico* carries no precedential weight" on the "application of the First Amendment."). If anything, *Pico* supports the State: the fractured opinions widely credit the view that States have broad "discretion in matters of curriculum." 457 U.S. at 869 (plurality opinion) (emphasis omitted); *see id.* at 878 & n.1 (Blackmun, J., concurring in part); *id.* at 889-92 (Burger, J., dissenting); *id.* at 893-95 (Powell, J., dissenting); *id.* at 909-15 (Rehnquist, J., dissenting); *id.* at 921 (O'Connor, J., dissenting).

2. Plaintiffs' other arguments on their free-speech claims also fail.

On educators, plaintiffs claim that the Act intrudes on college and university professors' academic freedom. Br. 16-17. But as the State has explained, the Act expressly protects "[s]cholarly research" and "creative work[s]" by "faculty" and "compl[iance] with" "academic accreditation standards" that safeguard academic freedom. § 5(b), (j); *see* State Br. 38-39. Indeed, plaintiffs concede that, given these exceptions and the Act's overall focus, teachers remain "free to engage" in *any* "subject[ ]" at least "in their own work," with the only "question" being the extent to which they can "inject the banned subjects into the class discussion." Br. 29. That concession (again) dooms their facial claims. It also undermines the central basis of plaintiffs' free-speech theory: it shows that the Act does not intrude on educators' "private speech" on "matter[s] of public concern" and instead regulates their conduct and messaging as "public employee[s]" when acting "pursuant to [their] official duties." *Kennedy v.*

11

*Bremerton School District*, 597 U.S. 507, 528-29, 530 (2022). Plaintiffs also ignore that academic freedom does not mean that educators have a right "to say anything and everything simply because the words are uttered in the classroom context." *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (cited at State Br. 38). Indeed, plaintiffs' own cases make clear that "academic freedom" has "its limits," particularly when it comes to the "practice" of "discrimination"—the very target of the challenged provisions here. *In re Dinnan*, 661 F.2d 426, 431 (5th Cir. 1981) (cited at Br. 16). Plaintiffs also concede (*see* Br. 19, 20) that academic freedom has less purchase at the K-12 level. That (once again) undermines their facial claims and shows why a *Moody* analysis is essential here. *See* State Br. 38-39.

Plaintiffs claim that once a State "choose[s]" to teach a particular "course and subject matter," it "cannot censor classroom discussion related to that subject matter" even at the K-12 level. Br. 20-21; *see* Br. 23. As the State has explained, that view has no basis in law. State Br. 36-37; *see, e.g., Rosenberger*, 515 U.S. at 833 ("the government" may "regulate the content of what is or is not expressed" on its behalf); *Evans-Marshall v. Board of Education of Tipp City*, 624 F.3d 332, 340 (6th Cir. 2010) (States "ha[ve] ultimate responsibility for what goes on in" public schools, "legitimately giving [them] a say over what teachers may (or may not) teach in the classroom."); *Chiras*, 432 F.3d at 611-13. Plaintiffs ignore that their view would upend state control of public education by

giving individual teachers veto power over curricular choices. Indeed, on plaintiffs' view, a State could not "prohibit[ ]" a public-school history teacher from instructing students that the Holocaust never happened or that "slavery" played *no* "role" in the Civil War: by plaintiffs' lights, blocking those teachings constitutes impermissible "censor[ship]" of "classroom discussion." *Contra* Br. 10, 20-21. That is not the law.

Plaintiffs invoke *Keyishian* and *Epperson* to support their claim that educators must be free to teach "disfavored concepts." Br. 16-17, 19-20. Those cases do not help them. The anti-sedition laws condemned in *Keyishian* restricted educators' private speech and associations "inside the classroom or out," and so went far beyond reasonable restrictions on state educators' in-school conduct and messaging. 385 U.S. at 601-02; *cf. Kennedy*, 597 U.S. at 527-28 (distinguishing *Keyishian* from cases involving "public employee[s] speak[ing] pursuant to [their] official duties") (cleaned up). And as noted, *Epperson* was decided on "narrower" establishment and free-exercise grounds. 393 U.S. at 106. Unlike the Act here, there was "[n]o suggestion" in that case that Arkansas' ban on teaching evolution was "justified by considerations of state policy other than [favored] religious views." *Id.* at 108. Plaintiffs cite no case supporting the view that individual educators can override a State's reasonable regulation of public-school administration.

On students, plaintiffs claim that the challenged provisions violate students' "right ... to receive speech" in the academic setting. Br. 17-18

13

(citing *Martin v. City of Struthers*, 319 U.S. 141 (1943)). They add that that the challenged provisions "den[y]" college and university students "the right to learn from and openly discuss [certain] viewpoints" and "the opportunity" to "engag[e] in debate on certain subjects." Br. 17. But the Act does not regulate individual students: it regulates educational "institution[s]." § 3; *see infra* Part I-C; State Br. 28-32, 40, 43. The Act does not prevent students from "discuss[ing]" or "debat[ing]" anything. To the extent plaintiffs suggest that students' "right to learn" or to "receive speech" is infringed by barring public schools from endorsing or indoctrinating students on particular concepts—such as the view that one race or sex is inherently superior, *see* §§ 2(e)(i), 3(f)—that claim fails. Plenty of cases make clear that students do not have the right to control a public-school curriculum or to be instructed on specific topics. State Br. 40-41. To those cases, plaintiffs have no response. And plaintiffs ignore this Court's holding that the First Amendment "does not" convey a right to "receive information from the government." *Little*, 138 F.4th at 845; *see* State Br. 39-41.

Plaintiffs invoke *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), for the (undisputed) proposition that "students are entitled to freedom of expression." Br. 20. But again, the Act does not regulate students. And any incidental impact on student speech in individual cases can be justified by the State's "legitimate pedagogical concerns" about DEI-related discrimination and

14

indoctrination, both of which are "inconsistent with" the State's "basic educational mission." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 266, 273 (1988). The challenged provisions are a "constitutionally valid" means of addressing those concerns "in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506, 511.

Last: Plaintiffs take issue with the Act's exception for "activit[ies]" of "registered student organization[s]" that do not rely on "state funds." § 5(c); *see* Br. 18-19. They do not suggest that individual student groups have a right to state funding in the first place. Instead, they claim that the Act unlawfully denies funding to student groups with missions that concern "sex, gender identity, sexual orientation, DEI, and related concepts" "because of their viewpoints." Br. 18 (citing *Rosenberger*, 515 U.S. at 836). But the Act does not target student speech related to the "concepts" that plaintiffs identify. *Contra ibid.* The Act bars public-school institutions and officials from, for example, "[e]ngag[ing] in" or "endors[ing]" specifically identified "divisive concepts" that (in the Legislature's judgment) constitute or promote invidious discrimination. §3(b), (f); *see* § 2(e). And so the exception in section 5(c) ensures that state funds are not used for specific "activit[ies]" that endorse or promote invidious discrimination with the State's imprimatur. *Cf. Hazelwood*, 484 U.S. at 270-73 (noting greater "authority" over "school-sponsored expressive activities" to ensure that particular "views" "are not erroneously attributed" to state institutions); *Rosenberger*, 515 U.S. at

15

834-35 (distinguishing students' "private speech" made "independent[ly]" from a state university's "control" and "responsibility" from student speech that could be attributed to the State).

Plaintiffs' criticisms of the Act amount to policy disagreements with the State's legitimate curricular choices and control over its own employees' conduct. That is not a basis for blocking the Act on First Amendment grounds.

## C. The District Court Erred In Ruling That The Challenged Provisions Are Likely Facially Void For Vagueness.

The district court erred in ruling that the challenged provisions are likely facially vague. State Br. 44-51. Plaintiffs' responses (Br. 26-30) fail.

1. Plaintiffs' concessions doom their claim that the challenged provisions are facially vague. Plaintiffs agree that the "challenged provisions" "apply to teachers, administrators, and others who work for [public] schools." Br. 36. They concede that the challenged provisions "target[ ]" DEI-related "discrimination," though not as "directly" as plaintiffs would prefer. Br. 10. They agree that the provisions (along with the Act's listed exceptions) leave "teachers and students" "free to engage" with all "subjects" at least "in their own work." Br. 29 (cleaned up). And they do not dispute that the district court's vagueness ruling rests in part on the demonstrably erroneous view that the Act fails to "defin[e]" key terms like "divisive concepts" (defined in § 2(e)) and "gender identity"

16

(defined in § 2(j)). State Br. 48; *see* ROA.703-704; ROA.976. These concessions alone show that the challenged provisions have many clear (nonvague) applications and a plainly legitimate sweep, and so are not facially vague under the "daunting" "standard" that applies to "facial vagueness" claims. *Woodlands Pride v. Paxton*, 168 F.4th 293, 308 (5th Cir. 2026); *see* State Br. 44-46.

2. Plaintiffs' other arguments on their vagueness claim lack merit.

*First*, plaintiffs dispute that the challenged provisions do not bar "discuss[ing]" or "instructing students" on any and all "issues related to race" because (plaintiffs observe) the Act addresses "formal or informal education." Br. 28. The phrase "formal or informal education" appears in provisions on mandatory "diversity training." §§ 2(d), 3(i); *see* State Br. 10-11, 48-49. Those provisions must be read in context—including with the related definitions of "[d]iversity, equity and inclusion" in section 2(a). That shows that the Act is focused on efforts to mandate "formal or informal education" or "other ... program[s]" that (for example) "promote differential treatment" of students or educators "based on race, sex, color or national origin" or that "compel" students or educators to "change their beliefs" on these issues. §§ 2(a)(ii), (iv), 3(i). The State has never suggested that the Act embraces "discussion" of (for example) "civil rights history," "Dr. Martin Luther King, Jr.," or "the Fourteenth Amendment" because those "issues" are not "related to race." *Contra* Br. 28. Rather, the State has maintained that the Act does not bar discussing such issues

17

because doing so does not require educators to (for example) "endorse" or "promote" invidious discrimination or "compel" students to change their personal beliefs. *See* §§ 2(a)(iv), 3(f). To claim that the Act bars such discussion, plaintiffs must adopt an untenable view of an Act that explicitly embraces the view that "[a]n individual's moral character" is not "determined by" demographics and that is aimed at preventing invidious "discriminat[ion]" in schools. §§ 1, 2(e)(v); *see* State Br. 46-50.

Plaintiffs also claim that the Act's bars on "endors[ing]," "promot[ing]," or "[e]ngag[ing] in" certain overtly racist, sexist, or otherwise discriminatory "concepts" "raise[ ] the question of whether simply discussing" or "describing" those concepts "violates" the Act. Br. 28-29; *see* § 3(b), (f). That is not so. The plain meanings of *endorsing*, *promoting*, and *engaging in* require a degree of official approval or active participation that "discussing" or "describing" does not. *Compare* Webster's Third New International Dictionary 749 (1993) (*endorse* means "to express definite approval or acceptance of"; to "vouch for"), *id.* at 1815 (*promote* means "to move forward"; "to advance in station, rank, or honor"; "to contribute to the growth" of), *and id.* at 751 (*engage* means "to offer ... as backing to a cause or aim," and *engage in* means "to employ or involve oneself"; "to take part," "participate"), *with id.* at 648 (*discuss* means "to investigate" "by reasoning or argument"; "to converse or talk about") *and id.* at 610 (*describe* means "to represent ... for the knowledge or understanding of others"; "to convey" a "notion of"). And the Act's

18

broader context and focus make clear that the Act is concerned with discriminatory conduct and indoctrination using discriminatory ideologies, not with instructing students on key parts of our history. State Br. 46-50.

Plaintiffs invoke *SEIU, Local 5 v. City of Houston*, 595 F.3d 588 (5th Cir. 2010), which faulted a city ordinance that provided "no manner" for ordinary citizens to determine when a small, "private" outdoor event became a "public gathering" that required a permit. *Id.* at 605; *see* Br. 27-28. Here, by contrast, statutory "context" informs the Act's use of "common-sense" terms like *promote*, *endorse*, or *engage in*, which can be read according to their "ordinary English meaning[s]" and alongside the Act's "statutory definitions" of other key terms. *La Union del Pueblo Entero v. Abbott*, 167 F.4th 743, 757-58 (5th Cir. 2026); *cf. United States v. Williams*, 553 U.S. 285, 294-95, 305-06 (2008) (term "promotes" not vague in context). *SEIU* itself rejected a vagueness challenge to a different ordinance that included the undefined phrase "*expressing* or *celebrating* views or ideas," which (this Court said) "provides a discernible and objective standard." 595 F.3d at 601-02 (emphases added).

*Second*, plaintiffs dispute that the Act does not directly regulate individual students. Br. 27-28; *see* Br. 8-9, 11. But the Act states that all the prohibitions in section 3—including the bars on "endors[ing]," "promot[ing]," or "[e]ngag[ing] in" discrimination, § 3(b), (f)—apply to

19

"public[-]school" "*institution[s]*." § 3 (emphasis added); *see also* § 1 (The Act "prohibit[s] public schools and public postsecondary educational institutions from taking certain actions and engaging in discriminatory practices."). Reading "public[-]school" "institution[s]" to encompass individual students—who, of course, are not state actors—makes no sense. The Act's structure confirms that point. The Act's prohibitions target actions that students lack the authority to take. *E.g.*, § 3(a) ("[e]stablish[ing] or maintain[ing] a diversity, equity and inclusion office"); § 3(d) ("[r]equir[ing]" "diversity statements" in, *e.g.*, "hiring" or "contract renewal"). And contrary to plaintiffs' suggestion, the Act's exceptions for "[s]cholarly research" and "creative work" by "students" (and "faculty") in section 5(b) do not negate the Act's clear text and focus on institutional actors or "imply[] that students are covered for everything other than scholarly research or a creative work." *Contra* Br. 8 (cleaned up). Rather, the Act excepts "[s]cholarly research" and "creative work[s]" (and their "dissemination" (§ 5(b)) because such activities are likely to involve collaboration with faculty members or other school officials who are otherwise covered by the Act.

Plaintiffs also dispute that the Act does not provide for penalties for educators or students. Br. 27; *see* Br. 8-9, 11. But as plaintiffs have admitted, the Act does not include any penalties for educators or students (or any mechanism for applying such penalties). §§ 1, 3, 7-9. (Indeed, the only time the Act mentions penalties in connection with educators or

20

students is in a provision that *bars* schools from "[p]enaliz[ing]" "student[s]" or "faculty" for their refusal to embrace DEI. § 3(h).) Plaintiffs argue that the Act remains impermissibly vague because an individual "educator," "student," or "school board" "*might ...* come to the opposite conclusion." Br. 27 (emphasis added). But plaintiffs cannot manufacture vagueness—and certainly not on a pre-enforcement facial claim—by peddling a view that is at war with the statute's "plain language." *Doe I v. Landry*, 909 F.3d 99, 116-18 (5th Cir. 2018); *see La Union*, 167 F.4th at 759 (rejecting pre-enforcement vagueness claim based on "speculative scenarios" that "are inconsistent with a reasonable interpretation of the statute"); *Williams*, 553 U.S. at 305-06. Plaintiffs also suggest that the Act's lack of a "state-of-mind requirement is an additional indication of unconstitutional vagueness." Br. 30. But the lack of a mens rea requirement simply reflects that the Act does not include penalties for individual educators or students.

*Last*, plaintiffs fault the Act's exceptions for scholarly research, creative work, and compliance with academic-accreditation standards, which (plaintiffs claim) do not fully address "classroom lessons and discussions" and are otherwise "confusing." Br. 29-30. But the Act's exceptions (at least) cabin the challenged prohibitions' application and reinforce that the Act targets discriminatory conduct and messaging by public-school employees, not students' or educators' individual speech. State Br. 24-25, 30-31. Plaintiffs' own brief shows that the exceptions

ensure that the Act carves out students' and educators' "own work." Br. 29. The exceptions do not render the Act impermissibly vague.

## II.    Even Putting The Merits Aside, This Court Should Reject Or Dramatically Narrow The Preliminary Injunction.

The equities support rejecting or dramatically narrowing the injunction. State Br. 51-56. Plaintiffs' responses (Br. 43-49) fail.

On irreparable harm, plaintiffs highlight claimed injuries to their First Amendment rights. Br. 43. That claim collapses with plaintiffs' merits arguments. *Supra* Parts I-B & I-C. And any potential infringement on an individual student's or teacher's free-speech rights in hypothetical future cases can be addressed in as-applied challenges.

On the equities, plaintiffs dispute that the Act serves the State's interest in preventing public-school students and employees from facing DEI-related discrimination. Br. 44. The Act—which was enacted to "prohibit" "discriminatory practices" and to "ensure" that public schools operate based on "individual merit, qualifications and academic performance," § 1—does that. State Br. 45-46, 51-54. The Act also helps to ensure that Mississippi schools comply with federal anti-discrimination laws and guidance and thus retain access to federal funding. State Br. 51-53. Plaintiffs allege that the State has not "explain[ed]" how enjoining enforcement of the challenged provisions "would lead to the withholding of federal funds." Br. 46. And they note that the federal government has disclaimed enforcement actions based

on the Department of Education's February 2025 "Dear Colleague" letter on DEI. Br. 45-46 & n.11. But plaintiffs do not dispute that the federal government remains committed to combating DEI-related discrimination in schools, including by withholding federal funding from non-compliant institutions. State Br. 7-9, 52-53; *see*, *e.g.*, General Services Administration, *Information Collection; System for Award Management Registration Requirements for Financial Assistance Recipients*, 91 Fed. Reg. 3726 (Jan. 28, 2026) (pending notice from GSA that would require federal-funding recipients to certify compliance with anti-DEI guidance). Indeed, the Department of Justice—which has not rescinded its 2025 Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination, *see* State Br. 8-9, 45-46—is pursuing enforcement actions against schools that use DEI. *E.g.*, Trump DOJ Investigating Possible Race Discrimination At UC San Diego, Stanford Medical Schools, L.A. Times (Mar. 26, 2026), bit.ly/41IpgA0; U.S. Department of Justice, Justice Department Sues Harvard University for Withholding Race-Related Admissions Documents (Feb. 13, 2026), bit.ly/4m5I99D; U.S. Department of Justice, Justice Department Joins Lawsuit Against Racial Discrimination in Admissions at UCLA's Medical School (Jan. 28, 2026), bit.ly/419emDe.

On the injunction's scope, plaintiffs claim that the district court properly granted them universal relief "[b]ecause" plaintiffs brought "a putative class action" and because courts "routinely certif[y] classes" in

23

"civil rights cases brought against government defendants." Br. 48; *see* Br. 47-49. But, as plaintiffs do not dispute, the district court did not certify any classes or address Fed. R. Civ. P. 23's requirements for class certification before awarding universal relief. State Br. 55-56. Plaintiffs themselves note that they filed a motion for class certification only last month—nine months after they filed this lawsuit and nearly six months after the State brought this appeal. Br. 47-48. The district court has yet to rule on that motion. Next, based on *AARP v. Trump*, 145 S. Ct. 1364 (2025) (per curiam), plaintiffs claim that "courts may issue temporary relief to a putative class" without "decid[ing] whether a class should be certified." Br. 47. But *AARP* at most suggests that courts may issue "temporary relief" to putative classes where "exigent circumstances" justify departing from normal procedures. State Br. 56 (quoting 145 S. Ct. at 1368, 1369). It does not bless months- or years-long injunctions that defy the Court's holding that federal courts lack "equitable authority" to issue "universal injunctions" that "extend[ ] beyond the parties" to a lawsuit. *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2550, 2552 (2025); *see* State Br. 53-54, 55-56. There is no exigency here.

Plaintiffs also echo the district court's view that a universal injunction is "necessary to afford complete relief" and that a more "limited" injunction would be "impracticable" to implement. Br. 49. The State already refuted those points. State Br. 54-55. "Complete relief" means (at most) relief "between the parties." *CASA*, 145 S. Ct. at 2557

(emphasis omitted). The injunction here covers countless nonparties. As to implementation, any hypothetical "impractica[lities]" in implementing a more targeted injunction would fall on the State, not on plaintiffs. That does not justify awarding broader relief to plaintiffs—let alone relief that exceeds federal courts' authority. Plus, neither plaintiffs nor the district court have explained why it is more "[ ]practicable" for institutions to implement the relief the district court ordered. As plaintiffs note, they challenged—and the district court blocked—"only" some of the Act's "restrictions." Br. 10; *see* ROA.981. But those "restrictions" often overlap with, and were intended to operate alongside, other provisions of the Act that the injunction does not touch. *E.g.*, § 3(b) (cross-referencing sections 2(d) and (e)); § 3(i) (incorporating term "diversity training" as defined in section 2(d)). Schools throughout the State thus face the practical difficulty of determining how the district court's injunction might affect their duty to comply with provisions of the Act that remain in force.

## CONCLUSION

This Court should reverse the preliminary-injunction order.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Justin L. Matheny*

SCOTT G. STEWART
  *Solicitor General*
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  *Deputy Solicitors General*
DANIEL KIM
  *Assistant Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Email: justin.matheny@ago.ms.gov

*Counsel for Defendants-Appellants*

April 20, 2026

26

## CERTIFICATE OF SERVICE

I, Justin L. Matheny, hereby certify that this brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: April 20, 2026

> s/ Justin L. Matheny
> Justin L. Matheny
> *Counsel for Defendants-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 5,840 words, excluding parts exempted by Fed. R. App. P. 32. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: April 20, 2026

> s/ Justin L. Matheny
> Justin L. Matheny
> *Counsel for Defendants-Appellants*